

Charles S. LiMandri, SBN 110841
 cslimandri@limandri.com
Paul M. Jonna, SBN 265389
 pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
 jtrissell@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Peter Breen, *pro hac vice**
 pbreen@thomasmorsociety.org
Christopher J. Galiardo, *pro hac vice**
 cgaliardo@thomasmoresociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
*Application forthcoming

*Attorneys for Plaintiff Roger Lopez*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ROGER LOPEZ,

       Plaintiff,

   v.

CITY OF SAN DIEGO,

       Defendant.

Case No.: 3:24-cv-01577-LL-SBC

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Judge:      Hon. Linda Lopez
Courtroom:   5D
Hearing Date:  December 18, 2024

PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND....................................................................................1

ARGUMENT........................................................................................5

I.  Likelihood of Success on the Merits......................................5

    A.  The challenged ordinance violates Mr. Lopez's freedom of speech. ....................................................5

        1.  The speech ban discriminates on the basis of content and viewpoint.................................... 6

            a.  Content-based discrimination. ..............................7

            b.  Viewpoint-based discrimination..........................10

        2.  The content and viewpoint-based ban serves no government interest. ................................... 11

        3.  The content and viewpoint-based ban is not the least restrictive means of achieving any theoretical compelling interest. ....................................14

        4.  The speech ban even would fail as a time, manner, and place regulation. ......................................16

    B.  The challenged ordinance violates Mr. Lopez's due process rights..........................................................19

        1.  The ordinance's vagueness violates due process........................................................ 20

        2.  The ordinance's overbreadth violates due process........................................................ 22

II.  The Remaining Preliminary Injunction Factors Favor Relief. ....................................................... 24

CONCLUSION.................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ....................................................................................6, 11

*Akron v. Akron Ctr. for Reprod. Health, Inc.*,
    462 U.S. 416 (1983)......................................................................................... 21

*Alexander v. S.C. State Conf. of the NAACP*,
    602 U.S. 1 (2024) ........................................................................................... 11

*Animal Legal Def. Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) .........................................................................9

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) .......................................................................24

*Betschart v. Oregon*,
    103 F.4th 607 (9th Cir. 2024).........................................................................5

*Boos v. Barry*,
    485 U.S. 312 (1988).........................................................................................8

*Brown v. City of Pittsburgh*,
    586 F.3d 263, 282 (3d Cir. 2009)..............................................................13, 19

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)....................................................................................12, 17

*Butcher v. Knudsen*,
    38 F.4th 1163 (9th Cir. 2022) ......................................................................20

*Camenzind v. Cal. Expo. & State Fair*,
    84 F.4th 1102 (9th Cir. 2023) ...................................................................... 17

*Carey v. Brown*,
    447 U.S. 455 (1980) ........................................................................................9

*Carlson v. California*,
    310 U.S. 106 (1940)......................................................................................20

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022) ...................................................................................... 7, 9

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)........................................................................................20

ii

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) ....................................................................... 21

*Collins v. City of Harker Heights, Tex.*,
    503 U.S. 115 (1992) ........................................................................ 20

*Colten v. Kentucky*,
    407 U.S. 104 (1972) ........................................................................ 20

*Comm. to Def. Reprod. Rts. v. Myers*,
    29 Cal. 3d 252 (1981) ..................................................................... 24

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019) .......................................................... 20

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................ 20

*Fogel v. Collins*,
    531 F.3d 824 (9th Cir. 2008) .......................................................... 17

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ........................................................................ 16

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) ...................................................................... 23

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................. 16, 21, 22

*Green v. Miss U.S.A., LLC*,
    52 F.4th 773 (9th Cir. 2022) ........................................................... 22

*Hill v. Colorado*,
    530 U.S. 703 (2000) ......................................................... 2, 8, 10, 22

*Hoye v. City of Oakland*,
    653 F.3d 835 (9th Cir. 2011) ....................................................... 6, 10

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) .......................................................................... 6

*Interpipe Contracting, Inc. v. Becerra*,
    898 F.3d 879 (9th Cir. 2018) .......................................................... 11

*Isaacson v. Mayes*,
    84 F.4th 1089 (9th Cir. 2023) ......................................................... 15

iii

*Junior Sports Mags. Inc. v. Bonta*,
    80 F.4th 1109 (9th Cir. 2023) ........................................................................ 24

*Kusper v. Pontikes*,
    414 U.S. 5 (1973) ........................................................................................... 22

*Marinello v. United States*,
    584 U.S. 1 (2018) ........................................................................................... 22

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ............................................................................... passim

*Meinecke v. City of Seattle*,
    99 F.4th 514 (9th Cir. 2024) .................................................................... 17, 18

*Minority Television Project, Inc. v. FCC*,
    736 F.3d 1192 (2013) ...................................................................................... 2

*Missouri Pac. Ry. Co. v. Humes*,
    115 U.S. 512 (1885) ...................................................................................... 20

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) .................................................................................... 6

*Munn v. Illinois*,
    94 U.S. 113 (1876) ........................................................................................ 19

*Murdock v. Pennsylvania*,
    319 U.S. 105 (1943) ...................................................................................... 20

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ........................................................................................ 13

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................................... 17

*NAACP v. Button*,
    371 U.S. 415 (1963) ...................................................................................... 21

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ........................................................................................ 6

*Palmer v. City of Euclid*,
    402 U.S. 544 (1971) ...................................................................................... 20

*Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*,
    819 F.2d 875 (9th Cir. 1987) ..................................................................... 6, 12

*Porter v. Martinez,*
    68 F.4th 429 (9th Cir. 2023) ........................................................ 17

*Rajaram v. Meta Platforms, Inc.,*
    105 F.4th 1179 (9th Cir. 2024)..................................................... 22

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................ 7, 8

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988)..................................................................... 16

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) ...................................................................... 24

*S. Bay United Pentecostal Church v. Newsom,*
    141 S. Ct. 716, 718 (2021) ........................................................... 12

*Santa Monica Nativity Scenes Cmte. v. City of Santa Monica,*
    784 F.3d 1286 (9th Cir. 2015) ...................................................... 18

*Schenk v. Pro-Choice Network of W. N.Y.,*
    519 U.S. 357 (1997) ......................................................... 2, 15, 21

*Sisters for Life, Inc. v. Louisville-Jefferson County,*
    56 F.4th 400 (2022) ...................................................................... 18

*Smith v. Goguen,*
    415 U.S. 566 (1974) ..................................................................... 20

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ..................................................................... 17

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024)................................................................... 5

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ...................................................... 12

*Tucson v. City of Seattle,*
    91 F.4th 1318 (9th Cir. 2024) ................................................ 20, 22

*Twitter, Inc. v. Garland,*
    61 F.4th 686 (9th Cir. 2023)........................................................ 15

*United States v. Allen,*
    34 F.4th 789 (9th Cir. 2022) ....................................................... 18

v

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

*Valenzuelo Gallardo v. Lynch*,
  818 F.3d 808 (9th Cir. 2016) ........................................................... 21

*Vasquez v. Rackauckas*,
  734 F.3d 1025 (9th Cir. 2013) .......................................................... 20

*Victory Processing, LLC v. Fox*,
  937 F.3d 1218 (9th Cir. 2019) .......................................................... 10

*Vidal v. Elster*,
  602 U.S. 286 (2024) ...................................................................... 6, 11

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980) ........................................................................ 15

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ...................................................................... 7, 8

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) ...................................................... 5, 7, 11


**Statutes**

18 U.S.C. § 248(a)(1) ........................................................................ 16

18 U.S.C. § 248(a)-(b) ...................................................................... 15

Act of July 14, 1798, 5th Cong., 2d sess. ....................................... 24

Cal. Const. § 1.1 ............................................................................. 16

Cal. Pen. Code § 407 ...................................................................... 15

Cal. Pen. Code § 409 ...................................................................... 15

Cal. Pen. Code § 416(a) .................................................................. 15

Cal. Pen. Code § 422 ...................................................................... 16

Cal. Pen. Code § 422.6 ................................................................... 16

Cal. Pen. Code § 422.7 ................................................................... 16

Cal. Pen. Code § 422.75 ................................................................. 16

Cal. Pen. Code § 423.2(c) ............................................................... 15

Cal. Pen. Code § 423.3(a)-(b) ......................................................... 15

Cal. Pen. Code § 602(o) .................................................................. 15

vi

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

Cal. Pen. Code § 646.9 ................................................................. 16

San Diego Mun. Code § 52.1002 ............................................ 4, 8, 21

San Diego Mun. Code § 52.1003(b)(2) .......................................... 8

San Diego Mun. Code § 52.1003(c)(1)(iii) ..................................... 7

San Diego Mun. Code § 52.1003(f)(2) .......................................... 10

San Diego Mun. Code § 52.1004(1) ............................................... 8

San Diego Mun. Code § 52.1006(b) ............................................... 4

San Diego Mun. Code § 56.27 ...................................................... 15

San Diego Mun. Code § 59.5.0501(b) ........................................... 23

San Diego Mun. Code § 82.29 ...................................................... 15

U.S. Const. amend XIV ................................................................. 19

## **Other Authorities**

*Abortion Clinic Violence: Hearings Before the Subcomm. on Crime & Crim.
    Just. of the H. Comm. on the Judiciary*, 103d Cong., 1st Sess. (1993)
    (statement of Rep. Charles Schumer, Chairman of the Subcomm.
    on Crime & Crim. Just.) ........................................................... 9

Cass Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315 (2000) ..................... 22

City of San Diego, City Council Meeting (May 21, 2024) ................................... 8, 9

City of San Diego, *Historical Crime Reports: By Neighborhood* (2016-2023) ........... 13

Diana Green Foster, et al., *Effect of Abortion Protestors on Women's
    Emotional Response to Abortion*, 87 Contraception 81 (2013) ......................... 17

Elena Kagan, *Private Speech, Public Purpose: The Role of Government
    Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413 (1996) .............. 24

George Washington, *Farewell Address* (1796) ............................................. 24

*Implementation of the Freedom of Access to Clinic Entrances Act: Hearing
    Before the Subcomm. on Crime and Crim. Just. of the H. Comm. on
    the Judiciary*, 103d Cong., 2d Sess. (1994) (statement of Deval
    Patrick, Assistant Attorney General, Civil Rights Division, U.S.
    Dep't of Just.) .................................................................... 15

vii

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

John R. Aiello, *Human Spatial Behavior*, *in* Handbook of Environmental Psychology 359 (Daniel Stokols & Irwin Altman eds., 1987)........................ 14

Lauren Rankin, *Bodies on the Line: At the Front Lines of the Fight to Protect Abortion in America* (2023) ......................................................... 11, 13

Laurence Tribe, *Response*, 28 Pepp. L. Rev. 747 (2001) ............................................ 2

Nat'l Abortion Fed., *2022 Violence and Disruption Statistics* ................................. 12

Nat'l Safety Council, *Odds of Dying Due to Injury, United States, 2022* (2024) .......................................................................................................... 12

O. Michael Watson, *Proxemic Behavior: A Cross-Cultural Study* (1970).................. 14

Press Release, Planned Parenthood, *Planned Parenthood Announces $16 Million Paid Media Campaign on National Abortion Access Crisis Ahead of Supreme Court Decision* (Apr. 27, 2022)........................................ 18

Robert E. Rakel, *Establishing Rapport*, *in* Textbook of Family Medicine (8th ed. 2012)............................................................................................ 14

Tomoko Shimoda, et al., *Examining Modifications of Noise Generated by Nurses' Footsteps and the Use of Pass-By Objects*, 10(2) Open J. of Nursing 184 (2020)................................................................................... 14

U.S. Dep't of Just., *Special Litigation Section Cases and Matters: FACE* (Oct. 14, 2024) ...................................................................................... 15

Viktor E. Frankl, *Man's Search for Meaning* (2006) ............................................... 25

William Shakespeare, *Macbeth* ............................................................................... 22

Yoav Arieh & Lawrence E. Marks, *Measurement of Loudness, Part II: Context Effects*, *in* Springer Handbook of Auditory Research: Loudness 57 (Mary Florentine et al. eds., 2011) ............................................ 3

Ziad Munson, *Becoming an Activist: Believers, Sympathizers, and Mobilization in the American Pro-Life Movement* (2002) (Ph.D. dissertation, Harvard University) (ProQuest) ............................................ 19

viii

# INTRODUCTION

Roger Lopez quietly prays a few days a month near San Diego's abortion clinic. Some days he sees a woman falter down the sidewalk toward him with the bloodshot eyes he knows often signal that a woman feels forced to abort due to lack of support. He waves, smiles, and offers her a soft hello. If she wants to talk, his day is hers. And if she needs help, he shares a pamphlet that lists local nonprofits she can call for free resources from prenatal care to Pampers and parenting classes. No strings attached. *See* Verif. Compl. ¶ 16 & Exhibits B-D.[1]

Most women Mr. Lopez meets outside the clinic welcome that information, and about 100 of them have chosen life after speaking with him. But because their reproductive choice costs the clinic considerable revenue, its operator has invested heavily in city council campaigns in recent years to keep other women in the dark. The investment matured on May 21, when councilmembers fresh off partying at the operator's annual gala pushed through an ordinance written to stifle pro-life speech. *See* Exhibit A, Ordinance O-2024-114. The grateful clinic operator promptly backdoored a campaign contribution to the deputy city attorney who oversaw the ordinance drafting process. *See* Exhibit H.

The ordinance has worked as it was designed to since it took effect in July, muzzling Mr. Lopez and other pro-life sidewalk counselors with its unconstitutional bubble zones, unprecedented noise ordinance, and unintelligible descriptions of prohibited conduct. Mr. Lopez's constitutional injuries mount by the day and subvert the public interest, compelling him to ask the Court to enjoin Ordinance O-2024-114 pending final judgment in this case.

# BACKGROUND

Some of San Diego's efforts to suppress pro-life speech in the 1990s are well remembered by locals of a certain age: memories of pro-lifers penned behind fences

---

[1] Exhibits A-G are attached to and authenticated by the Verified Complaint. Exhibits A, and H-S are attached to and authenticated by the declaration of Paul M. Jonna, Esq.

1

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

1  or police with nunchakus plowing through peaceful protestors do not fade fast. *See*

2  Verif. Compl. ¶ 20. Less remembered, though, are speech-free bubble zones outside

3  city abortion clinics that San Diego added to the municipal code in 1993 to prohibit

4  pro-lifers from approaching passersby within 100 feet of a clinic. *See* Exhibit I.

5      San Diego got rid of those bubble zones in 1997 after the city attorney's office

6  concluded they were unconstitutional in light of *Schenck v. Pro-Choice Network of*

7  *Western New York*, 519 U.S. 357 (1997). *See* Exhibit J. The zones remained consigned

8  to the dustbin of history for decades without dustups outside clinics: the last reported

9  clinic blockade here occurred in 1996, and today a woman is eight times likelier to die

10  from a car striking her while she is on a sidewalk than to be harassed by a pro-lifer. *See*

11  Verif. Compl. ¶¶ 35-36. The city attorney's office revisited its 1997 analysis in 2014

12  only to acknowledge that its existing (and more narrowly tailored) restriction on pro-

13  life sidewalk speech sufficiently protected "significant government interests of

14  preserving access to health care facilities." *See* Exhibit K.

15      The Supreme Court and Ninth Circuit have agreed with that view at least

16  twenty-one times since *Schenk*.[2] But as City Attorney Mara Elliott neared the end of a

17  term she had won after being endorsed by Planned Parenthood, she held a press

18  conference to denounce *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215

19  (2022), and propose restoring bubble zones to the municipal code supported only by

20  the thin reed of *Hill v. Colorado*, 530 U.S. 703 (2000). *See* Verif. Compl. ¶ 21. She

21  charged her attorneys to work with abortion activists across California to draft the

---

[2] This compares to only one time holding otherwise. *See Hill v. Colorado*, 530 U.S. 703 (2000). Long derided even by pro-choice constitutional scholars, *e.g.*, Laurence Tribe, *Response*, 28 Pepp. L. Rev. 747, 750 (2001), *Hill* was later read its last rites by an embarrassed Supreme Court that confessed the case had "distorted First Amendment principles" to backward engineer a desired holding. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 287 n.65 (2022). By any reasonable measure, *Hill* is now a dead letter. *Cf. Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1223 (2013) (Kozinski, J., dissenting). *See Price v. City of Chicago*, 915 F.3d 1107 (7th Cir. 2019) (explaining *Hill*'s de facto demise before *Dobbs*).

2

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

1  necessary ordinance, and in May unveiled it for city council approval. *See id.* ¶ 22 &
2  Exhibit E.

3      That unveiling was in many ways anticlimactic. The ordinance drafters,
4  despite two months of work, largely just disinterred the moldered 1993 bubble zones
5  rather than molding new ones. Same size, same zone, same private right of action,
6  same remedies, same tendentious but evidence-free claims of rampant harms.
7  *Compare* Exhibit I, *with* Exhibit A. But there also was moxie amid the mothballs, with
8  the proposed ordinance imposing two new restrictions specially designed to suppress
9  pro-life speech outside the city's abortion clinic at First Avenue and Grape Street.
10  First, a passerby would now be required to provide unmistakable *express* consent
11  before a counselor could approach her: the clear and easy *opt out* of 1993 retconned as
12  a newly opaque and difficult *opt in*. *See* Verif. Compl. ¶ 24. Second, bubbles would
13  now encircle not only pedestrians but also each of the thousands of vehicles that daily
14  pass by the clinic. *See id.* ¶ 24.

15      The sight of counselors darting around sidewalks to evade so many bubbles by
16  itself would scare away many passersby. To keep less skittish women in the dark too,
17  the city attorney proposed a new noise ordinance to ensure counselors' requests for
18  permission to approach could rarely be heard. *See id.* ¶ 27. They would be forbidden
19  from naturally raising their voice to a hearable volume if doing so could "harass" or
20  "intimidate" a reasonable person—or even "discomfort" or "annoy" her. *See id.*
21  ¶¶ 27, 28. And they would be prohibited from artificially amplifying their voice
22  beyond 55 decibels as heard from 10 feet away—a volume only about a third as loud
23  as a normal close-in conversation and a fourth as loud as local traffic. *See id*. ¶¶ 27, 42
24  & n.2; Yoav Arieh & Lawrence E. Marks, *Measurement of Loudness, Part II: Context*
25  *Effects*, *in* Springer Handbook of Auditory Research: Loudness 57, 57-58 (Mary
26  Florentine, et al. eds., 2011) (perceived loudness doubles every 10 dB).

27      None of this is needed, as no evidence exists that anyone outside a San Diego
28  abortion clinic has been harassed or intimidated by a pro-life protester in decades. But

the ordinance the city attorney proposed so vaguely defined both terms that she and future city attorneys (and any "aggrieved" private party) could bring almost *any* word or tone of voice into the terms' ambit. San Diegans were advised only that:

> *Harass* and *harassment* mean engaging in knowing and willful actions or course of conduct directed at a specific person or persons that would seriously alarm or aggravate, cause substantial distress to, intimidate, terrorize, threaten, or torment a reasonable person.

§ 52.1002. The ordinance failed to even hint at the meaning of any of the key words in that definition. And even where it "clarified" by saying what harassment is *not*, it merely fell into a tautology reducible to "not harassing is not harassment."

Such a vague prohibition would drive any sensible person to excessively self-censor, especially given the severe penalties the city attorney proposed for a violator. Any undefined "aggrieved person" could sue him for costs, attorneys' fees, and a civil penalty of up to $2,500 for each violation. *Id.* Even worse, he could be incarcerated for longer than the average drug trafficker for such innocuous actions as bending his arm or ear toward a family of four eight feet away on a public sidewalk. *See id.* § 52.1006(b); Verif. Compl. ¶¶ 30-31.

Yet when the city attorney wrapped up her presentation, no councilmember seemed bothered by the ordinance's constitutional infirmities or even interested in its details, preferring to spend their time praising Planned Parenthood and pillorying pro-lifers. *See* Exhibit L at 14-18. They then approved the proposed ordinance without amendment and thereby effectively banned peaceful pro-life speech from the city's sidewalks solely because they disfavored it. Mayor Todd Gloria stood by his campaign promise to always support Planned Parenthood, swiftly signing the ban.

The vague and overbroad final ordinance that emerged from the city council's May 21 struggle session has chilled Mr. Lopez's speech ever since it took effect this summer. The retiree simply cannot afford risking tens of thousands of dollars in costs and even prison time for what is now the crime of kindly offering women in need a reproductive choice. So he holds back his helping hand and softens his grandfatherly

voice, hoping to squeeze in a smiling request to approach passersby whenever a rare break in road and air traffic makes it possible for him to be heard. Lopez Decl. ¶¶ 6-10.

Mr. Lopez is not one to race to the courthouse for light or transient causes. But the city council forced him to file suit last month because Ordinance O-2024-114's viewpoint-based speech ban and vague and overbroad prohibitions infringe (1) his First Amendment right to freely speak his peaceful message of hope on a public sidewalk and passersby's First Amendment right to hear what he has to say and (2) his Fourteenth Amendment due process rights. Those constitutional injuries have continued to swell since then and disserve the public interest, so Mr. Lopez now moves the Court to enjoin Ordinance O-2024-114 pending final judgment.

## ARGUMENT

A movant may obtain a preliminary injunction if he is likely to succeed on the merits, would otherwise suffer irreparable harm, the equities favor an injunction, and the public interest does not disfavor it. *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). The last two factors merge when the defendant is a government entity. *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024). Showing the likelihood that a First Amendment violation occurred by itself almost always warrants a preliminary injunction, as deprivation of a constitutional right for any amount of time causes irreparable injury and is against the public interest. *X Corp. v. Bonta*, 116 F.4th 888, 903-04 (9th Cir. 2024) ("[E]ven undeniably admirable goals must yield when they collide with the Constitution." (cleaned up)).

## I.    Likelihood of Success on the Merits

Mr. Lopez asserts in his verified complaint causes of action against the City of San Diego for violations of his rights to freedom of speech under the First Amendment and due process under the First and Fourteenth Amendments. *See* Verif. Compl. ¶¶ 48-87. He is likely to succeed on each of those claims.

### A.    The challenged ordinance violates Mr. Lopez's freedom of speech.

Totalitarian societies may establish ministries of truth, but no government in

5

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

the United States may enact a law "abridging the freedom of speech." U.S. Const. amend. I. That freedom includes the right to peaceably speak and hear diverse views in public forums—even views some think are offensive (as many Americans once thought about sex and race equality). *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2402 (2024) (enabling citizens to hear multiple viewpoints is "the whole project of the First Amendment"). And courts must not hesitate to guard that freedom against government infringement of disfavored views, which is "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

Content or viewpoint discrimination targeting sidewalk speech is especially odious. Public sidewalks are a traditional public forum sacrosanct in American constitutional history, the place where abolitionists, suffragettes, and civil rights leaders climbed soapboxes and converted a nation. *See Hoye v. City of Oakland*, 653 F.3d 835, 839 (9th Cir. 2011). Freedom of speech is at its very apex there, with abortion speech specially protected due to the important political, sociological, and moral questions it raises. *See McCullen v. Coakley*, 573 U.S. 464, 496 (2014).

Freedom of speech in public forums is indeed so vital to a healthy democracy that governments may never try to "excise certain ideas or viewpoints" from them. *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023); *see Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). To the contrary, content-based regulation of noncommercial speech is presumed unconstitutional unless it is narrowly tailored to advance a compelling government interest. *Vidal v. Elster*, 602 U.S. 286, 292-93 (2024). That standard of review—strict scrutiny—is the most stringent in all constitutional law and satisfied only by laws that target "the gravest abuses, endangering paramount interests." *Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, 882 (9th Cir. 1987).

> 1. ***The speech ban discriminates on the basis of content and viewpoint.***

At the May 21 council meeting, the city attorney painted the challenged ordinance as content and viewpoint neutral. She had announced plans to draft it at a presser focused only on abortion. Her office had worked hand-in-glove with abortion

1  activists for months to draft it. Everyone present and scheduled to speak in favor of
2  the ordinance was affiliated with Planned Parenthood. The only covered facility with
3  regular protestors was an abortion clinic. No matter, she insisted; the ordinance was
4  allegedly content and viewpoint-neutral simply because it says it regulates speech
5  outside multiple types of facilities. *See* Verif. Compl. ¶¶ 21-22; Exhibit L, City of San
6  Diego, City Council Meeting, at 1-4, 7-13 (May 21, 2024). She was wrong.

### a. *Content-based discrimination.*

8  Start with what qualifies a speech ban as discriminating based on content. "A
9  content-based regulation 'target[s] speech based on its communicative content,'
10  restricting discussion of a subject matter or topic." *X Corp.*, 116 F.4th at 899 (quoting
11  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Because governments can make any
12  speech ban *look* content-neutral—think of Jim Crow Era speech codes—the Supreme
13  Court has clarified that even a facially neutral ban is content-discriminatory if
14  adopted "because of disagreement with the message." *Ward v. Rock Against Racism*,
15  491 U.S. 781, 791 (1989). That disagreement can be found in the ban's purpose or in
16  its proponents' desire to keep listeners from hearing a potentially uncomfortable
17  message. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75
18  (2022); *McCullen*, 573 U.S. at 481. Additionally, a law is facially content-based if it
19  "defin[es] regulated speech by particular subject matter *or by its function or purpose*."
20  *Reed*, 576 U.S. at 163 (emphasis added).

21  Under those standards, Ordinance O-2024-114 discriminates based on content.
22  Looking first at its text, in one spot, it forbids entering a bubble zone without prior
23  consent to "engage in oral protest, education, or counseling." § 52.1003(c)(1)(iii).
24  Enforcing that provision inescapably turns on the content (including the function or
25  purpose) of what a person will say: it is fine to ask what time the Padres game starts
26  or whether the sea lions are out in La Jolla Cove but not to protest, educate, or
27  ///
28  ///

7

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

counsel. *Id.*[3] And in another spot, the ordinance text provides that "no person shall … harass or intimidate a person," which it elsewhere defines as conduct that *inter alia* aggravates or distresses the person approached, § 52.1003(b)(2); *see id.* § 52.1002, or to engage in "disturbing" or "offensive noise" that "causes discomfort or annoyance to" a "reasonable person of normal sensitivities" (whatever that means). § 52.1004(1). Yet it is hornbook law and common sense that a speech regulation is content based if it is "concerned with … [l]isteners' reactions to speech." *McCullen*, 573 U.S. at 471.

A speech ban's text naturally must be read in light of its purpose. *See City of Austin*, 596 U.S. at 76; *Reed*, 576 U.S. at 164-66. But its purpose has been clear since the city attorney's February press conference trashing *Dobbs*: to silence speech solely because of "disagreement with the [pro-life] message." *Ward*, 491 U.S. at 791. That purpose was not lost on councilmembers, about 70 percent of whose substantive remarks at the May 21 council meeting concerned abortion. *See* Exhibit L at 14-18. Meeting attendees supporting the ban uniformly understood that to be its purpose, too, dedicating *100* percent of their own substantive remarks to abortion. *Id.*[4]

---

[3] The fact that the ban does not expressly identify the *subject matter* of such protest, education, or counseling is immaterial since it covers an entire category of speech. *See Boos v. Barry*, 485 U.S. 312, 319 (1988). Also, even if *Hill* on its face required finding such a restriction content-neutral, that holding has been "hollowed out as if by termites" by succeeding Supreme Court precedents. *Minority Television Project*, 736 F.3d at 1223 (Kozinski, J., dissenting). *See* Verif. Compl. ¶ 26 n.1.

[4] School board member Sabrina Bazzo called into the meeting to fleetingly mention hypothetical school protests (leaving 94 percent of combined in-person and remote discussion about abortion). *See* Exhibit L at 13. Unlike every other speaker who focused exclusively on abortion, she avoided any mention of it. That silence was remarkable given Bazzo's friendship with the clinic operator's director of political action and her dedication to abortion advocacy. *See* Exhibit M. Planned Parenthood endorsed her school board run and celebrated her attendance at its gala last year. *See id.* at 3-4. She told Telemundo when the *Dobbs* draft dropped that she wanted to ensure that schoolchildren can readily access abortion "no matter what" the Supreme Court says. Christina Bravo & Gilberto Dorrego, *California y San Diego*

The grandstanding councilmembers even sporadically let slip that the ban's aim was to keep women from hearing pro-life views. Councilmember Campbell's candor was especially commendable, as when she opined that women should be kept in the dark because hearing a pro-life message might make them feel uncomfortable. *See* Exhibit L at 16.[5] One could hardly imagine a franker admission that a speech ban is content based. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1198 (9th Cir. 2018) (refusing to ignore that several speech ban supporters were less concerned with the purported government aim than "about protecting a target group from critical speech."); *see also McCullen*, 573 U.S. at 481.

Put simply, the speech ban has always been about disfavored speech content. Just as one implicitly targets labor protests by banning protest speech outside "a place of employment," *see Carey v. Brown*, 447 U.S. 455, 457, 460-61 & n.4 (1980), one implicitly targets abortion protests by banning protest speech that only regularly

---

*Responde a la Posible Anulación de* Roe v. Wade, Telemundo 20 San Diego (May 3, 2022) (Span.). And she authored a school board resolution declaring the district "a champion" of "reproductive freedom for all." *See* Exhibit M at 5-6. Of course, the odd silence would be much easier to understand if Bazzo's last-second comments were actually meant to help a city attorney she has praised on social media obscure content-based discrimination as Bazzo ran for reelection. *See id.* at 7. Perhaps incidentally, Planned Parenthood endorsed her again this year in a race she narrowly won on November 5.

[5] This analysis does not change, of course, just because Campbell personally believes that all passersby already know everything about all sides of the abortion debate. *See* Exhibit L at 16. Her opinion is objectively wrong: as the pro-choice sponsor of the current federal ban on abortion clinic blockades once put it, "I truly believe that anyone on either side who is on a moral high horse has not really thought the issue through." *Abortion Clinic Violence: Hearings Before the Subcomm. on Crime & Crim. Just. of the H. Comm. on the Judiciary*, 103d Cong., 1st Sess. 5 (1993) (statement of then-Rep. Charles Schumer, Chairman of the Subcomm. on Crime & Crim. Just.). More importantly, though, no federal or state court ever appears to have recognized an exception to a person's First Amendment right to hear views on an issue of public concern if those views are redundant with knowledge the person already possesses. That makes sense: one cannot know a message is redundant if it is not heard first.

occurs outside an abortion clinic. The city attorney's May 21 council presentation was a masterclass in misdirection. But try as she did to pull a rabbit out of her hat to get enacted a ban her office has previously concluded is unconstitutional, that ban's text, drafting history, and purpose combine to let the cat out of the bag instead.

### b.    *Viewpoint-based discrimination*

Even worse, the ordinance also subtly discriminates based on viewpoint. Because such viewpoint discrimination is even deadlier to democracy than content discrimination is, a court may dig deeper to unearth evidence of it. *See Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1227-28 (9th Cir. 2019). That includes examining exemptions from a speech ban for a group of speakers whose views can be predicted in advance. *See Hill*, 530 U.S. at 725; *Hoye*, 653 F.3d at 851-52. Such an exemption is especially probative of viewpoint discrimination if it undermines the ban's purported goals. *See Victory Processing*, 937 F.3d at 1228.

The challenged ordinance contains such an exemption for facility personnel "acting within the scope of their employment, agency, or volunteer service." § 52.1003(f)(2). Even before the May 21 meeting, the city council could not have been insensate to the likelihood that abortion clinic personnel might support abortion more than pro-life protestors do. Escort statements at the meeting scattered any shadow of doubt on that point, raising a suspicion of viewpoint discrimination. *See Hill*, 530 U.S. at 725; *Hoye*, 653 F.3d at 851-52. And that gnawing suspicion is confirmed when one considers that exempted persons alone are known to have made clinic patients feel unsafe. *See* Verif. Compl. ¶ 3.

It pains one to conclude that a city council that not long ago chided residents that "it is vital to our democracy to allow free speech for all, even those with whom we vehemently disagree" itself is engaged in such blatant viewpoint discrimination. *See* Exhibit N, San Diego City Council, *Declaration of 100 Year Celebration of Free Speech* 2 (Feb. 7, 2012). But that conclusion is unavoidable given the Supreme Court's discussion of a facility employee exemption fourteen years after *Hill*. In *McCullen*, the

Court upheld a speech ban exemption for "employees or agents of [an abortion] facility acting within the scope of their employment" because clinics forbade their sidewalk personnel from promoting abortion. *See* 573 U.S. at 484-85. Some clinics today still prohibit such advocacy on paper, but clinic "defenders" energetically promote abortion all the way up to clinic doors. *See* Lauren Rankin, *Bodies on the Line: At the Front Lines of the Fight to Protect Abortion in America* 94-109 (2023).[6]

When such evidence of viewpoint discrimination appears in a ban's text, one may check the ban's drafting history for confirmation. *See Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018). Here confirmation abounds. A speech ban conceived by a charter member of California's Reproductive Rights Taskforce, announced at a press conference denouncing *Dobbs*, drafted with abortion activists, and zealously pushed by councilmembers fresh from an abortion gala reeks of viewpoint discrimination. *See Wasden*, 878 F.3d at 1191-92 (viewpoint discrimination where lobbyists drafted restriction of opponents' speech and lawmakers voiced hostility toward those opponents). Indeed, such direct evidence "amounts to a confession of error," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8 (2024), that the ordinance silences "only *some* messages and *some* persons" to "eliminate disfavored ideas." *303 Creative LLC*, 600 U.S. at 602.

### 2. *The content and viewpoint-based ban serves no government interest.*

Because the ordinance bans speech based on its content and viewpoint, it must "serve compelling state interests" in the least restrictive way. *Vidal*, 602 U.S. at 293; *see X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024). Such strict scrutiny is almost impossible to survive and is "rarely satisfied." *S. Bay United Pentecostal Church v.*

---

[6] The viewpoint discrimination the ordinance smuggles into this exemption is only amplified by the ordinance's pervasive vagueness. A core duty of clinic personnel is to protect the clinic's interests, so almost *anything* they might say in favor of abortion could be construed as falling with the scope of their employment.

*Newsom*, 141 S. Ct. 716, 718 (2021) (mem.) (Statement of Gorsuch, J.). Exceptions are made only when speech threatens "the gravest abuses, endangering paramount interests." *Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, 882 (9th Cir. 1987). Typically, governments may suppress obscenity, incitement to violence, and fighting words but little else. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011); *Tingley v. Ferguson*, 47 F.4th 1055, 1079-80 (9th Cir. 2022).

The city council pretends that its speech ban is a public safety measure, but no evidence has yet been offered of *any* incitement to violence or even fighting words outside the downtown clinic. No patient mentions either in online reviews. Local media archives stretching back a quarter century do not mention any. And police data show that harassment of *anyone* by *anyone* almost never occurs in the clinic's neighborhood—it is 43 times rarer than a blue moon. *See* Verif. Compl. ¶ 35. Put simply, the sidewalks outside the downtown abortion clinic are an island of tranquility in a city increasingly beset by violence in recent years.

Nor is there evidence of imminent dangers outside the clinic that might save the speech ban from being impermissibly overinclusive. No clinic blockade has been reported in San Diego this century, and only 1 in 2,800 pro-life protests nationwide sees even one person harassed. *See* Exhibit O, Nat'l Abortion Fed., *2022 Violence and Disruption Statistics* 10-11. That is, a woman is eight times likelier to die from a car hitting her while she is walking than to be harassed by a pro-life protestor. *See* Nat'l Safety Council, *Odds of Dying Due to Injury, United States, 2022* (2024).

Indeed, even anecdotes offered at the May 21 meeting to support the ban show the *absence* of ongoing grave abuses outside the clinic. Planned Parenthood personnel claimed that three persons have felt harassed over five years: a volunteer entering a parking lot where she likely could not even be seen,[7] a staffer mailing abortion pills[8]

---

[7] The volunteer also allegedly fears being murdered by a pro-lifer, but there has been no evidence offered that any fighting word or true threat has ever been uttered at the volunteer by anyone. And Barack Obama was still president the last time *anyone* was

the clinic does not even mail, and some unnamed person who saw Antifa protestors holding a "menacing banner" not even related to abortion. *See* Verif. Compl. ¶¶ 38-39.[9] Even supposing all three alleged incidents actually happened, a rate of one nonviolent incident every twenty months falls far short of demonstrating a clear and present danger of violence erupting outside the clinic and cannot justify an overinclusive ban on sidewalk speech. *See Brown*, 568 U.S. at 805.[10]

Indeed, the only real danger to patients (at least outside the clinic) is *caused* by the discriminatory speech ban. The First Amendment protects each patient's right to hear pro-life views. *See Murthy v. Missouri*, 603 U.S. 43, 75 (2024). Yet the ordinance

---

murdered by anyone in the clinic's Park West neighborhood. *See* City of San Diego, *Historical Crime Reports: By Neighborhood* (2016-2023).

[8] The speaker's words were muddled when she recounted the alleged event, leaving unclear whether she said that the staffer had mailed a "pill" or a "bill." *See* Exhibit L at 9. Slow-motion video analysis of how the speaker formed the letters "p" and "b" when they are the initial letter in surrounding words strongly suggests she said "pill." The legal conclusion is in no way altered, of course, if she instead said "bill."

[9] One clinic escort also alleged it has been "impossible to drive by or walk into" the clinic "for years" because of clinic blockades. *See* Exhibit L at 8. Yet that allegation is self-evidently baseless: no blockade has been reported in San Diego since *two decades* before that escort became a Planned Parenthood volunteer. *See* Exhibit P, Grace Gage, LinkedIn. And abortion industry data and pro-choice historians both admit that "clinic blockades [a]re a relic of a long-gone era." Lauren Rankin, *supra*, at 82. Even at the height of the clinic blockade movement in the late 1980s and early 1990s, there was only *one* recorded blockade in San Diego. *See* Robert A. Van Dyk, *Challenging Choice: Abortion Clinic Blockades and the Dynamics of Collective Action* 316-34 (1995) (Ph.D. dissertation, University of Washington) (ProQuest) (collecting all known clinic blockades 1986-1992).

[10] The floor for when abortion-related violence becomes grave is murky. But the fact that the U.S. Department of Justice has declined to prosecute any of the at least 120 recorded instances of pro-life pregnancy help centers and churches being firebombed or vandalized and pro-lifers being violently attacked because of their pro-life views in the year after *Dobbs* leaked, *see* Exhibit Q, suggests that the floor is higher than one instance of discomfiting but nonviolent words every twenty months. *See* H.R. Rep. No. 103-306, at 3 (1993) (stating the Freedom of Access to Clinic Entrances Act of 1994 applies as much to protecting pregnancy help centers as to abortion clinics).

craftily keeps her in the dark. Few people consent to speak with a stranger from more than seven feet, and Americans less so than any other studied nationality due to differences in how Americans psychologically structure interpersonal space. *See* O. Michael Watson, *Proxemic Behavior: A Cross-Cultural Study* 73-96 & 88 tbl.21 (1970); John R. Aiello, *Human Spatial Behavior*, *in* Handbook of Environmental Psychology 359, 389 (Daniel Stokols & Irwin Altman eds., 1987); Robert E. Rakel, *Establishing Rapport*, *in* Textbook of Family Medicine 146-59 (8th ed. 2012). Yet the ordinance forces a patient often already scared by her pregnancy to expressly consent to a conversation with a stranger she just saw lurching around the sidewalk to avoid invisible bubble zones and mouthing words she cannot hear.

### 3. *The content and viewpoint-based ban is not the least restrictive means of achieving any theoretical compelling interest.*

The challenged ordinance hangs a sword of Damocles above Mr. Lopez. If he is standing within 100 feet of a clinic entrance and raises his head from quiet prayer to see a passerby nine feet away from him, he risks thousands of dollars in penalties if he kindly calls out to her but she gets annoyed. Once she comes one foot closer, he risks limitless costs and fees if he asks to talk to her at a volume a few decibels louder than the sound of her shoes hitting the sidewalk. *See* Tomoko Shimoda, et al., *Examining Modifications of the Noise Generated by Nurses' Footsteps and the Use of Pass-By Objects*, 10(2) Open J. of Nursing 184, 187-88 & fig.2 (2020). And until she is all but out of earshot, a clinic employee can get him locked up for "approaching" her by timidly tipping a pamphlet in her direction.

The ordinance says pro-life speech must be so suppressed for public safety: "to prevent the obstruction, harassment, and intimidation of people entering and exiting Covered facilities." Ordinance O-2024-114, at 3. But again, the last reported blockade of a San Diego clinic predates the birth of Google, and public harassment and intimidation in the clinic's neighborhood almost never occurs over *anything*. *See* Verif. Compl. ¶ 35. And even if pro-life protestors were running amok outside the

clinic, the speech ban would be unconstitutional if there were "less restrictive alternatives … at least as effective in achieving" the ordinance's stated purpose. *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023); *see Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 362-63, 369 (1997). Such "narrow tailoring" is the very touchstone of government regulation when freedom of expression is at stake. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980).

Less restrictive alternatives abound under local, state, and federal law to prevent obstruction of abortion clinics. The San Diego Municipal Code gives city police broad authority to break up crowds gathered on city sidewalks. *See* San Diego Mun. Code § 82.29. Obstructing an abortion clinic has been a crime in California for decades, with violators subject to a $25,000 fine and a year in prison. Cal. Pen. Code § 423.2(a) & (c); *id.* § 423.3(a)-(b) & (d)-(e). And even absent a federal constitutional right to abortion, *Isaacson v. Mayes*, 84 F.4th 1089, 1095 (9th Cir. 2023), the U.S. Department of Justice vigorously prosecutes clinic obstructors under federal law. *See* 18 U.S.C. § 248(a)-(b); Exhibit R, U.S. Dep't of Just., *Special Litigation Section Cases and Matters: FACE* (Oct. 14, 2024); *Implementation of the Freedom of Access to Clinic Entrances Act: Hearing Before the Subcomm. on Crime and Crim. Just. of the H. Comm. on the Judiciary*, 103d Cong., 2d Sess. 6 (1994) (statement of Deval Patrick, Assistant Attorney General, Civil Rights Division, U.S. Dep't of Just.) (promising that enforcement of FACE would be one of DOJ's top priorities).

Many generally applicable laws also prevent obstructions sans speech bans. If a protestor steps onto clinic property, he can be arrested for trespass. *See* Cal. Pen. Code § 602(o). If he is part of a sidewalk crowd that does anything illegal *or* does something legal "in a violent, boisterous, or tumultuous manner," he can be arrested for unlawful assembly. *See id.* §§ 407, 409. If a police officer tells him to leave because the officer thinks he is disturbing the peace, he can be arrested if he stays. *See id.* § 416(a). If he engages in undefined "disorderly conduct," he can find himself in handcuffs. *See* San Diego Mun. Code § 56.27. Et cetera, et cetera, et cetera.

Less restrictive alternatives likewise exist to prevent harassment and intimidation of passersby. If a protestor diverts a passerby from her path, he can be arrested. *See* Cal. Pen. Code § 423.2(c). If he harasses or intimidates her while *not* diverting her from her path, he can be arrested. *See* 18 U.S.C. § 248(a)(1). If he threatens her, he can be arrested, *see* Cal. Pen. Code § 422(a); "interferes" with her abortion rights, arrested, *see id.* § 422.6(a); Cal. Const. § 1.1; follows her without consent, arrested, *see* Cal. Pen. Code § 646.9(a); does any of this chauvinistically, be subject to a sentencing enhancement for a hate crime. *See id.* §§ 422.7, 422.75.[11]

Even if those laws did not exist, the ban still would not be narrowly tailored. A narrowly tailored speech ban "targets and eliminates no more than the exact source of the evil it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal marks omitted). That source must be defined precisely given the preciousness of Americans' right to free speech, *see Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988), such that broad prophylactic rules banning speech are automatically and deeply suspect, *see Grayned v. City of Rockford*, 408 U.S. 104, 119-20 (1972). But the challenged ordinance is close to the exact opposite, banning speech so vaguely and tautologically that its scope is essentially limitless.

At the end of the day, the speech ban blatantly discriminates based on content and viewpoint and easily fails strict scrutiny. Consequently, Mr. Lopez is likely to succeed on the merits of his first claim.

### 4. *The speech ban even would fail as a time, manner, and place regulation.*

Mr. Lopez is likely to succeed on the merits even if the ordinance is misread as being content-neutral. A content-neutral speech regulation on a traditional public forum such as a sidewalk can survive scrutiny only if it (1) is narrowly tailored to

---

[11] That such less-restrictive alternatives already exist was not lost on the city council. Councilmember Campbell, for example, correctly noted in her May 21 remarks that threating persons outside clinics with violence is already illegal. *See* Exhibit L at 16.

serve a "significant" governmental interest and (2) leaves open ample alternative channels for communication of the information. *See Meinecke v. City of Seattle*, 99 F.4th 514, 522 (9th Cir. 2024). Under no circumstances may the speech be regulated "in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Porter v. Martinez*, 68 F.4th 429, 443 (9th Cir. 2023).

To be sure, the city has a significant interest in sidewalk safety. *See McCullen v. Coakley*, 573 U.S. 464, 486-87 (2014); *Camenzind v. Cal. Expo. & State Fair*, 84 F.4th 1102, 1114 (9th Cir. 2023).[12] But, as discussed above, the city has not found *any* evidence that pro-life speakers pose *any* danger outside any covered facility.[13]

Even if there were such a public safety risk, the speech ban is not sufficiently narrowly tailored even to survive as a time, place, and manner regulation. To meet that standard, there must be evidence that the city "seriously undertook to address the problem with less intrusive tools readily available to it," including by

---

[12] That holds no less true just because some city councilmembers who supported the speech ban themselves have ignored that interest, joining pickets and protests that have blocked traffic and entrances and impeded pedestrians. *See* Verif. Compl. ¶ 19. Their hypocrisy only lends further evidence that the ordinance impermissibly discriminates based on content and viewpoint. *See Brown*, 564 U.S. at 805 (laws regulating First Amendment rights may not be "seriously underinclusive").

[13] The city attorney mused at the May 21 council meeting that the mere sight of a pro-lifer creates a danger that women might get scared. *See* Exhibit L at 4. Several local governments lately have voiced the same concern, only to conveniently discover when sued over their own bubble zones that the supposed danger never was real. *See* Verif. Compl. ¶¶ 60-62. Indeed, women on average report being *happier* with whatever reproductive choice they make after they see, hear, or talk with a pro-life sidewalk counselor. *See* Diana Greene Foster, et al., *Effect of Abortion Protestors on Women's Emotional Response to Abortion*, 87 Contraception 81, 86 tbl.4 (2013). But even imagining the city attorney were right, nonviolent speech does not fall outside First Amendment protection even if it is "vehement, caustic and sometimes unpleasantly sharp." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *Fogel v. Collins*, 531 F.3d 824, 830 (9th Cir. 2008). Consequently, San Diego has no more of a significant interest in preventing nonviolent protests it might think scary or even immoral than Pinkertons or Klansmen had an interest in breaking up labor strikes and civil rights sit-ins in the 20th century. *See Snyder v. Phelps*, 562 U.S. 443, 457 (2011).

---

1  "consider[ing] different methods that other jurisdictions have found effective."
2  *McCullen*, 573 U.S. at 494; *accord United States v. Allen*, 34 F.4th 789, 797 (9th Cir.
3  2022). Here, there is no evidence that San Diego's prior and less intrusive limits on
4  pro-life speech outside abortion facilities were ineffective.[14]

5      In any event, the ban does not leave affected speakers with ample alternative
6  channels of communication. *See Meinecke*, 99 F.4th at 522. Few channels can meet
7  that standard when sidewalk speech is banned because sidewalks "remain one of the
8  few places where a speaker can be confident that he is not simply preaching to the
9  choir." *McCullen*, 573 U.S. at 476. When exposed to an uncomfortable message
10  elsewhere, someone "can always turn the page, change the channel, or leave the Web
11  site." *Id.* Sidewalks alone often provide an "uninhibited marketplace of ideas in
12  which truth will ultimately prevail." *Id.*

13      Alternative channels border on nonexistent here, as the ban deprives affected
14  speakers of their *only* way to reliably identify or converse face-to-face with abortion-
15  minded women. *See Santa Monica Nativity Scenes Cmte. v. City of Santa Monica*, 784
16  F.3d 1286, 1298 (9th Cir. 2015).[15] As shown in figure 1 below, a counselor cannot

17

---

18  [14] Further, the speech restriction's application to *all* "health care facilities, schools,
19  and religious institutions" is "wildly [over]inclusive" and flagrantly violates narrow
    tailoring. *Cf. Brown*, 564 U.S. at 802. The Sixth Circuit recently held as much
20  regarding a simple buffer zone law in Kentucky. *See Sisters for Life, Inc. v. Louisville-
21  Jefferson County*, 56 F.4th 400 (2022). The law there applied outside *all* medical
    facilities in a county, even though "the County ha[d] not made any showing that *all*
22  [such] facilities need this kind of regulation"; thus, "the ordinance lack[ed] any
23  tailoring, to say nothing of narrow tailoring." *Id.* at 405. The same is true here.

24  [15] Many abortion providers have deep pockets: Planned Parenthood can spend more
    than $16 million on a single ad campaign to promote abortion. *E.g.*, Press Release,
25  Planned Parenthood, *Planned Parenthood Announces $16 Million Paid Media Campaign
    on National Abortion Access Crisis Ahead of Supreme Court Decision* (Apr. 27, 2022).
26  But even though the average pro-life activist is more highly educated and higher
27  income than the median citizen is, sidewalk counselors typically can afford to air their
    views only in person. *See* Ziad Munson, *Becoming an Activist: Believers, Sympathizers,
28  and Mobilization in the American Pro-Life Movement* 5, 86, 89 tbl.3-2 (2002) (Ph.D.

know a woman is headed for the clinic until she has entered the fixed buffer zone. And once she is inside it, the counselor may not approach her without unequivocal and express consent—requested at a volume inaudible over ambient noise, and in a way so anodyne that no one could possibly allege being harassed or even annoyed. An acrobatic sidewalk counselor might sometimes find ways to communicate his message if one or maybe two of the restrictions were in place. But the ban's chimera of buffer, bubbles, noise ordinance, and harassment law "burdens substantially more speech than appears necessary," *Brown v. City of Pittsburgh*, 586 F.3d 263, 282 (3d Cir. 2009), while foreclosing any real chance of a meaningful exchange of ideas.



Figure 1 Buffer zone around the downtown abortion clinic

**B.    The challenged ordinance violates Mr. Lopez's due process rights.**

Mr. Lopez is also likely to succeed on his claim that the ordinance violates his due process rights. Under the Fourteenth Amendment, no state or its subunits may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Since ratification, the amendment has been understood to protect citizens from arbitrary government action and creeping oppression. *See Munn v. Illinois*, 94 U.S. 113, 134 (1876); *Missouri Pac. Ry. Co. v. Humes*, 115 U.S. 512, 519-20

dissertation, Harvard University) (ProQuest) (compiling ethnographic studies).

19

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

1  (1885); *Collins v. City of Harker Heights*, 503 U.S. 115 (1992).

2        Due process claims are analyzed in two steps. First, a court must ask whether a
3  government has deprived a person of a liberty or property interest. Second, a court
4  must examine whether the government used constitutionally sufficient procedures
5  when depriving that person of that interest. *See Vasquez v. Rackauckas*, 734 F.3d 1025,
6  1042 (9th Cir. 2013). In this case, the answer to the first question could not be more
7  straightforward: the Fourteenth Amendment incorporates the First Amendment
8  against the States, *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943), and municipal
9  ordinances constitute state action that falls within the prohibition of the Due Process
10  Clause, *see Carlson v. California*, 310 U.S. 106, 112-13 (1940). The answer to the
11  second question also is a straightforward yes for the reasons of vagueness and
12  overbreadth discussed below, compelling a conclusion that Mr. Lopez is likely to
13  succeed on the merits of his due process claim.

14        **1.**    *The ordinance's vagueness violates due process.*

15        Due process is violated when a government enacts a vague law and thereby
16  fractures a bedrock "principle in our legal system … that laws which regulate persons
17  or entities must give fair notice of conduct that is forbidden." *Butcher v. Knudsen*, 38
18  F.4th 1163, 1168 (9th Cir. 2022); *see Colten v. Kentucky*, 407 U.S. 104 (1972). A law
19  fails the vagueness inquiry if its provisions and key terms are not clearly defined. *See*
20  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012); *Edge v. City of Everett*, 929
21  F.3d 657 (9th Cir. 2019). That is, a law must be written so that (1) a person of ordinary
22  intelligence can know what it prohibits and (2) those who enforce the prohibitions are
23  given objective standards to apply. *See City of Chicago v. Morales*, 527 U.S. 41, 56
24  (1999); *Tucson v. City of Seattle*, 91 F.4th 1318, 1329 (9th Cir. 2024).

25        The Supreme Court has emphasized that these requirements are even more
26  stringent when a law affects speech, *Smith v. Goguen*, 415 U.S. 566, 573 & n.10 (1974),
27  especially if it imposes criminal penalties, *Palmer v. City of Euclid*, 402 U.S. 544, 545-
28  46 (1971). That includes regulation of abortion-related speech. *Schenck v. Pro-Choice*

1    *Network of W. N.Y.*, 519 U.S. 357, 383 (1997); *City of Akron v. Akron Ctr. for Reprod.*

2    *Health, Inc.*, 462 U.S. 416, 451-52 (1983). Otherwise, speech that politicians disfavor

3    will lack "breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

4    Yet no person of even extraordinary intelligence can know what the challenged

5    ordinance prohibits. Start with its definition of harassment. It says "harassment"

6    includes "approaching or following a person with intent to *harass* once the person has

7    indicated they do not want to be approached or followed." § 52.1002. But it does not

8    define what qualifies as such an indication, thereby freezing sidewalk counselors who

9    sensibly want to give legal gray zones a wide berth. *See Grayned*, 408 U.S. at 109.

10   Even if a sidewalk counselor can correctly gauge which gestures, gaits, or guffaws

11   indicate that a passerby wants to be left alone, the ordinance leaves him on

12   tenterhooks about what might count as "harassment." Asking a passerby, "quietly

13   and politely, two times, whether she will take literature or … has any questions?

14   Three times? Four times?" *McCullen*, 573 U.S. at 500 (Scalia, J., concurring).

15   The ordinance only gets even vaguer from there. It does not define key terms

16   such as "serious alarm" or "cause substantial distress," let alone gauzier second-

17   order concepts like when one demonstrates an *intent* to cause such undefined harms.

18   It tries to evade its vagueness by prohibiting only knowing or willful *actions* that *result*

19   in such harms—whether or not the harms are intended. But that only compounds the

20   confusion. *See Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 821 (9th Cir. 2016)

21   (prohibition insufficiently limited just because it requires "specific intent").

22   A similar problem infects the noise ordinance's prohibition on "offensive"

23   noise that causes "discomfort" or "annoyance" to an alleged reasonable person. The

24   Supreme Court has held that a ban on "annoying" speech is quintessentially vague.

25   *See Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971); *see also City of Everett*, 929

26   F.3d at 665 The restriction here is not saved by the "reasonable person" standard

27   because "[c]onduct that annoys some people does not annoy others," such that "no

28   standard of conduct is specified at all." *Coates*, 402 U.S. at 614.

Nor does the ordinance define "approach," which could be anything that closes the distance between a protestor and a passerby from a nod to a full-on sprint. It defines the content of the prohibited activities in a way at least as imprecise as prohibitions the Supreme Court already has declared unconstitutional. *See Hill,* 530 U.S. at 774 (Kennedy, J., dissenting). It entirely fails to describe (let alone define) a thesaurus dump of prohibited effects of those activities on listeners. The words "alarm," "aggravate," "terrorize," "threaten," "torment," and "cause substantial distress" could mean anything.

In short, the ordinance is full of sound and fury signifying nothing. *Cf.* William Shakespeare, *Macbeth* act 5, sc. 5, *l.* 31. Lack of fair notice extends to law enforcement, who are given no objective standards to differentiate permissible and impermissible speech. *See Grayned*, 408 U.S. at 108-09. Such a standardless sweep conjures a specter of "policemen, prosecutors, and juries [unleashed] to pursue their personal predilections." *Marinello v. United States*, 584 U.S. 1, 11 (2018); *see* Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 320 (2000). Its unascertainable standard impermissibly chills speech and facially violates the Due Process Clause of the Fourteenth Amendment. *See Tucson*, 91 F.4th at 1328.

### 2. *The ordinance's overbreadth violates due process.*

Due process is also violated if a government broadly stifles speech to satisfy a legitimate interest even though it has a less drastic way available to it. *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973). A statute that prohibits a substantial amount of protected speech relative to its plainly legitimate sweep must be struck down. *See Green v. Miss U.S.A., LLC*, 52 F.4th 773, 800 (9th Cir. 2022). Determining whether the law does so begins with a review of the law's text to see what it covers, supplying ordinary definitions for terms that the law leaves undefined. *See Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179, 1181 (9th Cir. 2024).

Here, the ordinance's text overbroadly prohibits more constitutionally protected speech than necessary to ensure public safety and patient access to abortion

22

Memo. Points & Auths. ISO Mot. for Prelim. Inj.

1   clinics. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1077 (1991) (plurality). It bans

2   speech outside all "health care facilities, schools, and religious institutions"

3   regardless of whether they have ever seen expressive activities or difficulties. It draws

4   bubbles in areas and under circumstances where crime data shows there is no public

5   safety need to restrict speech. It prohibits persons from approaching others without

6   consent regardless of whether those others intend to enter a covered facility or not. It

7   bans speech during all normal business hours rather than the hours during which a

8   facility receives patients or clients who might be endangered.

9       Perhaps most remarkably overbroad, though, is the noise ordinance imposed.

10  Within the covered 100-foot buffer zone, Ordinance O-2024-114 broadly forbids

11  (1) "any disturbing, excessive, or offensive noise which causes discomfort or

12  annoyance to any reasonable person of normal sensitivities"; *or* (2) "any noise which

13  unreasonably interferes with the workings of" a covered facility; *or* (3) "use loud

14  speaking amplifiers or similar devices in a manner that emits a sound level exceeding

15  55 decibels at any point ten feet or more from the noise source." § 52.1004. (A sound

16  registering 55 decibels is only about 35% as loud as a normal conversation with a

17  nearby person.) *See* Verif. Compl. ¶ 27 & n.2.

18      In contrast, the city council knows how to write a narrow noise ordinance when

19  it wants to, as shown by the municipal code's nuanced general noise abatement law

20  with its non-exhaustive list of *nine* factors for identifying prohibited noise:

21      The characteristics and conditions which should be considered in
        determining whether a violation of the provisions of this section exists
22      should include, but not be limited to [sic] the following: (1) The level of
        the noise; (2) Whether the nature of the noise is usual or unusual;
23      (3) Whether the origin of the noise is natural or unnatural; (4) The level
        of the ambient noise; (5) The proximity of the noise to sleeping facilities;
24      (6) The nature and zoning of the area from which the noise emanates
        and the area where it is received; (7) The time of day or night the noise
25      occurs; (8) The duration of the noise; and (9) Whether the noise is
        recurrent, intermittent, or constant.
26

27

28  San Diego Mun. Code § 59.5.0501(a)-(b). Such stark contrast strongly suggests an

1  aim "to quash ideas as ideas rather than to promote a legitimate interest" in the
2  challenged speech ban. Elena Kagan, *Private Speech, Public Purpose: The Role of*
3  *Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 453 (1996).

4  **II.    The Remaining Preliminary Injunction Factors Favor Relief.**

5      If a plaintiff is likely to succeed on the merits of a constitutional claim against a
6  government—especially a claim involving a fundamental right such as freedom of
7  speech—the remaining preliminary injunction factors favor granting an injunction.
8  *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023). After all, a
9  moment's deprivation of a constitutional right constitutes irreparable injury, *see*
10 *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020), and is never in the
11 public interest, *see Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

12     Mr. Lopez is experiencing and will continue to experience irreparable harm so
13 long as the speech ban and its potentially ruinous damages, fines, civil penalties, and
14 prison time hang over his head and chill his protected speech. So, too, pregnant
15 passersby will continue to be irreparably deprived of their First Amendment right to
16 hear from him about free pregnancy and childcare resources they can access. For
17 those women, "the constitutional question before us does not involve a weighing of
18 the value of abortion as against childbirth, but instead concerns the protection of
19 either procreative choice from discriminatory governmental treatment." *Comm. to*
20 *Def. Reprod. Rts. v. Myers*, 29 Cal. 3d 252, 256 (1981).

21                              **CONCLUSION**

22     Just two years after George Washington admonished fellow Americans in his
23 farewell address to forever defend constitutional liberties, Congress passed a sedition
24 act targeting disfavored speech. *See* George Washington, *Farewell Address* (1796); Act
25 of July 14, 1798, 5th Cong., 2d sess. In unconscious imitation, just two years after
26 *Dobbs* enfranchised voters to decide their states' abortion policies, those censors'
27 heirs in progressive jurisdictions nationwide are now similarly trying to silence pro-
28 life speech because they disfavor its content and viewpoint, using suppressive laws

alien to democratic norms and seditious toward binding legal precedent.

Ordinance O-2024-114 is one such law, proposed by City Attorney Mara Elliott not long after she participated in a California Reproductive Rights Taskforce brainstorming session on how to champion abortion and silence views opposed to it. *See* Exhibit S. Its vague and overbroad content and viewpoint-based speech ban serves no government interest and subverts the public interest. As such, Mr. Lopez is likely to succeed on the merits of his constitutional claims in this case.

He accordingly asks the Court to preliminarily enjoin enforcement of Ordinance O-2024-114 against him so that mounting irreparable injury no longer imperils his ability "to bear witness" to passersby on public sidewalks in San Diego about "the uniquely human potential … to transform a personal tragedy" such as a scary unplanned pregnancy "into a triumph." Viktor E. Frankl, *Man's Search for Meaning* 112 (2006). Free resources abound for local women in need, and Mr. Lopez wishes only to freely speak about those resources so that every pregnant resident of "America's Finest City" feels empowered to exercise a real reproductive choice.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: November 13, 2024        By:

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
Attorneys for Plaintiffs