Charles S. LiMandri, SBN 110841
 cslimandri@limandri.com
Paul M. Jonna, SBN 265389
 pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
 jtrissell@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Peter Breen, *pro hac vice*\*
 pbreen@thomasmorsociety.org
Christopher J. Galiardo, *pro hac vice*\*
 cgaliardo@thomasmoresociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
\*Application forthcoming

*Attorneys for Plaintiff Roger Lopez*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER LOPEZ,<br><br>       Plaintiff,<br><br>  v.<br><br>CITY OF SAN DIEGO,<br><br>       Defendant. | Case No.: 3:24-cv-01577-LL-SBC<br><br>**DECLARATION OF PAUL M. JONNA, ESQ. IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Judge:        Hon. Linda Lopez<br>Courtroom:   5D<br>Hearing Date:  December 18, 2024<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATEL ORDERED BY THE COURT |

I, Paul M. Jonna, Esq., declare and state as follows:

1. I am an attorney at law duly licensed to practice in the State of California and in the Southern District of California. I am a Partner with LiMandri & Jonna LLP, and am counsel of record for Plaintiff Roger Lopez in this action. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The matters discussed below are based on my own personal knowledge. I could and would testify to them if called upon to do so in court.

2. Attached to the Complaint and hereto as **Exhibit A** is a true and correct copy of San Diego Ordinance O-2024-114. Exhibits B through G are attached to the Complaint and authenticated by Plaintiff's verification of that complaint.

3. Attached hereto as **Exhibit H** is a true and correct copy of the California Form 460 that San Diego Deputy City Attorney Heather Ferbert filed on July 31, 2024, listing monetary contributions to her campaign for city attorney. Plaintiff's counsel has highlighted two segments of text in the form: (1) Ms. Ferbert's campaign committee name and (2) a contribution from Neal Ortiguerra, the Director of Political Action for Planned Parenthood of the Pacific Southwest (the operator of San Diego's downtown abortion clinic) made to Ms. Ferbert's campaign the day Ordinance O-2024-114 was passed.

4. Attached hereto as **Exhibit I** is a true and correct copy of San Diego's 1993 ordinance imposing buffer and bubble zones outside the city's abortion clinics, which the city later abandoned as unconstitutional.

5. Attached hereto as **Exhibit J** is a true and correct copy of the San Diego City Attorney's 1997 memorandum of law concluding the 1993 city ordinance could not survive constitutional scrutiny "because the 'floating' aspect of the zones creates the situation that the Court found unconstitutional."

6. Attached hereto as **Exhibit K** is a true and correct copy of the San Diego City Attorney's 2014 memorandum of law restating and not contesting the office's 1997 conclusion that the 1993 city ordinance was unconstitutional.

7. Attached hereto as **Exhibit L** is a transcript of the San Diego City Council meeting held May 21, 2024, at which Ordinance O-2024-114 was passed, as transcribed and certified as true and correct by Erica Lowther of San Diego Transcription on October 20, 2024. A recording of the meeting is available here:

https://sandiego.granicus.com/player/clip/8905?view_id=3&redirect=true.

8. Attached hereto as **Exhibit M** is a true and correct copies of pages from the social media accounts of the only speaker at the May 21 city council meeting to address any topic other than abortion, Ms. Sabrina Lev Bazzo, and a resolution promoting abortion that she championed as a school board member.

    a. The first two pages are true and correct copies of pages from Ms. Bazzo's friends list from her personal Facebook account, as of October 24, 2024, at 1:05 a.m. Eastern Time. Plaintiff's counsel highlighted the name and title of her friend Neal Ortiguerra, the Director of Political Action at Planned Parenthood of the Pacific Southwest (the operator of San Diego's downtown abortion clinic).

    b. The third page of Exhibit G is a true and correct copy of a post Ms. Basso made on Instagram on July 5, 2020. Plaintiff's counsel highlighted her statement thanking Planned Parenthood for its endorsement of her school board campaign.

    c. The fourth page of Exhibit G is a true and correct copy of a Facebook post made by Planned Parenthood of the Pacific Southwest (the downtown abortion clinic's operator) highlighting Ms. Basso's attendance at its annual gala in 2023. Plaintiff's counsel redacted on the right-hand side of the page the personal identifying information of a member of its own staff who pulled the post.

    d. The fifth and sixth pages of Exhibit G are a true and correct copy of a school board resolution Ms. Basso successfully wrote and sponsored days after the Supreme Court's *Dobbs* decision was leaked declaring the school board a "champion" of abortion access and requiring that the school

board advance "the historic fight" for abortion on social media and the school district's website.

    e.   The seventh page of Exhibit G is a true and correct copy of a Facebook post Ms. Basso made on October 25, 2019, praising and taking a selfie with City Attorney Mara Elliott. Plaintiff's counsel redacted in the lower left quadrant of the page the personal identifying information of a member of its own staff who pulled the post.

9.    Attached hereto as **Exhibit N** is a true and correct copy of the 2012 City of San Diego proclamation, sponsored by current San Diego Mayor Todd Gloria, celebrating 100 years of freedom of speech in the city, as calculated from the year the city council used buffer zones to suppress labor organizers' speech.

10.    Attached hereto as **Exhibit O** is a true and correct excerpt of pages from the National Abortion Federation's most recently published annual report on abortion clinics' self-reported and unverified accounts of clinic violence, entitled *2022 Violence & Disruption Statistics*.

11.    Attached hereto as **Exhibit P** is a true and correct copy as of October 23, 2024, at 5:13 p.m. Eastern Time of the LinkedIn profile of Grace Gage, the Planned Parenthood escort who at the May 21 city council meeting claimed that it is impossible to enter the downtown clinic because of protestor blockades. Plaintiff's counsel highlighted two segments of text: (1) Ms. Gage's name on page 1 and (2) her entry reporting her years working as a clinic escort, which began two decades after the last recorded clinic blockade in San Diego.

12.    Attached hereto as **Exhibit Q** is a true and correct copy of news stories and official social media postings of abortion activists' more than 120 attacks on churches, pro-life organizations and their property, and pro-life persons because of their pro-life views in the year and 17 days after the Supreme Court's *Dobbs* decision was leaked. Because the U.S. Department of Justice so far has refused to prosecute any of the attacks despite its authority to do so under the federal Freedom of Access to Clinic Entrances Act of 1994, Plaintiff's counsel pulled the list from the nonprofit Family Research Council as maintained at https://downloads.frc.org/EF/EF22F17.pdf.

13.    Attached hereto as **Exhibit R** is a true and correct excerpt of the U.S. Department of Justice webpage listing the agency's Civil Rights Division's litigation under the Freedom of Access to Clinic Entrances Act of 1994, as the webpage was updated through October 25, 2024, and appeared on November 9, 2024, at 10:01 p.m. Central Time. Plaintiff's counsel highlighted the word "FACE" on page 2 of the exhibit.

14.    Attached hereto as **Exhibit S** is a true and correct copy of the July 27, 2023 meeting agenda for California's Reproductive Rights Task Force. Plaintiff's counsel highlights the name and a question from San Diego City Attorney Mara Elliott on page 2 of the exhibit, a note about plans among participants to coordinate on imposing bubble zone ordinances on page 3, and language about the taskforce's goal of "[p]roviding assistance regarding model ordinance on bubble zones to protect access to clinics" on page 4.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on November 13, 2024, in Rancho Santa Fe, California.

_____
Paul M. Jonna, Esq.

Decl. of Paul M. Jonna, Esq. ISO Mot. for Prelim. Inj.

**EXHIBIT A**

## EXHIBIT A

(O-2024-114)
(COR. COPY)

ORDINANCE NUMBER O-_____**21822**_____ (NEW SERIES)

DATE OF FINAL PASSAGE _____**JUN 1 1 2024**_____

AN ORDINANCE AMENDING CHAPTER 5, ARTICLE 2,
DIVISION 10 OF THE SAN DIEGO MUNICIPAL CODE BY
AMENDING SECTIONS 52.1001, 52.1002 AND ADDING NEW
SECTIONS 52.1003, 52.1004, 52.1005, AND 52.1006; AND
AMENDING CHAPTER 5, ARTICLE 8, DIVISION 4 BY
AMENDING SECTIONS 58.0402 AND 58.0403, RELATING TO
PUBLIC ACCESS TO HEALTH CARE FACILITIES, PLACES
OF WORSHIP, AND SCHOOL GROUNDS.

WHEREAS, buffer zones generally establish an area around a specific location where

speech and demonstration activities are subject to regulations that are not applicable outside that

buffer zone area; and

WHEREAS, the City of San Diego adopted a buffer zone ordinance in 1997 applicable to

health care facilities, places of worship, and school grounds (Covered Facilities), which has not

been amended since its adoption; and

WHEREAS, the City's buffer zone ordinance was adopted to balance often competing

rights: to medical privacy, to freely gain access to health care and educational services, to

practice religion, and to freely exercise constitutionally protected speech; and

WHEREAS, the current law requires demonstrators within the buffer zone to withdraw to

15 feet away from a person entering or exiting a Covered Facility only if the person asks the

demonstrator to do so; and

WHEREAS, the current law is outdated and imposes a significant burden on persons

seeking to exercise protected rights while accessing a Covered Facility; and

-PAGE 1 OF 12-

1

(O-2024-114)
(COR. COPY)

WHEREAS, demonstration activities around Covered Facilities have subjected students, teachers, parents, worshippers, health care providers and their patients to harassment and abuse from people who attempt to block entrances and exits to Covered Facilities and parking lots used to access these locations; and

WHEREAS, aggressive demonstration activities pose significant public safety threats and risk bodily harm to the demonstrators blocking driveways and doorways, and to the persons trying to access Covered Facilities; and

WHEREAS, Planned Parenthood of the Pacific Southwest reported 75 percent of its staff hear complaints about protest activities from patients on a daily or weekly basis and approximately 70 percent of staff reported patients feeling intimidated, harassed, or threatened by protest activity; and

WHEREAS, places of worship and schools are increasingly exposed to demonstration activity and recently Governor Newsom authorized $30 million in state funding to protect places of worship from violent attacks and hate crimes that can occur if demonstration activity gets out of hand; and

WHEREAS, the United States Supreme Court recognized the harmful impact of nonconsensual conversations and amplified noise on patients receiving medical treatment and held that government may protect public health and safety by adopting narrowly tailored regulations on demonstration activity near healthcare facilities and further held that a distance of eight feet is sufficient for demonstrators to share their message with those entering Covered Facilities; and

(O-2024-114)
(COR. COPY)

WHEREAS, the Council desires to prevent the obstruction, harassment, and intimidation of people entering and exiting Covered Facilities while preserving the fundamental constitutional rights of people to peacefully assemble and express opinions on matters of public concern; and

WHEREAS, the Council further desires to facilitate healthcare organizations, religious organizations, and schools ability to notify people of their rights under the law and to protect their staff, patients, worshippers, parents and students when needed through maintaining their own legal action under the law; NOW THEREFORE,

BE IT ORDAINED, by the Council of the City of San Diego, as follows:

Section 1. That Chapter 5, Article 2, Division 10 of the San Diego Municipal Code is amended by amending sections 52.1001, 52.1002, and adding new sections 52.1003, 52.1004, 52.1005, and  52.1006, to read as follows:

**§52.1001**　　　**Purpose and Intent**

The Council finds that every person in the City of San Diego has a constitutional right to privacy in accessing healthcare, including reproductive healthcare, to exercise religion, and to access equal educational opportunities, and that intentional efforts to harass or prevent a person from exercising these rights are contrary to the interests of the people of San Diego. The Council further recognizes that every person in the City of San Diego has the constitutional right to assemble peaceably and to exercise free speech rights. It is the purpose of this Division to strike a balance between protecting the rights of those who seek access to healthcare, to practice their religion, and access educational services, while also protecting the rights of those who wish to express themselves.

(O-2024-114)
(COR. COPY)

**§52.1002**      **Definitions**

For purposes of this Division, defined terms appear in italics. The following definitions apply:

*Consent* means to give permission through words or acts to what another person proposes through words or acts.

*Entrance* and *exit* mean any door, gate, opening, or intersection of the public right-of-way and a private walk or path leading to a *health care facility*, *place of worship,* or *school grounds*, used by persons to gain access to or leave the premises of a *health care facility*, *place of worship,* or *school grounds*.

*Harass* and *harassment* mean engaging in a knowing and willful actions or course of conduct directed at a specific person or persons that would seriously alarm or aggravate, cause substantial distress to, *intimidate*, terrorize, threaten, or torment a reasonable person. *Harassment* does not include consensual conversations or displaying a sign from more than eight feet away from a person or persons. *Harassment* includes approaching or following a person with the intent to *harass* once the person has indicated they do not want to be approached or followed; intentionally touching or causing physical contact with a person without that person's *consent*; and using violent or threatening gestures toward a person.

*Health care facility* means any medical or health facility, hospital, or clinic within the City that is licensed as a health care facility under state law or any building, office, or other place within the City regularly used by any health care provider licensed under California law to provide medical, nursing, counseling, referral, information, or advice to patients.

(O-2024-114)
(COR. COPY)

*Intimidate* means use of credible threats of violence, oppression, or coercion with the intent to prevent a person from accessing a *health care facility*, *place of worship*, *school grounds*, or a *parking lot*.

*Obstruct* means making ingress to or egress from a *health care facility*, *place of worship*, *school grounds*, or a *parking lot* impassable or unreasonably difficult or hazardous. *Obstruct* includes intentionally blocking or interfering with the safe or free passage of pedestrians or vehicles by any means, intentionally causing a pedestrian to take evasive action to avoid physical contact, and placing signs, tables, chairs, or other objects in a manner that blocks the flow of pedestrian traffic.

*Parking lot* means property owned, leased, occupied, or otherwise held out to the public by a *health care facility*, *place of worship*, or school as a place where a person can park a vehicle for the purpose of accessing the *health care facility*, *place of worship*, or *school grounds*.

*Place of worship* means a place in which religious worship, as defined under California law, is conducted.

*School grounds* means the building or buildings set aside for purposes of giving instruction on those courses of study required by the California Education Code or maintained pursuant to standards set by the State Board of Education, or in which such instruction is actually given, plus any grounds surrounding the school that are enclosed by a fence, wall, hedge, or other manner of enclosure. *School grounds* does not include the grounds associated with a vocational or professional institution of higher education, including a community or junior college, college,

(O-2024-114)
(COR. COPY)

or university and does not include a private residence where home schooling activities occur.

**§52.1003    Establishment of Buffer Zone at Entrances and Exits to Health Care Facilities, Places of Worship, and School Grounds**

(a)    Obstructing Access. No person shall *obstruct* an *entrance* or *exit* or access to a *parking lot* at a *health care facility*, *place of worship*, or *school grounds*.

(b)    Harassment and Intimidation Prohibited. Within a radius of 100 feet of a *health care facility*, *place of worship*, or *school grounds*, no person shall:

    (1)    approach within eight feet of a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility*, *place of worship*, or *school grounds* to *harass* or *intimidate* that person; or

    (2)    *harass* or *intimidate* a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility*, *place of worship*, or *school grounds*.

(c)    Consent Required. Within a radius of 100 feet of a *health care facility*, *place of worship*, or *school grounds*, unless the person or motor vehicle occupant *consents*, no person shall:

    (1)    knowingly and willfully approach within eight feet of a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility*, *place of worship*, or *school grounds*, to:

        (i)    pass a leaflet or handbill to that person;

        (ii)    display a sign to that person; or

(O-2024-114)
(COR. COPY)

(iii)    engage in oral protest, education, or counseling.

(2)    knowingly and willfully approach within eight feet of an occupant of a motor vehicle seeking to enter or exit a *parking lot*, to:

(i)    pass a leaflet or handbill to the motor vehicle occupant;

(ii)    display a sign to the motor vehicle occupant; or

(iii)    engage in oral protest, education, or counseling.

(d)    Measuring Eight Feet. For purposes of this Division, eight feet shall be measured from the extension of the body of the person seeking to enter or exit a *health care facility*, *place of worship*, or *school grounds* or the exterior of the occupied motor vehicle seeking to enter or exit a *parking lot* to the extension of the body of, or any sign or object held by, another person.

(e)    Measuring 100 Feet. For purposes of this Division, 100 feet shall be measured from the main entrance door, or if the property is fenced and gated then from the main entrance gate, of the *health care facility*, *place of worship,* or *school grounds.*

(f)    Exemptions. Section 52.1003 does not apply to:

(1)    law enforcement or public safety officials acting in the scope of their employment; and

(2)    employees, agents, or volunteers of the *health care facility*, *place of worship*, or school or school district operating on *school grounds* acting within the scope of their employment, agency, or volunteer service.

(O-2024-114)
(COR. COPY)

**§52.1004    Noise Limitations**

    (a)    Within a radius of 100 feet of a *health care facility*, *place of worship*, or *school grounds*, no person shall:

        (1)    make, or cause to be made, any disturbing, excessive, or offensive noise which causes discomfort or annoyance to any reasonable person of normal sensitivities; or

        (2)    make, or cause to be made, any noise which unreasonably interferes with the workings of a *health care facility*, *place of worship*, or school; or

        (3)    use loud speaking amplifiers or similar devices in a manner that emits a sound level exceeding 55 decibels any point ten feet or more from the noise source.

    (b)    Section 52.1004 applies from one hour before until one hour after the posted business hours of the *health care facility*, *place of worship*, or school.

    (c)    This prohibition does not apply when loud speaking amplifiers are operated by law enforcement or public safety officials acting in the scope of their employment.

**§ 52.1005    Signage**

Nothing in this Division shall prevent a *health care facility*, *place of worship*, or school or school district operating on *school grounds* from posting signage on property under its control stating the requirements of this Division. Posting

(O-2024-114)
(COR. COPY)

signage is not required for this Division to be effective or enforceable. Signage shall comply with any other applicable requirements of this Municipal Code.

**§52.1006**      **Remedies**

(a)      Any person who is aggrieved by an act prohibited by sections 52.1003 or 52.1004 may bring an action for damages, injunctive or declaratory relief, as appropriate, in a court of competent jurisdiction against any person who has violated or has conspired to violate its provisions. An aggrieved person includes any *health care facility*, *place of worship*, or school or school district operating on *school grounds*.

(b)      Any aggrieved person who prevails in an action brought under section 52.1006(a) shall be entitled to recover from the violator those actual damages, costs, attorneys' fees and such other relief as determined by the court. In addition to all other damages, the court may award to the aggrieved person a civil penalty of up to $2,500 for each violation.

(c)      The remedies provided by section 52.1006 are in addition to any other legal or equitable remedies the aggrieved person may have and are not intended to be exclusive.

(d)      Any violation of section 52.1003(a) or (b) shall constitute a misdemeanor. A first conviction for violation of section 52.1003(a) or (b), shall be punishable by a fine of not more than $500 or by imprisonment in the County Jail for a period of not more than three months, or by both fine and imprisonment. Each subsequent conviction for violation of section 52.1003(a) or (b) shall be punishable by a fine of not more than $1000 or

(O-2024-114)
(COR. COPY)

by imprisonment in the County Jail for a period of not more than six months, or by both fine and imprisonment.

   (e)   A law enforcement official may order any group of two or more persons who continue to violate this Division after a verbal warning to move to an area at least 100 feet away from any *entrance* or *exit* to a *health care facility*, *place of worship*, or *school grounds*. Section 52.1006(e) shall apply from one hour before until one hour after the posted business hours of the *health care facility*, *place of worship*, or school operating on *school grounds*.

   Section 2.   That Chapter 5, Article 8, Division 4 of the San Diego Municipal Code is amended by amending sections 58.0402 and 58.0403, to read as follows:

**§58.0402**   **Definitions**

All defined terms in this Division appear in italics. As used in this Division:

*School grounds* has the same meaning as in section 52.1002 of this Code.

*School Safety Zone* means all property within 1500 feet of *school grounds*.

**§58.0403**   **Minimum Penalties for Violations Occurring in a School Safety Zone**

Conviction of a violation of any of the laws specified in section 58.0403(a) - (e), occurring within a *School Safety Zone*, is punishable by a fine of not more than $1,000, or by imprisonment in the County jail for a period of not more than one year, or both. In all circumstances, the penalty for a first such offense within the *School Safety Zone* shall also include not less than three days or twenty-four hours of community service designed to enhance the safety and learning experience of school students; and for any subsequent such offense occurring within a *School*

(O-2024-114)
(COR. COPY)

*Safety Zone*, not less than five days or forty hours of community service designed

to enhance the safety and learning experience of school students:

(a)    Loitering for drug use, in violation of Municipal Code section 52.3001;

(b)    Committing any act in violation of Municipal Code section 52.1003;

(c)    Engaging in disorderly or offensive conduct in a public place, in violation

of Municipal Code section 56.27;

(d)    Consuming alcohol in a public place, in violation of Municipal Code

section 56.54(b); and

(e)    Committing any crime involving "a pattern of criminal gang activity," as

that term is defined in California Penal Code section 186.22.

Section 3.    That a full reading of this Ordinance is dispensed with prior to passage, a

written copy having been made available to the Council and the public prior to the day of its

passage.

Section 4.    That this Ordinance shall take effect and be in force on the thirtieth day

from and after its final passage.

APPROVED: MARA W. ELLIOTT, City Attorney

By _____

Heather M. Ferbert
Senior Chief Deputy City Attorney

HMF:sc:jdf:cm
05/06/2024
06/26/2024 COR. COPY
Or.Dept: City Attorney
Doc. No. 3511340_2

(O-2024-114)
(COR. COPY)

I hereby certify that the foregoing Ordinance was passed by the Council of the City of San Diego, at this meeting of _____ .



DIANA J.S. FUENTES
City Clerk

By_____
       Deputy City Clerk

Approved: _____          _____
         (date)                                    TODD GLORIA, Mayor

Vetoed: _____          _____
      (date)                                      TODD GLORIA, Mayor

(See attached memo and signature page.)

**Office of
The City Attorney
City of San Diego**

**MEMORANDUM**

**DATE:**      June 26, 2024

**TO:**        City Clerk

**FROM:**      Heather Ferbert, Deputy City Attorney

**SUBJECT:**   O-21822

Please see the attached Ordinance O-2024-114 COR. COPY. Corrections made to Sections 52.1001 and 52.1002, by adding the titles to each section.

HMF:jdf
Enclosure
cc:    Krystell Medina, Legislative Recorder
       Gilberto Sanchez, Associate Management Analyst

(O-2024-114)

I hereby certify that the foregoing Ordinance was passed by the Council of the City of San Diego, at this meeting of _____ JUN 0 4 2024 _____ .

DIANA J.S. FUENTES
City Clerk

By _____
    Deputy City Clerk

Approved: __6/11/24_____
              (date)

_____
        TODD GLORIA, Mayor

Vetoed: _____
              (date)

_____
        TODD GLORIA, Mayor

(O-2024-114)

# STRIKEOUT ORDINANCE

**OLD LANGUAGE:** ~~Struck Out~~
**NEW LANGUAGE:** __Double Underline__

ORDINANCE NUMBER O-_____ (NEW SERIES)

DATE OF FINAL PASSAGE _____

AN ORDINANCE AMENDING CHAPTER 5, ARTICLE 2,
DIVISION 10 OF THE SAN DIEGO MUNICIPAL CODE BY
AMENDING SECTIONS 52.1001, 52.1002 AND ADDING NEW
SECTIONS 52.1003, 52.1004, 52.1005, AND SECTION 52.1006;
AND AMENDING CHAPTER 5, ARTICLE 8, DIVISION 4 BY
AMENDING SECTIONS 58.0402 AND 58.0403, RELATING TO
PUBLIC ACCESS TO HEALTH CARE FACILITIES, PLACES
OF WORSHIP, AND SCHOOL GROUNDS.

**§52.1001**    ~~**Establishment of Fixed Buffer Zone at Entrances And Exits to Health Care Facilities, Places of Worship and School Grounds**~~ __**Purpose and Intent**__

(a)    ~~For purposes of Section 52.1001:~~

~~"Demonstration activity" includes but is not limited to advocating, protesting, picketing, distributing literature, or engaging in oral advocacy or protest, education or counseling activities. "Entrance" and "exit" mean any door, gate, opening, or intersection of the public right- of-way and a private walk or path leading to a health care facility, place of worship, or school grounds, used by persons to gain access to or leave the premises of a health care facility, place of worship or school grounds.~~

~~"Health care facility" means any medical or health facility, hospital, or clinic within the City that is licensed as a health care facility under State law or any building, office or other place within the City regularly used by~~

-PAGE 1 OF 12-

**15**

any health care provider licensed under California law to provide medical, nursing, or health care or advice to patients.

"Place of worship" means a place in which religious worship, as defined under California law, is conducted.

"School grounds" means the building or buildings set aside for purposes of giving instruction, or in which instruction is actually given, that is recognized and licensed as a school by the State of California or any political subdivision thereof, plus any grounds surrounding the school that are enclosed by a fence, wall, hedge or other manner of enclosure.

(b)     It is unlawful for any person in the course of demonstration activity in the vicinity of a health care facility, place of worship or school grounds, acting alone or in concert with others, to fail to withdraw, upon the request of a person entering or exiting a health care facility, place of worship or school grounds, to a distance of at least fifteen (15) feet away from any entrance to or exit from the health care facility, place of worship or school grounds. A person who has withdrawn pursuant to this section must remain at least fifteen (15) feet from the entrance or exit only until the person requesting the withdrawal has either: (1) entered the health care facility, place of worship or school grounds, or (2) is outside the fifteen (15) foot zone.

(c)     For purposes of this section, a person may request another person to withdraw by an oral communication, or by carrying or wearing a visible sign clearly requesting withdrawal. Oral statements or signs displaying

-PAGE 2 OF 12-

~~words or symbols such as "stop it," "withdraw," "back off," "get away," or "leave me alone" shall be sufficient to constitute a request to withdraw under this section. Mere statements of opinion or disagreement made in the absence of a request to withdraw shall not be sufficient to constitute a request under this section.~~

~~(d)    For purposes of this section, the distance of fifteen (15) feet shall be measured from the threshold of the entrance or exit.~~

<u>The Council finds that every person in the City of San Diego has a constitutional right to privacy in accessing healthcare, including reproductive healthcare, to exercise religion, and to access equal educational opportunities, and that intentional efforts to harass or prevent a person from exercising these rights are contrary to the interests of the people of San Diego. The Council further recognizes that every person in the City of San Diego has the constitutional right to assemble peaceably and to exercise free speech rights. It is the purpose of this Division to strike a balance between protecting the rights of those who seek access to healthcare, to practice their religion, and access educational services, while also protecting the rights of those who wish to express themselves.</u>

§52.1002    ~~**Private Right of Action**~~ <u>Definitions</u>

~~(a)    Any person who is aggrieved by an act prohibited by Sections 52.1001 may bring an action for damages, injunctive or declaratory relief, as appropriate, in a court of competent jurisdiction against any person who has violated or has conspired to violate its provisions.~~

(O-2024-114)

(b) ~~Any aggrieved person who prevails in an action brought under Section 52.1002 shall be entitled to recover from the violator those damages, costs, attorneys' fees and such other relief as determined by the court. In addition to all other damages, the court may award to the aggrieved person a civil penalty of up to one thousand dollars ($1,000.00) for each violation.~~

(c) ~~The remedies provided by Section 52.1002<u>6</u> are in addition to any other legal or equitable remedies the aggrieved person may have and are not intended to be exclusive.~~

For purposes of this Division, defined terms appear in italics. The following definitions apply:

*Consent* means to give permission through words or acts to what another person proposes through words or acts.

*Entrance* and *exit* mean any door, gate, opening, or intersection of the public right-of-way and a private walk or path leading to a *health care facility, place of worship,* or *school grounds,* used by persons to gain access to or leave the premises of a *health care facility, place of worship,* or *school grounds.*

*Harass* and *harassment* mean engaging in a knowing and willful actions or course of conduct directed at a specific person or persons that would seriously alarm or aggravate, cause substantial distress to, *intimidate,* terrorize, threaten, or torment a reasonable person. *Harassment* does not include consensual conversations or displaying a sign from more than eight feet away from a person or persons. *Harassment* includes approaching or following a person with the intent to *harass*

-PAGE 4 OF 12-

(O-2024-114)

once the person has indicated they do not want to be approached or followed; intentionally touching or causing physical contact with a person without that person's *consent*; and using violent or threatening gestures toward a person.

*Health care facility* means any medical or health facility, hospital, or clinic within the City that is licensed as a health care facility under state law or any building, office, or other place within the City regularly used by any health care provider licensed under California law to provide medical, nursing, counseling, referral, information, or advice to patients.

*Intimidate* means use of credible threats of violence, oppression, or coercion with the intent to prevent a person from accessing a *health care facility, place of worship, school grounds,* or a *parking lot.*

*Obstruct* means making ingress to or egress from a *health care facility, place of worship, school grounds,* or a *parking lot* impassable or unreasonably difficult or hazardous. *Obstruct* includes intentionally blocking or interfering with the safe or free passage of pedestrians or vehicles by any means, intentionally causing a pedestrian to take evasive action to avoid physical contact, and placing signs, tables, chairs, or other objects in a manner that blocks the flow of pedestrian traffic.

*Parking lot* means property owned, leased, occupied, or otherwise held out to the public by a *health care facility, place of worship,* or school as a place where a person can park a vehicle for the purpose of accessing the *health care facility, place of worship,* or *school grounds.*

-PAGE 5 OF 12-

**19**

(O-2024-114)

*Place of worship* means a place in which religious worship, as defined under California law, is conducted.

*School grounds* means the building or buildings set aside for purposes of giving instruction on those courses of study required by the California Education Code or maintained pursuant to standards set by the State Board of Education, or in which such instruction is actually given, plus any grounds surrounding the school that are enclosed by a fence, wall, hedge, or other manner of enclosure. *School grounds* does not include the grounds associated with a vocational or professional institution of higher education, including a community or junior college, college, or university and does not include a private residence where home schooling activities occur.

**§52.1003    Establishment of Buffer Zone at Entrances and Exits to Health Care Facilities, Places of Worship, and School Grounds**

(a)    Obstructing Access. No person shall *obstruct* an *entrance* or *exit* or access to a *parking lot* at a *health care facility, place of worship,* or *school grounds.*

(b)    Harassment and Intimidation Prohibited. Within a radius of 100 feet of a *health care facility, place of worship,* or *school grounds,* no person shall:

    (1)    approach within eight feet of a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility, place of worship,* or *school grounds* to *harass* or *intimidate* that person; or

(O-2024-114)

    (2)    *harass* or *intimidate* a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility, place of worship*, or *school grounds*.

(c)    Consent Required. Within a radius of 100 feet of a *health care facility, place of worship*, or *school grounds*, unless the person or motor vehicle occupant *consents*, no person shall:

    (1)    knowingly and willfully approach within eight feet of a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility, place of worship*, or *school grounds*, to:

        (i)    pass a leaflet or handbill to that person;

        (ii)    display a sign to that person; or

        (iii)    engage in oral protest, education, or counseling.

    (2)    knowingly and willfully approach within eight feet of an occupant of a motor vehicle seeking to enter or exit a *parking lot*, to:

        (i)    pass a leaflet or handbill to the motor vehicle occupant;

        (ii)    display a sign to the motor vehicle occupant; or

        (iii)    engage in oral protest, education, or counseling.

(d)    Measuring Eight Feet. For purposes of this Division, eight feet shall be measured from the extension of the body of the person seeking to enter or exit a *health care facility, place of worship*, or *school grounds* or the exterior of the occupied motor vehicle seeking to enter or exit a *parking lot* to the extension of the body of, or any sign or object held by, another person.

(O-2024-114)

(e) Measuring 100 Feet. For purposes of this Division, 100 feet shall be measured from the main entrance door, or if the property is fenced and gated then from the main entrance gate, of the *health care facility, place of worship,* or *school grounds.*

(f) Exemptions. Section 52.1003 does not apply to:

    (1) law enforcement or public safety officials acting in the scope of their employment; and

    (2) employees, agents, or volunteers of the *health care facility, place of worship,* or school or school district operating on *school grounds* acting within the scope of their employment, agency, or volunteer service.

**§52.1004**     **Noise Limitations**

(a) Within a radius of 100 feet of a *health care facility, place of worship,* or *school grounds,* no person shall:

    (1) make, or cause to be made, any disturbing, excessive, or offensive noise which causes discomfort or annoyance to any reasonable person of normal sensitivities; or

    (2) make, or cause to be made, any noise which unreasonably interferes with the workings of a *health care facility, place of worship,* or school; or

    (3) use loud speaking amplifiers or similar devices in a manner that emits a sound level exceeding 55 decibels any point ten feet or more from the noise source.

-PAGE 8 OF 12-

**22**

(O-2024-114)

(b)   Section 52.1004 applies from one hour before until one hour after the posted business hours of the *health care facility, place of worship*, or school.

(c)   This prohibition does not apply when loud speaking amplifiers are operated by law enforcement or public safety officials acting in the scope of their employment.

**§ 52.1005**   **Signage**

Nothing in this Division shall prevent a *health care facility, place of worship*, or school or school district operating on *school grounds* from posting signage on property under its control stating the requirements of this Division. Posting signage is not required for this Division to be effective or enforceable. Signage shall comply with any other applicable requirements of this Municipal Code.

**§52.1006**   **Remedies**

(a)   Any person who is aggrieved by an act prohibited by sections 52.1003 or 52.1004 may bring an action for damages, injunctive or declaratory relief, as appropriate, in a court of competent jurisdiction against any person who has violated or has conspired to violate its provisions. An aggrieved person includes any *health care facility, place of worship*, or school or school district operating on *school grounds*.

(b)   Any aggrieved person who prevails in an action brought under section 52.1006(a) shall be entitled to recover from the violator those actual damages, costs, attorneys' fees and such other relief as determined by the

(O-2024-114)

court. In addition to all other damages, the court may award to the aggrieved person a civil penalty of up to $2,500 for each violation.

(c)     The remedies provided by section 52.1006 are in addition to any other legal or equitable remedies the aggrieved person may have and are not intended to be exclusive.

(d)     Any violation of section 52.1003(a) or (b) shall constitute a misdemeanor. A first conviction for violation of section 52.1003(a) or (b), shall be punishable by a fine of not more than $500 or by imprisonment in the County Jail for a period of not more than three months, or by both fine and imprisonment. Each subsequent conviction for violation of section 52.1003(a) or (b) shall be punishable by a fine of not more than $1000 or by imprisonment in the County Jail for a period of not more than six months, or by both fine and imprisonment.

(e)     A law enforcement official may order any group of two or more persons who continue to violate this Division after a verbal warning to move to an area at least 100 feet away from any *entrance* or *exit* to a *health care facility, place of worship,* or *school grounds.* Section 52.1006(e) shall apply from one hour before until one hour after the posted business hours of the *health care facility, place of worship,* or school operating on *school grounds.*

§58.0402    **Definitions**

All defined terms in this Division appear in italics. As used in this Division:

"*School grounds*" has the same meaning as in ~~S~~section 52.100~~1~~2 of this Code.

"*School Safety Zone*" means all property within 1500 feet of ~~school grounds~~ *school grounds*.

§58.0403    **Minimum Penalties for Violations Occurring in a School Safety Zone**

Conviction of a violation of any of the laws specified in ~~S~~section 58.0403(a) - (e), occurring within a *School Safety Zone*, is punishable by a fine of not more than $1,000, or by imprisonment in the County jail for a period of not more than one year, or both. In all circumstances, the penalty for a first such offense within the *School Safety Zone* shall also include not less than three days or twenty-four hours of community service designed to enhance the safety and learning experience of school students; and for any subsequent such offense occurring within a *School Safety Zone*, not less than five days or forty hours of community service designed to enhance the safety and learning experience of school students:

(a)    Loitering for drug use, in violation of Municipal Code section 52.3001;

(b)    Committing any act in violation of Municipal Code section 52.100~~1~~3;

(c)    Engaging in disorderly or offensive conduct in a public place, in violation of Municipal Code section 56.27;

(d)    Consuming alcohol in a public place, in violation of Municipal Code section 56.54(b); <u>and</u>

(O-2024-114)

    (e)    Committing any crime involving "a pattern of criminal gang activity," as

that term is defined in California Penal Code section 186.22.

HMF:sc:jdf:cm
05/06/2024
Or.Dept: City Attorney
Doc. No. 3511342

Passed by the Council of The City of San Diego on _____ JUN 0 4 2024 _____, by the following vote:

| Councilmembers | Yeas | Nays | Not Present | Recused |
|---|---|---|---|---|
| Joe LaCava | ☑ | ☐ | ☐ | ☐ |
| Jennifer Campbell | ☑ | ☐ | ☐ | ☐ |
| Stephen Whitburn | ☑ | ☐ | ☐ | ☐ |
| Henry L. Foster III | ☑ | ☐ | ☐ | ☐ |
| Marni von Wilpert | ☑ | ☐ | ☐ | ☐ |
| Kent Lee | ☑ | ☐ | ☐ | ☐ |
| Raul A. Campillo | ☐ | ☐ | ☑ | ☐ |
| Vivian Moreno | ☑ | ☐ | ☐ | ☐ |
| Sean Elo-Rivera | ☑ | ☐ | ☐ | ☐ |

Date of final passage _____ JUN 1 1 2024 _____.

AUTHENTICATED BY:

_____ TODD GLORIA _____
Mayor of The City of San Diego, California.

(Seal)

_____ DIANA J.S. FUENTES _____
City Clerk of The City of San Diego, California.

By _Krystell Medina_, Deputy

I HEREBY CERTIFY that the foregoing ordinance was not finally passed until twelve calendar days had elapsed between the day of its introduction and the day of its final passage, to wit, on

_____ MAY 2 1 2024 _____, and on _____ JUN 1 1 2024 _____.

I FURTHER CERTIFY that said ordinance was read in full prior to passage or that such reading was dispensed with by a vote of five members of the Council, and that a written copy of the ordinance was made available to each member of the Council and the public prior to the day of its passage.

(Seal)

_____ DIANA J.S. FUENTES _____
City Clerk of The City of San Diego, California.

By _Krystell Medina_, Deputy

Office of the City Clerk, San Diego, California

Ordinance Number O-_____ 21822 _____

27

**EXHIBIT H**

EXHIBIT H

**Recipient Committee
Campaign Statement
Cover Page**

COVER PAGE

| Date Stamp | **CALIFORNIA FORM 460** |
|---|---|

City of San Diego
Electronic Filing

Filing ID
300063104

Filing Date
07/31/2024 09:47:26

Page <u>1</u> of <u>85</u>

For Official Use Only

SEE INSTRUCTIONS ON REVERSE

| Statement covers period | | Date of election if applicable: (Month, Day, Year) |
|---|---|---|
| from <u>02/18/2024</u> | | |
| through <u>06/30/2024</u> | | |

**1. Type of Recipient Committee:**  All Committees – Complete Parts 1, 2, 3, and 4.

[X] Officeholder, Candidate Controlled Committee
   ○ State Candidate Election Committee
   ○ Recall
   *(Also Complete Part 5)*

[ ] General Purpose Committee
   ○ Sponsored
   ○ Small Contributor Committee
   ○ Political Party/Central Committee

[ ] Primarily Formed Ballot Measure Committee
   ○ Controlled
   ○ Sponsored
   *(Also Complete Part 6)*

[ ] Primarily Formed Candidate/ Officeholder Committee
   *(Also Complete Part 7)*

**2. Type of Statement:**

[ ] Preelection Statement
[X] Semi-annual Statement
[ ] Termination Statement
   (Also file a Form 410 Termination)
[ ] Amendment (Explain below)

[ ] Quarterly Statement
[ ] Special Odd-Year Report

**3. Committee Information**

I.D. NUMBER
1457399

COMMITTEE NAME (OR CANDIDATE'S NAME IF NO COMMITTEE)
Ferbert for City Attorney 2024

STREET ADDRESS (NO P.O. BOX)

| CITY | STATE | ZIP CODE | AREA CODE/PHONE |
|---|---|---|---|
| Sacramento | CA | 95841 | |

MAILING ADDRESS (IF DIFFERENT) NO. AND STREET OR P.O. BOX

| CITY | STATE | ZIP CODE | AREA CODE/PHONE |
|---|---|---|---|

OPTIONAL: FAX / E-MAIL ADDRESS

**Treasurer(s)**

NAME OF TREASURER
Denise Lewis
MAILING ADDRESS

| CITY | STATE | ZIP CODE | AREA CODE/PHONE |
|---|---|---|---|
| Sacramento | CA | 95841 | |

NAME OF ASSISTANT TREASURER, IF ANY
Marissa Russell
MAILING ADDRESS

| CITY | STATE | ZIP CODE | AREA CODE/PHONE |
|---|---|---|---|
| Sacramento | CA | 95841 | |

OPTIONAL: FAX / E-MAIL ADDRESS

**4. Verification**

I have used all reasonable diligence in preparing and reviewing this statement and to the best of my knowledge the information contained herein and in the attached schedules is true and complete.  I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on <u>07/25/2024</u>  By <u>Denise Lewis</u>
        Date                  Signature of Treasurer or Assistant Treasurer

Executed on <u>07/25/2024</u>  By <u>Heather M. Ferbert</u>
        Date                  Signature of Controlling Officeholder, Candidate, State Measure Proponent or Responsible Officer of Sponsor

Executed on _____  By _____
        Date                  Signature of Controlling Officeholder, Candidate, State Measure Proponent

Executed on _____  By _____
        Date                  Signature of Controlling Officeholder, Candidate, State Measure Proponent

**1**

FPPC Form 460 (Jan/2016)
FPPC Advice: advice@fppc.ca.gov (866/275-3772)
www.fppc.ca.gov

**Schedule A (Continuation Sheet)**
**Monetary Contributions Received**

Amounts may be rounded to whole dollars.

SCHEDULE A  (CONT.)

| Statement covers period | | CALIFORNIA FORM **460** |
|---|---|---|
| from _02/18/2024_ | | |
| through _06/30/2024_ | Page _48_ of _85_ | |

NAME OF FILER

Ferbert for City Attorney 2024

I.D. NUMBER

1457399

| DATE RECEIVED | FULL NAME, STREET ADDRESS AND ZIP CODE OF CONTRIBUTOR (IF COMMITTEE, ALSO ENTER I.D. NUMBER) | CONTRIBUTOR CODE * | IF AN INDIVIDUAL, ENTER OCCUPATION AND EMPLOYER (IF SELF-EMPLOYED, ENTER NAME OF BUSINESS) | AMOUNT RECEIVED THIS PERIOD | CUMULATIVE TO DATE CALENDAR YEAR (JAN. 1 - DEC. 31) | PER ELECTION TO DATE (IF REQUIRED) |
|---|---|---|---|---|---|---|
| 06/25/2024 | Nancy Norman Mumford<br>San Diego CA 92122 | [X] IND<br>[ ] COM<br>[ ] OTH<br>[ ] PTY<br>[ ] SCC | Retired<br>None<br><br>Intermediary:<br>Actblue<br>Somerville, MA, 02144 | 250.00 | 250.00 | P2024     300.00<br>G2024     250.00 |
| 04/21/2024 | Mary Nuesca<br>San Diego CA 92129 | [X] IND<br>[ ] COM<br>[ ] OTH<br>[ ] PTY<br>[ ] SCC | Not Employed<br>None<br><br>Intermediary:<br>Actblue<br>Somerville, MA, 02144 | 50.00 | 220.00 | P2024     250.00<br>G2024      70.00 |
| 06/30/2024 | Mary Nuesca<br>San Diego CA 92129 | [X] IND<br>[ ] COM<br>[ ] OTH<br>[ ] PTY<br>[ ] SCC | Not Employed<br>None<br><br>Intermediary:<br>Actblue<br>Somerville, MA, 02144 | 20.00 | 220.00 | P2024     250.00<br>G2024      70.00 |
| 02/22/2024 | Victor M Nunez<br>Chula Vista CA 91910 | [X] IND<br>[ ] COM<br>[ ] OTH<br>[ ] PTY<br>[ ] SCC | Retired<br>None | 200.00 | 200.00 | P2024     200.00 |
| 05/21/2024 | Neal Ortiguerra<br>San Diego CA 92154 | [X] IND<br>[ ] COM<br>[ ] OTH<br>[ ] PTY<br>[ ] SCC | Director of Political Action<br>Planned Parenthood of the Pacific Southwest<br>Intermediary:<br>Actblue<br>Somerville, MA, 02144 | 100.00 | 100.00 | G2024     100.00 |

**SUBTOTAL $**   620.00

*Contributor Codes
IND – Individual
COM – Recipient Committee
    (other than PTY or SCC)
OTH – Other (e.g., business entity)
PTY – Political Party
SCC – Small Contributor Committee

FPPC Form 460 (Jan/2016)
FPPC Advice: advice@fppc.ca.gov (866/275-3772)
www.fppc.ca.gov

**2**

**EXHIBIT I**

# EXHIBIT I



(O-93-78 REV. 2)
COR. COPY

ORDINANCE NUMBER O-_17897_____ (NEW SERIES)

ADOPTED ON ___MAR 1 5 1993___

AN ORDINANCE AMENDING CHAPTER V, ARTICLE 2,
OF THE SAN DIEGO MUNICIPAL CODE BY ADDING A
NEW DIVISION 10 ENTITLED "PUBLIC ACCESS TO
HEALTH CARE FACILITIES, PLACES OF WORSHIP OR
SCHOOLS" AND NEW SECTIONS 52.1001 and
52.1002, TO PROTECT AGAINST IMPEDING ACCESS
WITHIN ONE HUNDRED (100) FEET OF A HEALTH
CARE FACILITY, PLACE OF WORSHIP OR SCHOOL AND
CREATING A PRIVATE RIGHT OF ACTION FOR
VIOLATIONS.

WHEREAS, access to health care services, places of worship
or schools is critically and uniquely important to the public
health, safety and welfare so that persons desiring or needing
access to such services should not be hampered, impeded, harassed
or intimidated from obtaining those services; and

WHEREAS, persons attempting to access health care
facilities, places of worship or schools are subject to harassing
or intimidating activity tending to hamper or impede their access
to those facilities by demonstrators approaching within extremely
close proximity and shouting or waving objects at them; and

WHEREAS, such activity near health care facilities, places
of worship or schools creates a "captive audience" situation
because persons seeking services cannot avoid the area outside of
the facilities if they are to receive the services provided
therein, and their physical and emotional ailments or conditions
can make them especially vulnerable to the adverse physiological

**1**

and emotional effects of such harassing or intimidating activities directed at them from extremely close proximity; and

WHEREAS, the adverse physiological and emotional effects created by such harassing or intimidating activities may pose health risks, interfere with medical treatment, diagnosis or recovery or cause persons to delay or forego medical treatment; and

WHEREAS, such harassing or intimidating activities that tend to hamper, hinder or impede access to health care services, places of worship or schools undermine a person's right to privacy and interfere with a person's right to seek the preservation of personal health or legitimate medical treatment; and

WHEREAS, this "captive audience" situation requires the enactment of reasonable time, place and manner restrictions to separate and protect demonstrators expressing their views and persons wishing to access health care facilities, places of worship or schools without direct confrontation, hindrance, harassment or intimidation; and

WHEREAS, this ordinance is a necessary time, place and manner restriction intended to reconcile and protect the First Amendment rights of demonstrators near health care facilities, places of worship or schools, and the rights of persons using health care facilities, places of worship or schools to be free from direct confrontation, hindrance, harassment, intimidation and harm; and

WHEREAS, this ordinance does not preclude protesting, picketing, demonstrating, leafleting or counselling activities

-PAGE 2 OF 5-

2

O-17897

near a health care facility, place of worship or school, but is intended to preclude only those activities involving harassment, intimidation or intrusion which have the effect of foreclosing, hampering or impeding access by such persons to health care facilities, places of worship or schools; and

WHEREAS, existing law does not adequately protect such access to health care facilities, places of worship or schools; NOW, THEREFORE,

BE IT ORDAINED, by the Council of The City of San Diego, as follows:

Section 1.   That Chapter V, Article 2, of the San Diego Municipal Code is hereby amended by adding Division 10, and Sections 52.1001 and 52.1002 to read as follows:

### DIVISION 10

### PUBLIC ACCESS TO HEALTH CARE FACILITIES, PLACES OF WORSHIP OR SCHOOLS

### SEC. 52.1001  IMPEDING ACCESS PROHIBITED

(a)  It is unlawful for any person in the course of demonstration activity within the access area of a health care facility, place of worship or school, acting alone or in concert with others, to fail to withdraw upon request to a distance of at least eight (8) feet away from any person who has made the request.

(b)  For purposes of Section 52.1001:

"Access area" means any portion of a public street or other public place or any place open to the public within one hundred (100) feet of an exterior wall of a health care facility, place of worship or school.

-PAGE 3 OF 5-

○ -17897

"Demonstration activity" includes, but is not limited to, protesting, picketing, distributing literature, or engaging in oral protest, education or counselling activities.

"Health care facility" means any medical or health facility, hospital or clinic within the City which is licensed under State law or any building, office or other place within the City regularly used by any health care provider licensed under State law to provide medical, nursing, or health care or advice to patients.

(c)  For purposes of Section 52.1001, a person may request another person to withdraw by a verbal communication, or by carrying or wearing a visible sign clearly requesting withdrawal.

Verbal statements or signs displaying words or symbols such as "stop it," "withdraw," "back off," "get away," or "leave me alone" shall be sufficient to constitute a request to withdraw under Section 52.1001. Mere statements of opinion or disagreement made in the absence of a request to withdraw shall not be sufficient to constitute a request under Section 52.1001.

(d)  For purposes of Section 52.1001, distance shall be measured from that part of the closest demonstrator's body that is nearest to the closest part of the requesting person's body. For purposes of the preceding sentence, the term "body" includes any natural or artificial extension of a person's body, including, but not limited to, an outstretched arm or a hand-held sign.

**SEC. 52.1002  PRIVATE RIGHT OF ACTION**

(a)  Any person who is seeking or intends to seek access to a health care facility, place of worship or school and is

𝒪-17897

aggrieved by an act prohibited by Section 52.1001 may bring an action for damages, injunctive or declaratory relief, as appropriate, in a court of competent jurisdiction against any person who has violated, has conspired to violate or proposes to violate its provisions.

(b)  Any person who prevails in an action brought under Section 52.1002 shall be entitled to recover from the violator those damages, costs, attorneys' fees and such other relief as determined by the court.  In addition to all other damages, the court may award to the aggrieved person a civil penalty of up to one thousand dollars ($1,000.00) for each violation.

(c)  The remedies provided by Section 55.1002 are in addition to any other legal or equitable remedies the aggrieved person may have and are not intended to be exclusive.

Section 2.  This ordinance shall take effect and be in force on the thirtieth day from and after its passage.

APPROVED:  JOHN W. WITT, City Attorney


By  _Joseph M. Battaglino_____
      Joseph M. Battaglino
      Deputy City Attorney

JMB:jp
10/21/92
01/08/93 COR. COPY
03/01/93 REV. 1
03/01/93 REV. 2
03/01/93 COR. COPY
03/02/93 COR. COPY
Or.Dept:Council
O-93-78
Form=o+t

0-17897

OLD LANGUAGE - STRIKE OUT
NEW LANGUAGE - UNDERLINED

(O-93-78 REV. 2)
COR. COPY

STRIKEOUT ORDINANCE NUMBER O-_____ (NEW SERIES)

ADOPTED ON _____

AN ORDINANCE AMENDING CHAPTER V, ARTICLE 2,
OF THE SAN DIEGO MUNICIPAL CODE BY ADDING A
NEW DIVISION 10 ENTITLED "PUBLIC ACCESS TO
HEALTH CARE FACILITIES, PLACES OF WORSHIP OR
SCHOOLS" AND NEW SECTIONS 52.1001 and
52.1002, TO PROTECT AGAINST IMPEDING ACCESS
WITHIN ONE HUNDRED (100) FEET OF A HEALTH
CARE FACILITY, PLACE OF WORSHIP OR SCHOOL AND
CREATING A PRIVATE RIGHT OF ACTION FOR
VIOLATIONS.

## DIVISION 10

### PUBLIC ACCESS TO HEALTH CARE FACILITIES PLACES OF WORSHIP OR SCHOOLS

### SEC. 52.1001  IMPEDING ACCESS PROHIBITED

(a)  It is unlawful for any person in the course of demonstration activity within the access area of a health care facility, place of worship or school, acting alone or in concert with others, to fail to withdraw upon request to a distance of at least eight (8) feet away from any person who has made the request.

(b)  For purposes of Section 52.1001:

"Access area" means any portion of a public street or other public place or any place open to the public within one hundred (100) feet of an exterior wall of a health care facility, place of worship or school.

"Demonstration activity" includes, but is not be limited to, protesting, picketing, distributing literature, or engaging in

-PAGE 1 OF 3-

O-17897

6

oral protest, education or counselling activities.

"Health care facility" means any medical or health facility, hospital or clinic within the City which is licensed under State law or any building, office or other place within the City regularly used by any health care provider licensed under State law to provide medical, nursing, or health care or advice to patients.

(c)  For purposes of Section 52.1001, a person may request another person to withdraw by a verbal communication, or by carrying or wearing a visible sign clearly requesting withdrawal.

Verbal statements or signs displaying words or symbols such as "stop it," "withdraw," "back off," "get away," or "leave me alone" shall be sufficient to constitute a request to withdraw under Section 52.1001.  Mere statements of opinion or disagreement made in the absence of a request to withdraw shall not be sufficient to constitute a request under Section 52.1001.

(d)  For purposes of Section 52.1001, distance shall be measured from that part of the closest demonstrator's body that is nearest to the closest part of the requesting person's body. For purposes of the preceding sentence, the term "body" includes any natural or artificial extension of a person's body, including, but not limited to, an outstretched arm or a hand-held sign.

**SEC.  52.1002  PRIVATE RIGHT OF ACTION**

(a)  Any person who is seeking or intends to seek access to a health care facility, place of worship or school, and is aggrieved by an act prohibited by Section 52.1001 may bring an action for damages, injunctive or declaratory relief, as

-PAGE 2 OF 3-

O - 17897

appropriate, in a court of competent jurisdiction against any person who has violated, has conspired to violate or proposes to violate its provisions.

(b)  Any person who prevails in an action brought under Section 52.1002 shall be entitled to recover from the violator those damages, costs, attorneys' fees and such other relief as determined by the court.  In addition to all other damages, the court may award to the aggrieved person a civil penalty of up to one thousand dollars ($1,000.00) for each violation.

(c)  The remedies provided by Section 55.1002 are in addition to any other legal or equitable remedies the aggrieved person may have and are not intended to be exclusive.

O-17897

Passed and adopted by the Council of The City of San Diego on .................................... **MAR 1 5 1993** ........ ,
by the following vote:

| Council Members | Yeas | Nays | Not Present | Ineligible |
|---|---|---|---|---|
| Abbe Wolfsheimer | ☑ | ☐ | ☐ | ☐ |
| Ron Roberts | ☑ | ☐ | ☐ | ☐ |
| John Hartley | ☑ | ☐ | ☐ | ☐ |
| George Stevens | ☐ | ☑ | ☑ | ☐ |
| Tom Behr | ☑ | ☐ | ☐ | ☐ |
| Valerie Stallings | ☑ | ☐ | ☐ | ☐ |
| Judy McCarty | ☑ | ☐ | ☐ | ☐ |
| Juan Vargas | ☑ | ☐ | ☐ | ☐ |
| Mayor Susan Golding | ☑ | ☐ | ☐ | ☐ |

AUTHENTICATED BY:

.................................................................................
**SUSAN GOLDING**
Mayor of The City of San Diego, California.

(Seal)

.................................................................................
**CHARLES G. ABDELNOUR**
City Clerk of The City of San Diego, California.

By... *Branda R. Barnes* ..., Deputy.

 

I HEREBY CERTIFY that the foregoing ordinance was not finally passed until twelve calendar days had elapsed between the day of its introduction and the day of its final passage, to wit, on

**MAR 0 1 1993** .................................. , and on ............... **MAR 1 5 1993** ........

~~I FURTHER CERTIFY that said ordinance was read in full prior to its final passage.~~

I FURTHER CERTIFY that the reading of said ordinance in full was dispensed with by a vote of not less than a majority of the members elected to the Council, and that there was available for the consideration of each member of the Council and the public prior to the day of its passage a written or printed copy of said ordinance.

.................................................................................
**CHARLES G. ABDELNOUR**
City Clerk of The City of San Diego, California.

By... *Branda R. Barnes* ..., Deputy.

(Seal)

---

Office of the City Clerk, San Diego, California

Ordinance Number *O-17897* Adopted **MAR 1 5 1993**

CC-1255-A (Rev. 2-93)

**9**

RECEIVED

93 MAR -2 PM 1: 16

CITY CLERKS OFFICE
SAN DIEGO, CA

**10**

## CERTIFICATE OF PUBLICATION

```
OFFICE OF THE CITY CLERK
CITY ADMINISTRATION BUILDING
202 C STREET, 2ND FLOOR
SAN DIEGO, CA  92101
```

RECEIVED
CITY CLERK'S OFFICE
93 MAR 30 AM 9: 35
SAN DIEGO, CALIF.
Φ

IN THE MATTER OF                                      NO.

"PUBLIC ACCESS TO HEALTH CARE FACILITIES, PLACES
OF WORSHIP OR SCHOOLS"

**ORDINANCE NUMBER O-17897 (NEW SERIES)**
AN ORDINANCE AMENDING CHAPTER V, ARTICLE 2, OF THE SAN DIEGO MUNICIPAL CODE BY ADDING A NEW DIVISION 10 ENTITLED "PUBLIC ACCESS TO HEALTH CARE FACILITIES, PLACES OF WORSHIP OR SCHOOLS" AND NEW SECTIONS 52.1001 and 52.1002 TO PROTECT AGAINST IMPEDING ACCESS WITHIN ONE HUNDRED (100) FEET OF A HEALTH CARE FACILITY, PLACE OF WORSHIP OR SCHOOL AND CREATING A PRIVATE RIGHT OF ACTION FOR VIOLATIONS.
This ordinance amends Chapter V, Article 2, of the San Diego Municipal Code by adding a new Division 10 and new sections 52.1001 and 52.1002. The ordinance will protect against impeding access within one hundred (100) feet of a health care facility, place of worship or school and create a private right of action for violations.
A complete copy of the Ordinance is available for inspection in the Office of the City Clerk of the City of San Diego, 2nd Floor, City Administration Building, 202 "C" Street, San Diego, CA 92101.
INTRODUCED ON March 1, 1993
Passed and adopted by the Council of the City of San Diego on March 15, 1993.
AUTHENTICATED BY:
SUSAN GOLDING,
Mayor of The City of San Diego, CA
CHARLES G. ABDELNOUR
City Clerk of The City of San Diego, CA
By RHONDA R. BARNES, Deputy.
Pub: Mar. 29                                    267735

I, Corey Donahue, am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years, and not a party to or interested in the above- entitled matter. I am the principal clerk of the San Diego Daily Transcript, a newspaper of general circulation, printed and published daily, except Saturdays and Sundays, in the City of San Diego, County of San Diego and which newspaper has been adjudged a newspaper of general circulation by the Superior Court of the County of San Diego, State of California, under the date of January 23, 1909, Decree No. 14894; and the

ORDINANCE NUMBER O-17897 (NEW SERIES)

is a true and correct copy of which the annexed is a printed copy and was published in said newspaper on the following date(s), to wit:

MARCH 29

I certify under penalty of perjury that the foregoing is true and correct.

Dated at San Diego, California this 29th day of MAR. , 19 93 .

*Corey Donahue*
(Signature)

2 5/8" X 2 = $ 71.68

**EXHIBIT J**



000304
ATTACHMENT B

LESLIE E. DEVANEY
ANITA M. NOONE
LESLIE J. GIRARD
SUSAN M. HEATH
GAEL B. STRACK
ASSISTANT CITY ATTORNEYS

OFFICE OF

# THE CITY ATTORNEY

CITY OF SAN DIEGO

Casey Gwinn

CITY ATTORNEY

CIVIL DIVISION
1200 THIRD AVENUE, SUITE 1200
SAN DIEGO, CALIFORNIA 92101-4184
TELEPHONE (619) 533-5800
FAX (619) 533-5847

## MEMORANDUM OF LAW

**DATE:**    July 17, 1997

**TO:**    Deputy Mayor Barbara Warden

**FROM:**    City Attorney

**SUBJECT:**    Viability of the City's Floating Buffer Zone Ordinance in Light of Recent
Case Law

---

### QUESTION PRESENTED

The City currently has in place an ordinance, San Diego Municipal Code section 52.1001,
that allows a recipient of unwanted speech to create a mobile, 8-foot floating buffer zone, or
"bubble," around himself or herself within 100 feet[1] of a health care facility, place of worship, or
school.  A person can create such a buffer zone by orally requesting the speaker to withdraw, or
by displaying a sign requesting withdrawal.  If the speaker then fails to withdraw, the speaker
becomes subject to misdemeanor prosecution.  Municipal Code section 52.1002 further provides
that a speaker who refuses to withdraw may be subject to a private cause of action by the
recipient of the unwanted speech.

You have asked whether the City's floating buffer zone ordinance is constitutional in light
of the United States Supreme Court ruling in <u>Schenck v. Pro Choice Network of Western New
York</u>, -- U.S. --, 117 S. Ct. 855 (1997)[2] and the case it relies on, <u>Madsen v. Women's Health
Center</u>, 512 U.S. 753 (1994).   Earlier this week, the Ninth Circuit Court of Appeals issued an

---

[1]The 100-foot "access area" applies to public streets, public places, and places open to the
public within the 100-foot area.  State trespassing laws govern entry on private property.

[2]<u>Schenck</u> involved an injunction requiring abortion protesters to stay 15 feet away from
persons entering or leaving a clinic, and fifteen feet away from vehicles seeking access to clinics.

Deputy Mayor Warden                    -2-                    July 17, 1997

opinion in a related case, <u>Sabelko v. City of Phoenix</u>[3], 97 Daily Journal D.A.R. 8990 (July 15, 1997), which is also critical, and we believe may control the determination of whether our own floating buffer zone ordinance remains valid.

## SHORT ANSWER

Based upon the rulings in the two cases cited above, we believe that a court would find that our floating buffer zone ordinance unconstitutionally infringes upon freedoms protected by the First Amendment. Although we believe a court would find the ordinance meets two of the three essential tests of a permissible infringement on such freedoms, the decisions in <u>Schenck</u> and <u>Sabelko</u> would probably lead a court to find that the City's ordinance does not meet the third essential test: it is not sufficiently narrowly tailored to meet the City's legitimate interests in protecting the right to privacy and access to health care without unduly burdening First Amendment rights. As a result, a court would probably invalidate the City's ordinance.

## ANALYSIS

A.  <u>First Amendment Analysis</u>

  1.  Content Neutrality

When the government regulates speech in a public forum,[4] the first standard for evaluating the constitutionality of the regulation depends on whether the regulation is based on the content of the speech ("content-based"), or applies regardless of the content

---

[3] The Phoenix ordinance is virtually identical to the City's ordinance, except that it applies only to health care facilities, while the City's ordinance applies as well to schools and places of worship. The City's ordinance further clarifies that mere statements of opinion or disagreements do not constitute a request to withdraw; this distinction, however, does not change our analysis that <u>Sabelko</u> applies to our own ordinance.

The <u>Sabelko</u> case was pending before the U. S. Supreme Court when the Supreme Court issued its opinion in <u>Schenck</u>. Thereafter, and based upon <u>Schenck</u>, the Supreme Court remanded the <u>Sabelko</u> case to the Ninth Circuit for reconsideration and a ruling consistent with the <u>Schenck</u> decision.

[4] Our ordinance applies to public streets and public places, and thus operates in a public forum. <u>See</u> <u>Frisby v. Schultz</u>, 487 U.S. 474, 480-81 (1988). Public streets and sidewalks are traditional public fora.

**2**

Deputy Mayor Warden                    -3-                    July 17, 1997

("content-neutral").  Perry Educ. Ass'n. v. Perry Local Educators Ass'n., 460 U.S. 37, 45 (1983).
If it is content-based, the regulation must pass "strict scrutiny," i.e., the regulation must be
necessary in order to serve a compelling state interest, and must be narrowly tailored to meet that
interest.  Id.  If the regulation is content-neutral, reasonable restrictions on the time, place and
manner of exercising the freedom of speech will be upheld as long as it is narrowly tailored to
serve a significant government interest, and leaves open ample alternative channels for
communication.[5]  Id.;  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (citations
omitted).

    To determine content-neutrality, the inquiry is whether the government's speech
regulation is based on disagreement with the message conveyed.  Id.  A regulation that is based
on the recipient's reaction to speech is considered content-based, not content-neutral.  Forsyth
County, GA. v. Nationalist Movement, 505 U.S. 123, 134-35 (1992).

    The City's ordinance affects those engaged in "demonstration activity," which includes
protesting, picketing, distributing literature, engaging in oral protest, education, or counseling
activities.  One may argue that it targets only "protest" speech, while "support" speech is not
punished.  However, the ordinance on its face does not regulate the content of the speaker's
message.  The ordinance applies to any person engaged in demonstration activity, no matter what
the subject or content of the demonstrator's[6] message.  No particular message is singled out for
regulation.  Therefore, the ordinance is content-neutral, and the "reasonable time, place and
manner" test applies.

    Our conclusion in this regard is supported by the opinion in Sabelko, in which the Ninth
Circuit found that the Phoenix ordinance was indeed "content neutral."  Given that the City's
ordinance and the Phoenix ordinance are identical in all material respects, the court would likely
find that our ordinance is likewise content neutral.

---

    [5]A classic example of a reasonable time, place and manner restriction is the well-
recognized prohibition against yelling "Fire!" in a theater, when there is no reasonable reason to
do so.

    [6]Case law in this area refers to "speakers," "protesters," and "demonstrators" to describe
those persons whose speech is being burdened. Unless otherwise noted, the term "demonstrator"
is used in this memorandum to describe all such persons, because the City's ordinance refers to
"demonstration activity."

**3**

Deputy Mayor Warden                           -4-                              July 17, 1997

### 2. Significant Governmental Interest

The second inquiry is whether there is a significant governmental interest being served by the regulation in question. In <u>Madsen</u>, the Supreme Court found that the government has a significant interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy, and that there is a significant governmental interest in protecting medical privacy. 512 U.S. at 767-768.

In the present case, although the ordinance does not specifically describe all the City's interests, those interests clearly include protecting and preserving several constitutional rights, including the rights of privacy and the freedom to seek medical services, as well as the constitutionally-guaranteed right of religious freedom. The City also has an interest in promoting public safety and order. The interests stated by the City in the ordinance's recitals include the prevention of intimidation and harassment directed at persons seeking access to health care facilities, places of worship, and schools. The City found that those persons are particularly vulnerable to adverse effects from harassing or intimidating activities at close range. One of the recitals says:

> WHEREAS, such activity near health care facilities, places of worship or schools creates a "captive audience" situation because persons seeking services cannot avoid the area outside of the facilities if they are to receive the services provided therein, and their physical and emotional ailments or conditions can make them especially vulnerable to the adverse physiological and emotional effects of such harassing or intimidating activities directed at them from extremely close proximity . . . .

Courts recognize the "captive audience" principle as one which allows otherwise protected speech to be burdened, because the recipient cannot avoid the speaker.[7]

---

[7]The courts are generally more willing to protect listeners inside their homes. <u>Frisby v. Schultz</u>, 487 U.S. 474, 484-85 (1988) (legislation prohibiting targeted residential picketing upheld; there is no right to force speech into the home of an unwilling listener). Outside the home, particularly in a public setting, it is usually up to the listener to avoid the speaker. The Supreme Court has also, however, approved of use of the "captive audience" principle to support an injunction against protesters at abortion clinics. <u>Madsen</u>, 512 U.S. at 767-68.

Deputy Mayor Warden                    -5-                    July 17, 1997

In both <u>Madsen</u> and <u>Schenck</u>, the Supreme Court approved a combination of governmental interests, including those asserted by the City, as sufficient to justify some burdening of speech. The approved interests include protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy, ensuring the public safety and order, promoting the free flow of traffic, and protecting citizens' property rights.

The <u>Sabelko</u> court likewise had no problem finding that the interests served by the Phoenix ordinance served such significant governmental interests. We believe that a court reviewing the City's ordinance would find this test satisfied as well.

3. Narrow Tailoring of the Ordinance

The third test is whether the ordinance is narrowly tailored to serve the identified significant governmental interests, leaving open ample alternative channels of communication, and burdening no more speech than is necessary to serve the identified interests. <u>Ward,</u> 491 U.S. at 791. Here we believe the City's ordinance, like the ordinance in <u>Sabelko</u>, would fail.

The City's ordinance does not bar anyone from speaking to a recipient; a demonstrator may approach a recipient and speak until asked to withdraw. Even after withdrawing to the eight-foot limit, the demonstrator may continue to speak. Further, the floating zone may only be invoked within 100 feet of a facility, and beyond that our ordinance imposes no limitations on the approach. One might conclude that such provisions appear to allow sufficient alternatives and are therefore "narrowly tailored" to serve the acknowledged governmental interests.

The Ninth Circuit in <u>Sabelko</u> found otherwise. Taking its lead from the <u>Schenck</u> case, in which the Supreme Court had struck down a fifteen-foot floating buffer zone[8], the Ninth Circuit found that the eight-foot floating zone in the Phoenix ordinance likewise was not narrowly tailored. By preventing leafleting and communication at a normal conversational distance, the floating zone prevents "classic forms of speech that lie at the heart of the First Amendment." <u>Schenck,</u> 117 S. Ct. at 866; <u>Sabelko,</u> 97 D.A.R. at 8991. Because the buffer zone "floated," demonstrators would have difficulty determining how to comply with the requirement:

Protesters could presumably walk 15 feet behind the individual, or 15 feet in front of the individual while walking backwards. But they are then faced with the problem of watching out for other individuals entering or leaving the clinic . . . [A]ttempts to stand 15 feet from someone entering or leaving a clinic and to

---

[8]The Supreme Court did allow a <u>fixed</u> fifteen-foot buffer zone, requiring demonstrators to stay fifteen feet away from doorways, parking lot entrances and driveways.

Deputy Mayor Warden                        -6-                        July 17, 1997

communicate a message--certainly protected on the face of the injunction--will be hazardous if one wishes to remain in compliance with the injunction.

Sabelko, 97 D.A.R. at 8991, quoting Schenck, 117 S. Ct. at 867.  The Sabelko court then concluded that the floating eight-foot zone in the Phoenix ordinance suffered the same defect. Moreover, because floating zones could apply to more than one person entering or leaving the clinic at the same time, demonstrators would have difficulty determining whether they were in one or more prohibited zones, and could not accurately determine whether they were at any given time in or out of compliance.  Id.

Because the City's ordinance is virtually identical to the Phoenix ordinance, a court reviewing the City's ordinance is likely to find this same defect and rule that the ordinance is unconstitutional.

B.   Other Related Laws

Notwithstanding the constitutional infirmity of the City's floating buffer zone ordinance, there are other laws that protect the significant governmental interests involved.  State law prohibits physically detaining or obstructing an individual's passage into or out of a health care facility, place of worship, or school.  Penal Code § 602.11.  Federal law prohibits the physical obstruction, injury, intimidation and interference of any person seeking reproductive health services or exercising their right of religious freedom at a place of worship.  Title 18 U.S.C. § 248(a), the Freedom of Access to Clinic Entrances Act of 1994 ("FACE").  FACE has been upheld as constitutional.  Riely v. Reno, 860 F. Supp. 693, 700-05 (D. Ariz. 1994).  These laws are listed on Appendix "A" attached to this memorandum.  There are no published opinions addressing Penal Code section 602.11. However, neither Schenck nor Sabelko affect any of these laws.

## CONCLUSION

The Schenck case set the ground rules for permissible buffer zones, and in so doing invalidated floating buffer zones that unduly restrict freedoms protected by the First Amendment. By its ruling, the Sabelko court has indicated how the Ninth Circuit will interpret and apply these rules.  In light of both rulings, we believe the City's existing floating buffer zone ordinance would be found constitutionally defective.  Although it is content-neutral and serves significant governmental interests, a court would probably rule that it infringes upon First Amendment freedoms, because it is not narrowly tailored.  Moreover, because the "floating" aspect of the zones creates the situation that the Court found unconstitutional, we do not believe that the ordinance can be modified to include any type of floating zone.

**6**

Deputy Mayor Warden                    -7-                        July 17, 1997


Although the existing ordinance is likely unenforceable, there may be alternative measures the City can adopt to protect the recognized governmental interests in privacy, access to health care, and freedom of speech. We are prepared to review the City's options and discuss them with you.

CASEY GWINN, City Attorney

By _____
Leslie E. Devaney
Executive Assistant City Attorney


By _____
Theresa C. McAteer
Deputy City Attorney


LED:TCM:tcm(x043.2)
ML-97-19
S:\BUBBLB\BUBMOL.FRM

**EXHIBIT K**

EXHIBIT K

ATTACHMENT B

PAUL E. COOPER
EXECUTIVE ASSISTANT CITY ATTORNEY

MARY T. NUESCA
ASSISTANT CITY ATTORNEY

MICHELLE A. GARLAND
DEPUTY CITY ATTORNEY

# THE CITY ATTORNEY

## CITY OF SAN DIEGO

### Jan I. Goldsmith
CITY ATTORNEY

1200 THIRD AVENUE, SUITE 1620

SAN DIEGO, CALIFORNIA 92101-4178

TELEPHONE (619) 236-6220

FAX (619) 236-7215

## MEMORANDUM OF LAW

**DATE:**         August 14, 2014

**TO:**            Shelley Zimmerman, Chief of Police

**FROM:**       City Attorney

**SUBJECT:**   Constitutionality of San Diego's Demonstration Activity Buffer Zone Ordinance

### INTRODUCTION

On June 26, 2014, the United States Supreme Court unanimously held that Massachusetts' buffer zone surrounding reproductive health care facilities violated the First Amendment. *McCullen v. Coakley*, 573 U.S. --, 134 S. Ct. 2518 (2014). San Diego has a fixed 15-foot buffer zone surrounding entrances to and exits from health care facilities, places of worship, and school grounds. This Memorandum will evaluate whether San Diego's ordinance remains valid in light of the new Supreme Court decision.

### QUESTION PRESENTED

Is San Diego's buffer zone ordinance contained in San Diego Municipal Code section 52.1001 valid under the First Amendment?

### SHORT ANSWER

Likely, yes. San Diego's ordinance is far less restrictive than the invalidated Massachusetts statute and other fixed buffer zones that have been challenged and upheld. San Diego Municipal Code section 52.1001 would likely withstand a First Amendment challenge.

**1**

Shelley Zimmerman,                              -2-                              August 14, 2014
Chief of Police

## BACKGROUND

In 2007, Massachusetts amended its law establishing a buffer zone surrounding health care facilities where abortions were offered or performed. The law as amended prohibited any person from knowingly entering or remaining on a public way or sidewalk within a radius of 35 feet of any portion of an entrance, exit or driveway to a reproductive health care facility or within the rectangle area between an entrance, exit, or driveway to such a facility and the street. Mass. Gen. Laws ch. 266, § 120E½(b) (2007). Several individuals challenged this law claiming violations of the First and Fourteenth Amendments. The First Circuit Court of Appeals upheld the statute and the United States Supreme Court granted certiorari. The Supreme Court invalidated Massachusetts' law and provided a detailed First Amendment analysis, which will be discussed below.

## ANALYSIS

### I.    LEGAL FRAMEWORK FOR FIRST AMENDMENT ANALYSIS

First Amendment rights are those accorded among the highest protections in the law. First Amendment scrutiny will be applied to a law that regulates or restricts speech, even if the regulation or restriction is only incidental to regulation of conduct. *McCullen,* 134 S. Ct. at 2529. The standard applied to government regulation of speech depends on whether the regulation is content based or content neutral. Content based regulation must be evaluated under "strict scrutiny" and must be the "least restrictive means of achieving a compelling state interest." *Id.* at 2530, citing *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 813 (2000). In contrast, government regulation of speech that is content neutral will be subject only to "intermediate scrutiny." *Turner Broadcasting System, Inc. v. F.C.C.,* 512 U.S. 622, 642 (1994), citing *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 (1984). Under this standard, a government imposed time, place, or manner restriction on speech must be "narrowly tailored to serve a significant governmental interest," and leave open "ample alternative channels for communication of information." *McCullen,* 134 S. Ct. at 2529, (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)).

### II.    CONSTITUTIONAL DEFICIENCY OF THE MASSACHUSETTS LAW

In its analysis of the Massachusetts law, the Supreme Court first determined that the buffer zone law was content neutral. Although it applied only to public sidewalks outside reproductive health care facilities, the law was facially neutral. *McCullen,* 134 S. Ct. at 2531. It applied to anyone who violated the buffer zone regardless of the message content. A person could be in violation of the law by simply standing on the sidewalk engaged in no speech or expressive activity at all. *Id.*

The petitioners argued that the law was content based because the limited location where it applied resulted in only restricting abortion-related speech. The Court looked to Massachusetts' content neutral justifications for the law to overcome this argument. The express intent of the law was to promote public safety, access to healthcare, and the "unobstructed use of public sidewalks and roadways." *Id.* These goals, combined with facial neutrality, the Court

**2**

00105

Shelley Zimmerman,                                                          August 14, 2014
Chief of Police

reasoned, have been held to be content neutral. The disproportionate effect on abortion-related speech did not render the law content based. *Id.* Therefore, strict scrutiny was not applied and the Justices evaluated the statute using the intermediate scrutiny standard.

The Court quickly accepted that public safety, access to healthcare, and free use of public rights of way were legitimate government interests. *Id.* at 2535. The analysis then turned to whether the buffer zone statute was sufficiently narrowly tailored to serve those interests. The Court held that it was not. *Id.* at 2539.

Evidence showed that the petitioners' desired speech was most effective through personal conversations and by providing literature directly to members of the target audience. *Id.* at 2535. The expansiveness of the buffer zone deprived them "of their two primary methods of communicating with patients." *Id.* at 2536. For example, the buffer zone excluded one petitioner from 56 feet surrounding an abortion clinic. *Id.* at 2527. The buffer zone outside another clinic excluded a different petitioner from over 93 feet of the sidewalk and driveway outside the clinic. *Id.* This, the Court found, burdened "substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* at 2537.

The Court then examined several less restrictive buffer zone laws and concluded that Massachusetts had not attempted to achieve its goals with "less intrusive tools readily available to it." *Id.* at 2539. Based on these concerns and the substantial amount of speech burdened by the buffer zone, the Court held that Massachusetts' buffer zone statute violated the First Amendment because it was not sufficiently narrowly tailored.

## III.    SAN DIEGO'S ORDINANCE IS VALID UNDER THE FIRST AMENDMENT

### A.    San Diego's Ordinance

San Diego's buffer zone ordinance applies to any person engaged in demonstration activity near a health care facility, place of worship, or school grounds. San Diego Municipal Code (SDMC) § 52.1001. Demonstration activity is defined to include "advocating, protesting, picketing, distributing literature, or engaging in oral advocacy or protest, education or counseling activities." *Id.* at § 52.1001(a). The ordinance declares it unlawful to remain within 15 feet of an entrance or exit to a health care facility, place of worship, or school grounds after having been requested to withdraw by a person entering or exiting the establishment. *Id.* at § 52.1001(b). Fifteen feet is measured from the threshold of the entrance or exit. *Id.* at § 52.1001(d). Once a demonstrator has withdrawn to 15 feet or more, he or she must remain at that distance until the person requesting withdrawal has either entered the establishment or is outside the 15-foot zone. *Id.* at § 52.1001(b). Violations of the ordinance may be enforced through criminal penalties or a private civil action. *Id.* at §§ 12.0201, 52.1002.

00106

Shelley Zimmerman,                                -4-                          August 14, 2014
Chief of Police

## B.    First Amendment Analysis

### 1.    Content Neutrality

A court would likely find San Diego's buffer zone ordinance to be content neutral and subject only to intermediate scrutiny. The ordinance is facially neutral. It restricts the location where demonstration activity may be performed, but imposes the restriction on all demonstration activity regardless of the message content.

SDMC section 52.1001 applies to demonstration activity at health care facilities, places of worship, and school grounds. The fact that the ordinance applies to specific locations, and incidentally affects speech topics related to those locations, does not render it content based. To the contrary, facially neutral restrictions applied only to reproductive health care clinics have been upheld as content neutral. *Hill v. Colorado*, 530 U.S. 703, 725 (2000) (upholding a health care facility buffer zone). San Diego's ordinance applies more broadly than the Massachusetts abortion clinic buffer zone in *McCullen* and the Colorado health care facility buffer zone in *Hill*. It does not restrict the content of any particular message despite regulating conduct at certain places. A court would likely find it to be content neutral.

### 2.    Significant Government Interest

San Diego's buffer zone was amended to its current form in December 1997. The amending ordinance recited several justifications including promoting access to health care facilities, places of worship, and school grounds, as well as preserving the constitutional rights of both patrons of such establishments and demonstrators. San Diego Ordinance O-18452 (Dec. 16, 1997). The ordinance was expressly intended only to prohibit activities that "threaten, impair or impede" privacy rights, free access to health care and education, the free exercise of religion, and "constitutionally-protected speech." *Id.*

These types of interests that promote public safety and protect constitutional rights are typically found to be legitimate government interests. *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 376 (1997). *See also Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 767-68 (1994). The Supreme Court found similar interests of Massachusetts to be valid in *McCullen*, noting that the buffer zone "clearly serves these interests." *McCullen*, 134 S. Ct. at 2535. Likewise, San Diego's governmental interests, as declared in the 1997 ordinance, would most likely be viewed as legitimate government interests withstanding First Amendment scrutiny.

### 3.    Narrowly Tailored

The third prong of the intermediate scrutiny analysis, narrow tailoring, is often the most difficult. In *McCullen*, the Court found that Massachusetts' buffer zone was not sufficiently narrowly tailored to serve the governmental interests. *McCullen*, 573 U.S. at 2539. San Diego decided to amend its 1997 ordinance based on the rulings in *Schenck*, 519 U.S. 357, and *Sabelko v. City of Phoenix*, 120 F.3d 161 (9th Cir. 1997) (finding a floating 8-foot buffer zone not narrowly tailored and unconstitutional). This Office concluded that San Diego's then existing

**4**

Shelley Zimmerman,                              -5-                              August 14, 2014
Chief of Police

8-foot floating buffer zone within a 100-foot fixed zone, nearly identical to the Phoenix ordinance in *Sabelko*, was not narrowly tailored. 1994 City Att'y MOL 304 (97-19; July 17, 1997). The Municipal Code was then amended to the current 15-foot fixed buffer zone.

San Diego's current buffer zone would likely be found to be narrowly tailored. In *McCullen*, the Court opined that "[w]hen selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more." *McCullen*, 134 S. Ct. at 2532. The Court then discussed several other buffer zone statutes and injunction terms that were less restrictive than the Massachusetts buffer zone.

A previous version of Massachusetts' buffer zone law was upheld after a First Amendment challenge in 2004. That version of the law established a fixed 18-foot buffer zone around the entrances and driveways of abortion clinics. Within the 18-foot zone, it was unlawful to approach within 6 feet of another person without that person's consent. *McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004). A similar law in Colorado was upheld by the United States Supreme Court in *Hill*, 530 U.S. 703. The Colorado law prohibited anyone from knowingly approaching within 8 feet of another person without consent while within 100 feet of a health care facility entrance. *Id.* at 707.

Courts have also upheld fixed buffer zones. In *Schenck*, the Supreme Court upheld an injunction creating a fixed 15-foot buffer zone around the doorways, driveways, and driveway entrances at an abortion clinic. *Schenck*, 519 U.S. at 380. The Court reasoned that the fixed buffer zone was necessary to ensure successful ingress and egress of clinic patrons. *Id.* In contrast, the Court struck down a 15-foot floating buffer zone surrounding people and vehicles entering or leaving the same clinic. The Court reasoned that such a buffer zone restricted more speech than was necessary, would prevent consensual conversation or leafleting, and would "restrict the speech of those who simply line the sidewalk or curb in an effort to chant, shout, or hold signs peacefully." *Id.*

The Court also evaluated an abortion clinic injunction in *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994). In that case, the Court upheld an injunction term prohibiting people from "'congregating, picketing, patrolling, demonstrating or entering' any portion of the public right-of-way . . . within 36 feet of the property line of the clinic . . . ." *Madsen*, 512 U.S. at 768. The Court accepted that the purpose of this term was to protect unobstructed access to the clinic and upheld the 36-foot buffer zone around the public right-of-way. *Id.* at 770. The Court then struck down a similar 36-foot rule applied to private property areas of the clinic because there was no showing that such a restriction was necessary to protect clinic access and it restricted more speech than was necessary. *Id.* at 771.

San Diego's ordinance is less restrictive than many of the other statutes and injunction terms previously found valid under the First Amendment. San Diego's 15-foot buffer zone applies only to the entrance or exit of a health care facility, place of worship, or school grounds. Unlike the invalid term in *Madsen*, it does not burden areas not near an entrance or exit. San Diego's ordinance is also not nearly as expansive as the 36-foot restriction approved in *Madsen*.

Shelley Zimmerman,
Chief of Police

August 14, 2014

Furthermore, San Diego's ordinance does not have a term allowing for massive expansion of the buffer zone similar to the Massachusetts statute in *McCullen*. Finally, San Diego's ordinance is less restrictive than the 15-foot fixed buffer zone approved in *Schenck* because withdrawal is only required upon request of the establishment's patron.

As one of the least restrictive buffer zones among those evaluated by the United States Supreme Court, San Diego's ordinance would likely be upheld. It restricts speech only within 15 feet of an entrance or exit, and only upon the request of a patron. Absent such a request, a person remains free to convey the desired message in any lawful manner. Additionally, the time of the restriction is extremely short. The affected person must only remain 15 feet away until the patron requesting withdrawal has either entered the facility or is outside the 15-foot zone. SDMC § 52.1001(b). After that time, the person is free to approach a different person and re-enter the 15-foot area. The ordinance is narrowly tailored to restrict speech only for a short time to allow free ingress and egress to and from a protected establishment and to protect patrons from undesired confrontation immediately near the entrance or exit.

### 4.    Ample Alternative Channels for Communication

The *McCullen* Court did not analyze the last prong of the intermediate scrutiny analysis because the Massachusetts statute failed on the narrowly tailored prong. However, it is clear that San Diego's ordinance is so narrow that a person wishing to engage in "demonstration activity" may engage in other forms of communication even if asked to withdraw. Though less conducive to quiet personal conversation, a distance of 15 feet is not so great as to prevent the intended audience from hearing the communication altogether. Ample opportunity still exists for verbal or visual communication of the message. A court would likely find that San Diego's ordinance successfully leaves open ample alternative channels for communication.

### CONCLUSION

Unlike the speech restrictions found by the Court to violate the First Amendment, San Diego Municipal Code section 52.1001 is narrowly tailored to limit speech only for a short time within a small area. San Diego's ordinance imposes these limitations in order to protect the significant government interests of preserving access to health care facilities, places of worship, and school grounds, as well as to preserve public safety and constitutional rights. It does not

00109

Shelley Zimmerman,
Chief of Police

August 14, 2014

restrict all forms of communication, but only those necessary to achieve these interests. Based on the First Amendment jurisprudence of the United States Supreme Court, including the new *McCullen* decision, San Diego's ordinance is likely to withstand a Constitutional challenge.

JAN I. GOLDSMITH, CITY ATTORNEY

By

Michelle A. Garland
Deputy City Attorney

MAG:amt
ML-2014-8
Doc. No. 827267_5

**EXHIBIT L**

**EXHIBIT L**

Lopez v. San Diego
S.D. Cal. Case No.: 3:24-cv-01577-LL

### SAN DIEGO CITY COUNCIL MEETING

### MAY 21, 2024

…

| | |
|---|---|
| S. ELO-RIVERA: | We will now move to our item that was pulled from the consent agenda. And, Clerk, if you'd please introduce the item. |
| D. FUENTES: | Yes. Item 52 is the proposed amendment to San Diego Municipal Code regarding buffer zones at healthcare facilities, places of worship and school grounds. |
| S. ELO-RIVERA: | All right. Um, do we have a presentation for this item? |
| FEMALE: | Yes. |
| D. FUENTES: | Yes. Somebody coming up right now. |
| S. ELO-RIVERA: | Uh, once our presenter is ready, please introduce yourself for the record and let us know how much time you'd like for the presentation, please. |
| M. ELLIOTT: | Good morning. I am San Diego City Attorney Mara Elliott. We need about seven and a half minutes for our presentation. |
| S. ELO-RIVERA: | Please proceed, Madam City Attorney. |
| M. ELLIOTT: | All right, thank you. And with me today is Senior Chief Deputy City Attorney Heather Ferbert. We are here today to request amendments to the City of San Diego's outdated Buffer Zone Ordinance. The City adopted its Buffer Zone Ordinance in 1997 and hasn't updated since then. In 1997, San Diego adopted a 100 foot buffer zone around entrances and exits to healthcare facilities, places of worship and school grounds to balance often competing rights to Medical privacy, to freely gain access to healthcare and educational services, to practice religion and to freely exercise constitutionally protected speech. The current laws requires demonstrates within the 100 foot buffer zone to withdraw to 15 feet away from a person entering or exiting a covered |

facility if the person asks the demonstrator to do so. In other words, the burden is on the individual who wishes to exercise their constitutional right to medical care, to educational services or to practice their religion to tell the demonstrator to back off. For many, this kind of engagement is not an _____ by demonstrators who harass or intimidate them by blocking entrances, exits, parking lots and driveways of healthcare facilities, places of worship or school grounds. For years, my office has received complaints from community members whose constitutional rights have been impeded by someone who claims to be exercising theirs. From the school board member who couldn't attend a meeting to discuss the education of elementary school students because anti-vaccination protestors blocked the entrance to the board room and created other risks; to the parent who wanted to attend a community forum on gun violence at her child's school but was blocked by individuals asserting their right to speak and to own guns; to worshippers who are afraid to attend services because antisemitic protesters are blocking the path that leads to their synagogue; to a patient who wishes to obtain a pap smear but leaves the facility when she is called a baby killer by an anti-choice protester. Certainly, all have the rights to express themselves but our law as written fails to balance the constitutional rights of all involved, leading not only to inequities, but just public safety risks. The amendments we propose address that imbalance. The proposed amendments strike a balance by maintaining a 100 foot buffer zone around entrances and exits to healthcare facilities, places of worship and school grounds, prohibiting harassing and intimidating behavior and requiring that access doors and parking lot driveways be kept clear for pedestrians and vehicles. A demonstrator within the buffer zone would need permission to approach within eight feet of another person for purposes of passing a leaflet or hand bill to that person, displaying a sign to that person, or engaging in verbal protest, education or counseling. Eight feet 2.

is closer than our current Ordinance allows and it's close enough to carry on a conversation. The Ordinance applies regardless of the message, meeting the content neutral standard. Violations of the Ordinance must be knowing and willful and not accidental or unintentional. The amendments include noise limitations that already exist in other parts of the Municipal Code. This is necessary because bullhorns are sometimes so loud outside of these facilities that employees cannot work and neighborhoods are robbed of their quality of life. The amendments would allow covered facilities to display signs advising of the City's Buffer Zone Ordinance. Remedies for violations of the Ordinance would extend to impacted healthcare facilities, schools or churches, and not just the person seeking access. The proposed amendments are modeled after a ho-, the holding in *Hill v. Colorado*, a case decided by the United States Supreme Court in 2000. In that case, the Court upheld Colorado's buffer zone because eight feet was accepted as a conversational distance that allowed demonstrators to still reach their audience while preserving the State's interest in ensuring safe access to healthcare clinics. The court also found the Colorado statute constitutional because it could only be violated intentionally, allowing someone to avoid criminal penalties who was complying in good faith but unintentionally came within eight feet of someone entering the facility. Specifically, the proposed amendments are narrowly tailored to promote public safety and protect constitutional right. Are content neutral. In other words, they're not based on the message, ideas or subject matter and establish a narrow time, place and manner restriction that is viewpoint neutral. The amendments also protect fundamental rights: the right to medical privacy, the right to freely access reproductive healthcare and educational services, the right to practice religion. More and more, the places people go to exercise their rights to access re-, reproductive care, gender affirming care, education or to worship have become places of 3.

| | |
|---|---|
| 1 | harassment and intimidation. No one should be afraid to see their doctor, |
| 2 | learn, pray or attend a school meeting. These are fundamental parts of our |
| 3 | civil society. In 2021, the San Diego Police Department responded to the |
| 4 | same healthcare facility about 55 times for complaints related to |
| 5 | demonstrations, trespass and disturbances, spending more than 300 hours of |
| 6 | officer time. We also learned that 70% of Planned Parenthood staff have |
| 7 | received patient complaints about intimidation, harassment or threats when |
| 8 | trying to enter or exit. This is unacceptable. We'll never know how many |
| 9 | people did not exercise their constitutional rights due to threat, intimidation |
| 10 | and fear for their own personal safety. Places of worship in K through 12 |
| 11 | schools are not immune from intimi-, intimidation, harassment or threats. |
| 12 | Demonstrations at a Los Angeles church escalated recently and made the |
| 13 | local news. An Easter mass in New York's St. Patrick's Cathedral was |
| 14 | interrupted by pro-Palestinian protesters. And we're seeing the Proud Boys |
| 15 | burning banners outside of Black churches. In San Diego, demonstrations |
| 16 | shut down school district board meetings where members were scheduled to |
| 17 | discuss wheth-, whether to fly the pride flag in San Diego County. Protests |
| 18 | related to vaccine mandates impacted school operations during and after the |
| 19 | pandemic. The City can and should regulate these sensitive locations to |
| 20 | prevent harassment and violence from occurring. This concludes our |
| 21 | presentation. And we request approval of Staff's recommendation. Thank |
| 22 | you. |
| 23 | S. ELO-RIVERA: Thank you, Madam City Attorney. Clerk, do we have public comment on this |
| 24 | item? |
| 25 | D. FUENTES: Yes, we do. We have several speakers. We will be going to one minute per |
| 26 | person. We have Jasmine Wilson. If I can ask the following individuals to |
| 27 | please come up to the front row. Jasmine Wilson, Roger Lopez, Patty Larson, |
| 28 | Catherine Weeks [phonetic], Grace Gage [phonetic] and Kat Tesorro, De-, |

| | |
|---|---|
| 1 | Teserro, sorry. Can you please come forward? Jasmine, you can come to the |
| 2 | microphone and you'll have one minute. Jasmine? Is she not here anymore? |
| 3 | Okay, we'll go with Roger. You have time ceded to you by Melissa S-, |
| 4 | Melissa Sanchez. |
| 5 | R. LOPEZ:     How many minutes? How many minutes do I have? |
| 6 | D. FUENTES:     You'll have two minutes. |
| 7 | R. LOPEZ:     Honorable Councilmembers. I am one of the people this new Ordinance is |
| 8 | directed at. I am 70 years old, the father of four children and grandfather of |
| 9 | six. I have been sidewalk counseling in front of Planned Parenthood |
| 10 | downtown for the past seven and a half years. I have never been arrested or |
| 11 | had the police called on me. I greet nearly all the clinic employees as they |
| 12 | walk by me. I courteously approach women or couples with a smile and say |
| 13 | "good morning" while offering literature and a chance to talk. More than 90% |
| 14 | of the women will either say thank you and take the literature or say no thank |
| 15 | you and continue into the clinic. Some will stay and talk with me, while others |
| 16 | won't. A small percentage will shout rude remarks at me before I ever say a |
| 17 | word. But for the vast majority, courtesy is returned with courtesy. I never |
| 18 | shout after a person When they walk away from me. I never block the |
| 19 | entrance, driveway or sidewalk from people entering. I challenge Planned |
| 20 | Parenthood to find a single employee who will say under oath that I verbally |
| 21 | harass or intimidate anyone going to the clinic. I am not the reason this |
| 22 | Ordinance was created, yet I am its victim. In the 14 plus years that I've been |
| 23 | sidewalk counseling, there are probably more than a hundred thankful women |
| 24 | who have children alive today because I reached out to them in a moment of |
| 25 | crisis when everyone they knew was encouraging or coercing them to have |
| 26 | an abortion. Civil people can walk up to one another and have a conversation |
| 27 | in a public right of way. No other place requires a person to ask permission |
| 28 | to approach someone in order to hand a flyer or start a conversation. The |

| | | |
|---|---|---|
| 1 | | streets in front of Planned Parenthood downtown are noisy with constant cars, |
| 2 | | trucks and jets flying overhead. Having to raise your voice and shout to |
| 3 | | someone in order to get permission to approach is unnatural and an |
| 4 | | unreasonable restraint on free speech. A law must be fair to all people and |
| 5 | | cannot blanket well-meaning, law abiding, courteous citizens because the |
| 6 | | behavior of a few. Current law already prohibits verbal harassment when a |
| 7 | | person is told to stop or go away. The FACE Act already prohibits blocking |
| 8 | | the entry to an abortion facility. You can make a law against bad behavior, |
| 9 | | but you can't make a law against free speech. It is unconstitutional. Please |
| 10 | | vote no and save the taxpayer the expense of defending this in the Court. The |
| 11 | | city will lose – |
| 12 | D. FUENTES: | Thank you for that concluding remark. Next is Patty Larson. |
| 13 | P. LARSON: | Hello, Council president and all here present. I'm not for bull horns or, um, |
| 14 | | preventing people from places of worship or school meetings, um, and, or |
| 15 | | from healthcare. But we just want to help women. And so we're asking why |
| 16 | | the City Council, uh, would be against a woman who's most often desperate |
| 17 | | for help to make a life altering decision. Why would the City Council be |
| 18 | | against women, um, who are, who really need, um, help right now and would |
| 19 | | greatly benefit from the array of free services available in San Diego to |
| 20 | | empower them to make life affirming choices. If Item 52, the proposed |
| 21 | | amendment to the buffer zone, passes, these women will never learn about |
| 22 | | pregnancy assistance centers that can and do empower them to make healthy |
| 23 | | choices. You, the City Council, will be aiding abortion centers, places of |
| 24 | | deception and despair, in preventing women from their freedom of choice, |
| 25 | | their choice to have a healthy [inaudible/crosstalk]. |
| 26 | D. FUENTES: | Your time has concluded. Thank you for that concluding remark. Catherine |
| 27 | | Weeks? You have time ceded to you by Sharina [phonetic]. If she could |
| 28 | | please raise her hand. Thank you so much. You'll have two minutes. Please |

San Diego Transcription

| | | |
|---|---|---|
| 1 | | proceed. |
| 2 | C. WEEKS: | Good morning, thank you. Um, I work as a greeter at the Planned Parenthood |
| 3 | | clinic on First Avenue, and I'm actually here to speak in support of this |
| 4 | | amendment. Um, if only people protesting were, in fact, as polite as a |
| 5 | | previous speaker was, but that, in fact, is not the case. And you don't have to |
| 6 | | physically block access to the clinic to prevent people from, um, accessing |
| 7 | | the clinic. In my experience as a, as a greeter, I've encountered protesters |
| 8 | | who, um, try to harass and manipulate people to keep them from going into |
| 9 | | the clinic without physically blocking it. A couple of examples. A young |
| 10 | | woman had entered the clinic to engage in some healthcare services. When |
| 11 | | she came in, one of the protesters had told her that, if she went into Planned |
| 12 | | Parenthood, she should not come back out the same way. There's only one |
| 13 | | way for the public to enter this particular clinic. Naturally, this woman was |
| 14 | | very distressed at the prospect of having to leave and walk by this same |
| 15 | | protester and group of protesters. In another case, a small family had come |
| 16 | | in. The woman was coming in for abortion services. They were harassed on |
| 17 | | the way in, told not to go into a charnel house, accused of being murders, |
| 18 | | asked why they didn't love their children. The father was so distressed, he |
| 19 | | explained to me that his wife had a medical condition that was not allowing |
| 20 | | her to continue her pregnancy and that's why they were there. While I |
| 21 | | appreciated that he shared that information with me, he should not have felt |
| 22 | | compelled to share that information with anyone. His family should have |
| 23 | | been free to go into that clinic to access any array of healthcare services |
| 24 | | without feeling they had to justify it to anyone. One of the things this |
| 25 | | amendment is designed to protect is people feeling that they are being judged, |
| 26 | | that they have to explain or justify why they're visiting the clinic. It's a private |
| 27 | | issue between them and their healthcare provider. They should be able to |
| 28 | | come in freely, engage in their healthcare services they've chosen, and leave |

| 1  | | freely as well. This is one of the reasons that I support the amendment and |
|----|--|--|
| 2  | | encourage you to do so as well. Thank you. |
| 3  | D. FUENTES: | Thank you. Next u-, next is Grace. Grace, you have time ceded to you by |
| 4  | | Judith. If you could, please raise your hand? Thank you. You'll have two |
| 5  | | minutes. Please proceed. |
| 6  | G. GAGE: | Good morning. My name is Grace Gage. I am a volunteer escort as well as a |
| 7  | | patient at Planned Parenthood. For years, protesters have harassed and |
| 8  | | intimidated patients like myself. It's impossible to drive by or walk into the |
| 9  | | building without interacting with protesters. I have personally feared for my |
| 10 | | safety, as I have been videotaped, told I will burn in hell, forced to view |
| 11 | | gruesome, misleading posters and listen to the sound of a baby crying over a |
| 12 | | megaphone. How is this treatment of patients at any healthcare facility |
| 13 | | allowed? Protesters intentionally crowd around entrances and exits of |
| 14 | | Planned Parenthood to physically block people from accessing lifesaving |
| 15 | | services like cancer screenings, pap smears, STI testing and treatment and |
| 16 | | abortions. As a volunteer, I've spoken with patients who are unaware the |
| 17 | | facility offered parking because the crowd around the door blocked the |
| 18 | | driveway. It sickens me to think about how many people who desperately |
| 19 | | needed healthcare drove away because they feared for their physical safety |
| 20 | | entering a building. Many Planned Parenthood patients already face |
| 21 | | socioeconomic and systemic barriers to accessing care. Adding a physical |
| 22 | | intimidation barrier is not only an unreasonable burden, but it is |
| 23 | | unconscionable. I urge you to pass this Ordinance to protect patients' rights, |
| 24 | | including my own, to access healthcare services without intimidation or fear. |
| 25 | | Thank you. |
| 26 | D. FUENTES: | Thank you. Next is Kat. You have time ceded to you by Jacelson [phonetic]. |
| 27 | | If you can please raise your hand? Rhodalander [phonetic]? Thank you. And, |
| 28 | | uh, Nettie or Nettle? |

San Diego
Transcription

8.

| | | |
|---|---|---|
| 1 | FEMALE: | Nste, Nate. |
| 2 | D. FUENTES: | Okay, I'm sorry. All right, you'll have three minutes. Please proceed. |
| 3 | FEMALE: | Neil, not Nate. Neil. I got his name wrong, too. Sorry, Neil! My name is Kat |
| 4 | | Tessero. I'm a community organizer at Planned Parenthood of the Pacific |
| 5 | | Southwest, and I'm in favor of the buffer zone. Although I do want to be very |
| 6 | | clear, I don't want to see this buffer zone weaponized in the future to infringe |
| 7 | | on people's First Amendment rights to protest. While I disagree with what |
| 8 | | the protesters outside of our health clinics say, I do not want to take away |
| 9 | | their right to say their opinion; I merely want our staff, volunteers, and, most |
| 10 | | importantly, patients, to feel safe as they enter and exit our facilities. I do not |
| 11 | | work in our healthcare centers and not all of our volunteer staff and patients |
| 12 | | could be here today to speak on this issue. So I do have a statement from one |
| 13 | | of our volunteers. She cleans rooms at one of our clinics, and her name is |
| 14 | | Suzanne. Quote, I think everyone who works in the building at First Avenue |
| 15 | | and Grape Street has been subjected to verbal harassment pretty routinely on |
| 16 | | Saturday mornings. But some of the harassment goes above and beyond. The |
| 17 | | examples below are from the last five years. Nearly every time I exit the |
| 18 | | parking lot, a woman protester stands in the street with a large sign blocking |
| 19 | | the view of those of us leaving the lot and those drivers who are attempting |
| 20 | | to travel north on First Avenue. It appears to be a deliberate attempt to cause |
| 21 | | a traffic accident. Frequently, a protester or two will harass staff and patients |
| 22 | | as they yell at us over the back fence that is next to the parking lot, giving |
| 23 | | them cover but leaving those of us in the parking lot particularly vulnerable. |
| 24 | | See the photo. This is an ongoing threat. My fear is that a protester could |
| 25 | | climb over the fence and enter the building from the back entry. I also record |
| 26 | | the protesters on my cellphone when I go to my car. I can't stop a bullet, but |
| 27 | | at least I can record the protester possibly shooting me. In one incident, when |
| 28 | | I walked across the street from the clinics to drop a bill in the mailbox, a |

| | | |
|---|---|---|
| 1 | | protester followed me, harassing me most of the way there. The harassment |
| 2 | | stopped only when I looked at her and said, "Thou shalt not judge, lest thee |
| 3 | | be judged." During the pandemic, a protester scaled a tree on city property to |
| 4 | | issue the threat in the photo. There's two other photos also, um, that can be |
| 5 | | seen from the third floor window. Last year, two protesters, one in a weird |
| 6 | | black robe, held a banner with a semiautomatic weapon prominently |
| 7 | | displayed. Again, this banner blocked the view of those of us leaving the |
| 8 | | parking lot and traveling north on First Avenue. I could go on but I think I've |
| 9 | | made my point. The protesters have become a clear and growing physical |
| 10 | | threat to the patients and staff. I would strongly encourage a wider buffer zone |
| 11 | | to protect the clinic staff and the men and women who, legally seeking ser-, |
| 12 | | safe, effective reproductive healthcare services, end quote from Suzanne. I |
| 13 | | want to emphasize that this is a safety issue. And I do not want anyone to lose |
| 14 | | the right to protest. I just want them to not block the entrances and exits, |
| 15 | | making our volunteers, staff and, most importantly, our patients feel unsafe. |
| 16 | | Thank you. |
| 17 | D. FUENTES: | Thank you. Next we have Caitlin [phonetic]. Caitlin, you have time ceded to |
| 18 | | you by Sue Vargas. Thank you so much. You'll have two minutes. |
| 19 | CAITLYN: | I Hello and thank you. My name is Caitlin. I am a Planned Parenthood greeter |
| 20 | | and clinic escort. I'm in strong support of the proposed amendments to the |
| 21 | | City Code regarding buffer zones. For the past three and a half years, I spent |
| 22 | | my Saturday mornings greeting patients outside and walking patients through |
| 23 | | active protesters. Today, I want to speak on traffic safety. My experiences |
| 24 | | and what I witnessed in front of Planned Parenthood Center on First Ave. |
| 25 | | Ideally, protesters should not block entrances or cause public safety hazards. |
| 26 | | But that has not been my experience. As soon as my car is seen driving up, |
| 27 | | protesters from both sides of the driveway begin to cross slowly from one end |
| 28 | | to the other of the sidewalk. This blocks the driveway from view, and I'm |

San Diego Transcription

10.

| | | |
|---|---|---|
| 1 | | forced to stop on the road. This occurs when cars pull out as well. This |
| 2 | | effectively creates a blockade, preventing patients and drivers from pulling in |
| 3 | | or out at the entrance to Planned Parenthood Clinic. The security has to usher |
| 4 | | the protesters off of this entrance. As patients pull out of the driveway and are |
| 5 | | stopped by protesters, they are met with knocking on windows, being filmed, |
| 6 | | pamphlets pushed into open windows, inflammatory yelling, waving signs |
| 7 | | and hands on both sides of the road, obstructing view of drivers as they pull |
| 8 | | out into the street. This is a huge distraction. So it is unsurprising that I've |
| 9 | | witnessed a traffic collision here, along with countless near misses of cars and |
| 10 | | pedestrians as people are pulling out through these active protesters into |
| 11 | | oncoming traffic. I strongly encourage everyone here today to consider the |
| 12 | | safety of this community. Thank you. |
| 13 | D. FUENTES: | Thank you. Our final speaker here in Council Chambers is Jen French. |
| 14 | J. FRENCH: | Good morning. My name is Jen French, and I'm in strong support of the |
| 15 | | proposed amendments to the Municipal Code regarding buffer zones. I'm |
| 16 | | here also to share my story as a patient escort on behalf of Planned Parenthood |
| 17 | | of the Pacific Southwest. For years, I have witnessed antiabortion protesters |
| 18 | | intimidate and harass patients who are simply trying to access healthcare. |
| 19 | | They also harass and intimidate volunteers, staff, security guards, food |
| 20 | | delivery drivers, postal deliveries and even a plumber. I most recently |
| 21 | | volunteered the Saturday before Mother's Day. There are over 50 protesters |
| 22 | | on both sides of the driveway and in front of the walkway blocking the |
| 23 | | entrance to the clinic. When I arrived, I had to walk into the driveway to get |
| 24 | | to the walkway. I was followed and shouted at the entire time, and I watched |
| 25 | | this happen to every single person who entered the clinic during my four hour |
| 26 | | shift. Patients are making important private decisions about their healthcare |
| 27 | | and they should not have to overcome harassment. Thank you. |
| 28 | D. FUENTES: | Thank you for that concluding remark. One last call for Jasmine Wilson? Not 11. |

| | |
|---|---|
| 1 | | seeing her come up. I'll set the timer for five minutes and go to those |
| 2 | | participating remotely. Lori Saldana, if you can, please unmute. You'll have |
| 3 | | one minute. |
| 4 | L. SALDANA: | Uh, thank you. And, fortunately, the agenda is back online and the supporting |
| 5 | | documents. So I'm speaking in support of the amendments to the existing |
| 6 | | policy. Uh, it needs to be updated, not only because of the Supreme Court |
| 7 | | decision but because the instances of harassment are increasing, not only at |
| 8 | | healthcare facilities but the other locations that were mentioned. This |
| 9 | | includes, uh, and I, I hope that the public safety may consider, at some point, |
| 10 | | including other types of, uh, rallies that, uh, where megaphones have been |
| 11 | | used in recent years to disrupt people's free speech activities. Um, and so I, I |
| 12 | | definitely support this to protect the interests of people seeking healthcare, |
| 13 | | uh, treatments. Uh, there is no excuse for this and, uh, it, it's shocking to me |
| 14 | | as someone who experienced this and was an escort decades ago, that we are |
| 15 | | fighting these same battles again. So thank you for bringing this forward with |
| 16 | | these amendments. |
| 17 | D. FUENTES: | Thank you for those remarks. Karen B. You are unmuted. We do not hear you |
| 18 | | here in Council chambers, though. |
| 19 | K. BORJA: | Good morning. My name is Karen. There we go. Um, I'm the Director of |
| 20 | | Legislative and Community Affairs at Planned Parenthood of the Pacific |
| 21 | | Southwest. And I'm speaking in support of Item 52. In March, during the |
| 22 | | annual 40 Days of Life intimidation protest outside of the health center, a |
| 23 | | patient shared tearfully that they felt intimidated and chose to forego their |
| 24 | | scheduled healthcare visits. Harassment and intimidation create a hostile |
| 25 | | environment for patients, deterring them from seeking necessary healthcare |
| 26 | | services. Patients should feel safe and comfortable accessing healthcare |
| 27 | | without fear of harassment anywhere in the City of San Diego. Healthcare |
| 28 | | providers and staff also deserve to feel safe in their working environment. |

| | | |
|---|---|---|
| 1 | | Harassment and intimidation does impact their wellbeing as well. Harassment |
| 2 | | near health center facilities can compromise patients' privacy and |
| 3 | | confidentiality. Patients have the right to access healthcare without their |
| 4 | | personal information being exposed and their privacy violated. Constituent-, |
| 5 | | no sorry -- consistent and uninterrupted access to healthcare services |
| 6 | | [inaudible/crosstalk]. |
| 7 | D. FUENTES: | Your time has concluded. Thank you for that concluding remark. And our last |
| 8 | | speaker is Sabrina. Sabrina, if you -- there you go. You are unmuted. |
| 9 | S. BAZZO: | Yes. |
| 10 | D. FUENTES: | [Inaudible/crosstalk]. |
| 11 | S. BAZZO: | Oh, can you hear me? |
| 12 | D. FUENTES: | Yes. Please proceed. |
| 13 | S. BAZZO: | Yes. Good afternoon. As a parent in a San Diego Unified School Board |
| 14 | | Member, I want to thank the City Attorney for addressing this issue, and I |
| 15 | | strongly urge this Committee to pass this proposal providing a buffer zone in |
| 16 | | order to protect our schools, our healthcare facilities and our places of |
| 17 | | worship. As a trustee for San Diego Unified, having safe facilities where our |
| 18 | | students and parents feel comfortable and secure is a very high priority and |
| 19 | | family involvement is extremely important to our students' success. So I find |
| 20 | | it deeply troubling that anyone would block the entrances to our schools and |
| 21 | | try to intimidate our families for any reason. No one has the right to deny our |
| 22 | | children access to their education and no one has the right to prevent parents |
| 23 | | from supporting their students. And these situations are, unfortunately, not |
| 24 | | uncommon. With this law in place, we can ensure that that doesn't happen. |
| 25 | | Access to education, healthcare and religious institutions is fundamental to |
| 26 | | our rights, not only as San Diegans, but also as Americans. And that's why I |
| 27 | | appreciate the City Attorney [inaudible/crosstalk]. |
| 28 | D. FUENTES: | Thank you. |

| | | |
|---|---|---|
| 1 | S. BAZZO: | Yeah, thank you. |
| 2 | D. FUENTES: | Your time has concluded. Thank you. Uh, 7-4-9-9, if you can please unmute. |
| 3 | | Star-six to unmute, 7-4-9-9. I can't unmute for you. [Inaudible], caller is not |
| 4 | | unmuting. That concludes our public comment on this item. |
| 5 | S. ELO-RIVERA: | All right, thank you, Clerk. Let's begin Council's discussion of this item with |
| 6 | | Councilmember von Wilpert. |
| 7 | M. VON WILPERT: | I want to thank the City Attorney, um, and, uh, Chief Deputy City Attorney |
| 8 | | Heather Ferbert for the presentation today on this, um, and for the incredible |
| 9 | | work that you've been doing to make sure that people have safe access to |
| 10 | | schools, clinics and places of worship. Very much want to thank, um, all the |
| 11 | | public speakers who came in, including, uh, our school board trustee who |
| 12 | | represents a lot of my district, um, Sabrina Bazzo, who is just trying to do her |
| 13 | | job every day to provide education, a safe and healthy education for students. |
| 14 | | Uh, and as we saw during the presentation, um, school board meetings have |
| 15 | | been blocked. Entrances to schools have been blocked. Uh, entrances to |
| 16 | | healthcare facilities have been blocked. #And that is not in the spirit of the |
| 17 | | First Amendment to, uh, uh, block someone's entrance and egress into a |
| 18 | | facility such as a place of worship, a healthcare clinic or a school or school |
| 19 | | board meeting. Uh, the First Amendment needs to be protected and people |
| 20 | | need to have free speech, and those free speech rights should not impinge on |
| 21 | | people's free ability to safely access, uh, facilities they need to go to every |
| 22 | | day. Um, I really want to say thank you to the folks who, who raised these |
| 23 | | points with the notion that, yes, we are protecting pr-, people's right to protest. |
| 24 | | It is your right to protest. At the same time, it needs to make sure that we |
| 25 | | don't impinge on anyone else's rights to access the basic services they need. |
| 26 | | So, um, I want to thank the City Attorney very much for bringing forth this |
| 27 | | public safety issue. This is what this is, is a bill to protect public safety and |
| 28 | | safe access. Um, I also want to thank very much the folks who do this hard |

San Diego
Transcription

14.

| | | |
|---|---|---|
| 1 | | work, um, at our school boards, in our schools every day, and, uh, incredible |
| 2 | | healthcare institutions like Planned Parenthood. For those of you who do not |
| 3 | | know, as mentioned multiple times, a pap smear is a test for cervical cancer. |
| 4 | | It is, uh, incredibly important and has saved thousands of women's lives, um, |
| 5 | | because cervical cancer can be deadly if not caught on time. Um, so I really |
| 6 | | want to thank everyone for being here today. I'm happy to make the motion |
| 7 | | to move Staff's recommendation, uh, just like we did at a Public Safety |
| 8 | | Committee. And, um, I want to thank again the City Attorney for taking on |
| 9 | | this issue. So thank you. |
| 10 | S. ELO-RIVERA: | Thank you. Council member von Wilpert. That's a motion to approve the, the |
| 11 | | item? |
| 12 | M. VON WILPERT: | Yes. |
| 13 | S. ELO-RIVERA: | And we will go to Councilmember Campillo. |
| 14 | R. CAMPILLO: | Thank you, Council President. I want to thank the City Attorney, uh, |
| 15 | | Ms. Ferber for being here, uh, presenting this. I'm happy to second this, uh, |
| 16 | | item. Um, fundamentally, uh, protecting folks, the public safety aspect of this |
| 17 | | just simply can't be denied. Uh, people are gonna be safer when we pass this |
| 18 | | amendment. So I urge my colleagues to vote in support. That concludes my |
| 19 | | second. |
| 20 | S. ELO-RIVERA: | Thank you, Councilmember Campillo. All right, so we got a motion and a |
| 21 | | second to approve Staff's recommendation. And we'll turn to |
| 22 | | Councilmember Campbell. |
| 23 | J. CAMPBELL: | Thank you. I want to thank the City Attorney and your office for all the great |
| 24 | | work on this issue, to protect San Diegans from harassment and inta-, and |
| 25 | | intimidation at the same time as protecting the right of free s-, expression. |
| 26 | | With women's productive health rights under attack in our nation, our City |
| 27 | | Attorney has been a tremendous leader, ensuring that here in the City of |
| 28 | | San Diego, women have safe access to reproductive healthcare. This |

San Diego
Transcription

15.

1    Ordinance doesn't stop there; it also ensures that all children and families in

2    San Diego can go to school safely and can attend their place of wors-, worship

3    with a sense of security and safety. The rise of hate, polarization and bigotry

4    in our country and communities, it is our duty as government officials to make

5    sure that San Diegans have safe access to health clinics, school grounds and

6    places of worship. As a family physician for 40 years, I would like to say that

7    I have had many patients over the years who came to me to discuss issues of

8    unwanted pregnancies or unexpected pregnancies. In all cases, I was

9    completely nonjudgmental and only asked them what they themselves wanted

10   and would only help them in their decision, whichever way it went. It's their

11   decision, not mine; I'm only there to help them with it. And, believe me,

12   people have access to all the information on all sides of this issue, for many,

13   many years. You do not have to harass them at health clinics. Furthermore,

14   Planned Parenthood only does about 8% of its business having to do with

15   abortion. Most of what they do is primary healthcare and women's healthcare.

16   But men go there, too, as patients for primary healthcare. So to make this the

17   one big thing and to block entrance for all those other patients is, is ridiculous

18   and it's unsafe. And as people have, have stated here, who have actually been

19   at the clinic when this happens, they've seen it. Now, I'd also like to say that

20   one of my daughters when she grew up decided to become an escort at a clinic

21   in Pittsburgh, Pennsylvania, which is where I practiced medicine. And I must

22   say, every time she was an escort at the clinic, I worried about her health and

23   safety because people would surround her as she tried to walk patients into

24   the clinic without being harassed and say terrible things and, and threaten

25   physical violence which is actually illegal. So, I say let each person in their

26   own private mind, in their own conscience, with their own family, with their

27   own physician, make up their own minds. Do not harass people for their

28   thoughts, their beliefs and their freedoms. Thank you so much for this

16.

| | | |
|---|---|---|
| 1 | | Ordinance. It is very much needed. I will be in support. |
| 2 | S. ELO-RIVERA: | Thank you, Councilmember Campbell. Councilmember Whitburn. |
| 3 | S. WHITBURN: | Thank you, Council President. I supported this at our Public Safety |
| 4 | | Committee meeting. And again, want to thank City Attorney Elliot and Senior |
| 5 | | Chief Deputy City Attorney Ferbert for all their work on this and for bringing |
| 6 | | it forward today. It is unacceptable that patients seeking reproductive |
| 7 | | healthcare in this city have their access hindered and their safety threatened. |
| 8 | | That has to stop. Uh, almost two years ago, as some states restricted abortion, |
| 9 | | I sponsored a resolution declaring San Diego a safe city for reproductive |
| 10 | | freedom and access to abortion. It was a signal to patients elsewhere that if |
| 11 | | they needed reproductive healthcare, they would be welcome here. But for |
| 12 | | patients to truly feel welcome, they also have to feel safe. And these |
| 13 | | amendments will help to protect these patients. Uh, and they'll protect staff |
| 14 | | as well, as we heard today. They'll increase safety around our schools and |
| 15 | | our places of worship, uh, which has certainly been an issue lately. Um, of |
| 16 | | course, for an ordinance to be effective, it also has to be enforced. And I hope |
| 17 | | that we will enforce this Ordinance and create a safer San Diego in the |
| 18 | | process. So, again, thank you for bringing this forward. I strongly support it. |
| 19 | | Thank you Council President. |
| 20 | S. ELO-RIVERA: | Thank you Councilmember Whitburn. Council President Pro Tem. |
| 21 | J. LACAVA: | Thank you, Council President. Uh, thank you to my colleagues for your |
| 22 | | comments. I won't repeat them, except to say thank you to Madam City |
| 23 | | Attorney, Miss Ferber for the good work you did. Uh, I appreciate your |
| 24 | | diligence and looking back at our very old Municipal Code or City Charter |
| 25 | | and trying to figure out what we can do to serve San Diegans and protect their |
| 26 | | public self-, safety and health and allow them the freedom to choose the kinds |
| 27 | | of education or health facilities or ways of worshiping that works for them. |
| 28 | | Thank you. |

San Diego
Transcription

17.

| | | |
|---|---|---|
| 1 | S. ELO-RIVERA: | Thank you, Council President Pro Tem. I will, uh, express gratitude to City |
| 2 | | Attorney and your office for the work, uh, to bring this forward. As always, |
| 3 | | thank you to Planned Parenthood, um, for all the work that you do, um, to |
| 4 | | provide, uh, healthcare access and so much more in our community. Truly |
| 5 | | appreciate you. We have a motion from Councilmember von Wilpert, |
| 6 | | seconded by Councilmember Campillo. Clerk please call the roll. |
| 7 | D. FUENTES: | I've started the voting system. Please cast your vote. And that passes |
| 8 | | unanimously, nine to zero. |
| 9 | S. ELO-RIVERA: | All right, thank you so much. |
| 10 | … | |
| 11 | [End of recording] | |

San Diego
Transcription

18.

**PROOFREADER'S CERTIFICATE**

I, Erica Lowther, owner of San Diego Transcription, certify that on October 20, 2024, I proofread all the transcript of the above-referenced recording, while listening to the recording from which the same was transcribed, and that said transcript as typed accurately reflects the spoken word, to the best of my ability to hear those recorded words and identify the persons speaking.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 20, 2024, at San Diego, California.

_____
ERICA LOWTHER

**EXHIBIT M**

       



# Sabrina Levy Bazzo

1.4K friends

  



## Friends

🔍 Search

All friends    Recently Added    Current city    Hometown    Following

**Kristin Ament Brownell**                    Add friend

**Shelly Rodrigues**
Kansas City, Missouri                          Add friend

**Carl Johansen**
Northeastern Illinois University               Add friend

**Julie Marie Çelebi**
Associate Clinical Professor at University of California, San Diego    Add friend

**Jay W. Lee**                                 Add friend

**Lauren Helfer Raphael**
Owner/Licensed Clinical                        Add friend



 **Mianne Legaspi**

 **Cindy López**
Northeastern Seminary

 **Josh Lunsford**    Add friend

 **Cheryl Burr**
Physical Therapist at
Urbana School District 116    Add friend

 **Abthin Khorshidian**
Elmhurst College    Add friend

 **Michelle Cao**

 **Stan Miller**
Vice President of Finance and
Administration at Armed Services YMCA San
Diego

 **Lori Taylor**

 **Monica Nowak**
Works at Trumpetwifeslots    Add friend

 **Lori Krause**
Manicurist/Pedicurist at
Sensibilities Day Spa    Add friend

 **JoAnn Schmidt**
Works at San Diego Unified
School District    Add friend

 **Tori Cederquist**
Works at Emergency
Department RN
(Emergency Department
Registered Nurse)    Add friend

 **Nonno Michael**    Add friend

 **Viv Yang**
1 mutual friend    Add friend

 **Lindsay Allen**
Works at University of San
Diego    Add friend

 **Susan Doubet Ekstrand**
Chicago, Illinois    Add friend

 **Michael DeVries**
Field Organizer at San
Diego Education
Association    Add friend

 **Barbara Lucas**
Rubidoux High    Add friend

 **Jeff Drobnick**
Owner/ President and Earth Innovations
Corp at JASD BUILDERS AND DEVELOPERS

 **Neal Ortiguerra**
Director of Political Action
at Planned Parenthood of
the Pacific Southwest    Add friend

 **Debbie Barlow Beiley**    Add friend

 **George Gastil**
History Instructor at
Grossmont College    Add friend

 **Joel C. Bartlett**
Cal Poly Pomona    Add friend

 **Maria Constantine**    Add friend

 **Lorna Ronnie Diamond**    Add friend

 **Krista Brown Clemen**    Add friend





**sabrinabazzo** • Follow
San Diego, California

**sabrinabazzo** 224w
Very proud to announce this endorsement from such a fantastic organization. Thank you @pppswhealth for endorsing me, and for everything that you do for the community. #bazzoforschoolboard #plannedparenthood #sandiego

View hidden comments

These comments were hidden because they may be misleading, offensive or spam. People can still tap to view them

**31 likes**
July 5, 2020

[redacted]

More posts from **sabrinabazzo**



This photo is from a post.    View post

Planned Parenthood Action Fund of the Pacific Southwest
May 23, 2023

BOARD OF EDUCATION
SAN DIEGO UNIFIED SCHOOL DISTRICT
SAN DIEGO, CALIFORNIA

In the Matter of Support for          )
Reproductive Rights                   )          **RESOLUTION**

**WHEREAS,** the reproductive rights movement is facing the most aggressive attacks to safe and legal access to abortions that it has since 1973, with serious implications for communities across the country; and

**WHEREAS,** the Supreme Court of the United States acknowledged in its 1973 landmark decision *Roe vs. Wade* that the ability to make a private medical decision impacting one's own reproductive health is a Constitutionally protected right; and

**WHEREAS**, the current Supreme Court reportedly plans to overturn *Roe v. Wade* and deny millions of American women the right to safe, legal and accessible abortion; and

**WHEREAS,** the impact of restrictions, bans, and attacks on reproductive freedom disproportionately impact populations that already face barriers to accessing care— communities of color, people with low incomes, people who are unsheltered, people who identify as LGBT, immigrants, and young people; and

**WHEREAS,** access to quality information and education about young people's sexual health is a critical step toward addressing disparities caused by historical inequities due to race, gender, and sexual identity which have been magnified by structural barriers; and

**WHEREAS,** the California Healthy Youth Act requires California public schools, including charter schools, to provide comprehensive sexual health education that includes information about the safety and effectiveness of all FDA-approved methods of preventing pregnancy and transmission of HIV and other sexually transmitted infections (including condoms, contraceptives, and antiretroviral treatment) and abstinence, as well as information about HIV, pregnancy, sexual harassment, sexual assault, healthy relationships, and human trafficking, as well as local resources for accessing care and students' rights to access care (CA Education Code §51930-51939); and

**WHEREAS,** sex education promotes and upholds the rights of young people to information that empowers them to make decisions about their bodies, health, sexuality, families, and communities in all areas of life; and

**WHEREAS,** sex education promotes gender equity -  inclusive of young people with varying gender identities, gender expressions, and sexual orientations - safe and healthy relationships and racial equity, ensuring responsiveness to the needs of young people who are Black, indigenous, and other people of color; and

**WHEREAS,** studies published in the June 2017 edition of the *Journal of Adolescent Health* and elsewhere have repeatedly found sex education which includes information beyond abstinence has been found to delay sexual intercourse, increase condom or contraceptive use, reduce the number of partners among young people, and decrease physical aggression with intimate partners; and

**WHEREAS,** young people who received sex education are 50 percent less likely to experience an unintended pregnancy, 31 percent less likely to contract a sexually transmitted infection, more likely to delay sexual activity and to use contraception upon becoming sexually active, and less likely to commit acts of sexual misconduct when fully educated on consent; and

**5**

**WHEREAS,** San Diego Unified and the Sexual Health Education Program have consistently been recognized as state and national leaders on providing students with age-appropriate and medically accurate information, receiving grant funding from the Centers for Disease Control and Prevention (CDC) for the past 30 years and maintaining a collaborative and public health approach to supporting students' physical, sexual, and mental health; and

**WHEREAS,** San Diego Unified protects the rights of all students to make their own reproductive choices by ensuring access to accurate, age-appropriate information on sexual health, providing sexual health education lessons in grades 6 and 8 and within high school Biology classes, and the Sexual Health Education department maintains a comprehensive website, containing vetted links to information and local clinical services; and

**WHEREAS,** San Diego Unified also informs students within sexual health education lessons of their fundamental right to consent to their own reproductive care, including pregnancy testing, birth control, condoms, abortion, and medical care related to pregnancy; the right of every student aged 12 and older to consent to their own testing and treatment for STIs and HIV, including PrEP and the HPV vaccine; and, the right of students to release themselves from school to seek these confidential services without parent notification or consent; and

**WHEREAS**, trained San Diego Unified school nurses provide free condoms on a confidential basis to any student in grades 6-12 under Board Policy 5141.25; and

**WHEREAS,** San Diego Unified seeks to engage parents in the education of their children by ensuring they have access to the Parent and Family Resources page, which includes "Guidelines for Talking with Your Child," and parents are notified about upcoming sexual health instruction, offered a way to preview the curriculum, and have a right to excuse their child from the instruction, per CA Ed Code §51937-51939; and

**WHEREAS,** prohibitions on the right to freely exercise reproductive freedoms are harmful to public health and safety, and are contrary to the values of the people of San Diego and the State of California.

**NOW, THEREFORE, BE IT RESOLVED**, that San Diego Unified will declare itself a champion and defender of health equity and reproductive freedom for all and will observe Women's Health Month in May by informing students of their reproductive rights on social media and through other platforms popular with students and will share information on the historic fight for reproductive freedom on the main district website.

Adopted and approved by the Board of Education of the San Diego Unified School District at a regular meeting held on the 10th day of May 2022.

_____          _____
President                                                Vice President

_____          _____
Member                                                 Member

_____          _____
Member                                                 Student Board Member

APPROVED AS TO FORM AND LEGALITY          Approved in public meeting of the Board of Education of the San Diego Unified School District on _____

_____          _____
ANDRA M. GREENE, General Counsel          Marty Stultz, Board Action Officer, Board of Education
San Diego Unified School District

**6**

**Trustee Sabrina Bazzo**
October 25, 2019 · 🌐

Was able to introduce myself to the Democrats for Equality group tonight and see Mara Elliott too! I love all the strong women we have running for office in 2020.



 33

 Like          Comment          Share

**EXHIBIT N**

## EXHIBIT N

# *100 Year Celebration of Free Speech*

### February 7, 2012

### *Presented by Councilmember Marti Emerald and Councilmember Todd Gloria*

WHEREAS, free speech and freedom of association are among the fundamental tenets of our democratic republic; AND

WHEREAS, in the past 100 years, we have evolved our legal interpretations to recognize that it is vital to our democracy to allow free speech for all, even those with whom we vehemently disagree; AND

WHEREAS, in 1912, workers of all walks of life, led by the I.W.W., Local 13, gathered in San Diego streets to protest and speak out against economic injustice and joined the national struggle to affirm the rights of all under the United States Constitution; AND

WHEREAS, in that same year, the San Diego City Council passed Ordinance No. 4623 banning any type of free speech or assembly in a 49-block radius of downtown San Diego; AND

WHEREAS, this ordinance read, in part: "It shall be unlawful for any person to address any assemblage, meeting or gathering of persons or hold or conduct any public meeting or make or deliver any public speech, lecture or discourse or sing any song or songs or take part in any public debate or discussion in or upon any public street or alley within that certain district in the City of San Diego…" AND

WHEREAS, this ordinance suppressed the free speech of all citizens of San Diego; AND

WHEREAS, the downtown Stingaree district was the heart of the working class in San Diego who had the most to learn about the economic injustice of the day but were denied the opportunity to benefit from robust public discussion on the issues affecting them, for fear of imprisonment and monetary fines; AND

WHEREAS, those affected, and others who were appalled by these free speech restrictions, stood up to police and fought for their right to protest; they were subsequently abused and held in local jails—some without trial for a period of up to six months; AND

WHEREAS, the City of San Diego and Chief of Police turned a blind eye to the violence perpetrated by police and vigilantes, allowing vigilantes to brutally tar and feather nationally known activist and "physician to the poor," Dr. Ben Reitman, and forcing him and his companion, Emma Goldman, out of San Diego; AND

WHEREAS, individuals such as George Marston, an important San Diego business leader and father to Helen Marston, who would later go on to found the local American Civil Liberties Union, refused to sign the petition to have speakers driven off the streets and instead publicly advocated for the free speech of all; NOW, THEREFORE

BE IT PROCLAIMED, by the Council of the City of San Diego, that this Council, for and on behalf of the people of San Diego, on this 100th anniversary of the historic San Diego Free Speech Fight, does express its deep dismay for our predecessors' actions and formally reiterates the Council's repudiation of this shameful ordinance.

1

**EXHIBIT O**

EXHIBIT O



# 2022 VIOLENCE & DISRUPTION STATISTICS



*In a year marked by a devastating Supreme Court decision and subsequent state abortion bans, anti-abortion extremists were emboldened and there was an increase in major incidents targeting abortion providers, including arsons, burglaries, death threats, and invasions.*

# Methodology

NAF has been tracking incidents of violence and disruption against reproductive health care providers since 1977. NAF asks our member facilities and allied organizations to submit monthly reports on the anti-abortion incidents that they experience. We conduct telephone and email follow up to our member clinics to acquire completed reports and to gather additional information about reported incidents as needed. If we are not able to validate an incident, it is not included in our statistics, which suggests that actual incidents are higher than reported. This year, 80% of our facility members reported data to us. In the 2022 statistics, we suspect underreporting in a number of categories, including picketing, hate mail/calls, hate email/internet harassment, obstruction, and trespassing.

NAF continues to work with an outside security firm to monitor threats and track scheduled anti-abortion events. NAF collects and compiles this data to detect patterns in anti-abortion criminal activities and appropriately report these trends to law enforcement. However, the shift among anti-abortion individuals and groups to use encrypted communication tools and services like Signal, Telegram, Discord, and Session likely contributed to a slight decrease in the incidents of hate email/internet harassment that we were able to document in 2022.

Numbers prior to 2013 represent the United States and Canada only. Numbers from 2013-2021 represent the United States, Canada, Mexico City, and Colombia, and numbers from 2022 represent the United States, Canada, and Colombia.

# ACKNOWLEDGEMENTS

NAF's Security & Safe Access Program is generously supported by a number of private foundations and individual donors. We appreciate this ongoing support, which enables us to provide our members with 24/7 security support, trainings and assessments, and the collection and production of these statistics.

We offer special thanks to the Guttmacher Institute's Rachel Jones, PhD, for support around our methodology and The Endora Project for additional information about anti-abortion centers.

| | NAF VIOLENCE AND DISRUPTION STATISTICS (2020 - 2022) INCIDENTS OF VIOLENCE & DISRUPTION AGAINST ABORTION PROVIDERS | | | |
|---|---|---|---|---|
| | 2020 | 2021 | 2022 | Totals 2020 - 2022 |
| **Violence** | | | | |
| Murder | 0 | 0 | 0 | 0 |
| Attempted Murder | 0 | 0 | 0 | 0 |
| Bombing | 0 | 0 | 0 | 0 |
| Arson | 5 | 2 | 4 | 11 |
| Attempted Bombing / Arson | 4 | 1 | 1 | 6 |
| Invasion | 7 | 16 | 20 | 43 |
| Vandalism | 80 | 123 | 101 | 304 |
| Trespassing[1] | 1,265 | 977 | 395 | 2,637 |
| Butyric Acid Attacks | 0 | 0 | 0 | 0 |
| Anthrax / Bioterrorism Threats | 0 | 0 | 4 | 4 |
| Assault & Battery | 54 | 123 | 40 | 217 |
| Death Threats / Threats of Harm[2] | 200 | 182 | 218 | 600 |
| Kidnapping | 0 | 0 | 0 | 0 |
| Burglary[3] | 8 | 13 | 43 | 64 |
| Stalking[4] | 4 | 28 | 92 | 124 |
| Totals | 1,627 | 1,465 | 918 | 4,010 |
| **Disruption** | | | | |
| Hate Mail / Harassing Calls | 3,413 | 2,999 | 2,413 | 8,825 |
| Hate Email / Internet Harassment[5] | 24,646 | 25,026 | 19,765 | 69,437 |
| Hoax Devices / Suspicious Packages[6] | 27 | 71 | 73 | 171 |
| Bomb Threats | 5 | 9 | 10 | 24 |
| Picketing[7] | 115,517 | 114,093 | 112,086 | 341,696 |
| Obstruction[8] | 2,712 | 2,439 | 2,100 | 7,251 |
| Totals | 146,320 | 144,637 | 136,447 | 427,404 |
| **Clinic Blockades** | | | | |
| Number of Incidents | 2 | 11 | 6 | 19 |
| Number of Arrests[9] | 18 | 27 | 20 | 65 |

[1] Tabulation of trespassing began in 1999.

[2] Death Threats, as of 2015, include any reported or discovered "Threats of Harm."

[3] This category includes incidents of Burglary, Robbery, and Theft that occurred at a reproductive health facility.

[4] Stalking is defined as the persistent following, threatening, and harassing of an abortion provider, staff member, or patient away from the clinic. Tabulation of stalking incidents began in 1993.

[5] Tabulation of email harassment began in 2002. As of mid-November 2015, enhanced technology allowed for an increased ability to document internet harassment.

[6] Tabulation of hoax devices began in 2002.

[7] NAF changed its method of collecting picketing data in 2012. Obstruction was separated into its own category.

[8] Tabulation of obstructions began in 2012. Obstruction is defined as the act of causing a delay or an attempt to cause a delay in the conduct of business or prevent persons from entering or exiting an area. This would apply to violations of the FACE Act.

[9] The "number of arrests" represents the total number of arrests, not the total number of persons arrested. Many individuals were arrested multiple times.

**EXHIBIT P**

**EXHIBIT P**



## Grace Gage, MS ✅ (She/Her) · 3rd
*Director of Accounts at Inspire360*

- Inspire360
- Texas A&M University

San Diego, California, United States · Contact info

500+ connections





### About

As Director of Accounts, I manage the relationships with over 50 key accounts and ensure clients have the tools they need to deliver exceptional education using Inspire360 software.

...                                                           ...see more

🏆 Top skills
Creative Problem Solving · Presentation Skills · Health Education · Fitness Instruction · Learning Management Systems → 

### Activity
773 followers

Posts   Comments

Grace Gage, MS reposted this · 8mo



Couldn't have said it better: Cross-Promote, Educate, Elevate with **Inspire360**. Congrats to the CFSC and **Exos** team!

👍❤️ 2

Show all posts →

### Experience

ℹ️ Preparing PDF, your download will begin shortly.

**1**

Dec 2014 - Present · 9 yrs 10 mos
San Diego, California
• Oversee and maintain relationships with over 50 key accounts
• Work with clients to create and distribute online education and ...see more


**Indoor Cycling Instructor**
CycleOM, LLC.
Feb 2016 - Feb 2019 · 3 yrs 1 mo


CycleOM Fit Tips: Bike set up in 3 easy steps!
Learn how to properly set up your bike for a safe and
more efficient indoor cycling experience. Three easy...


**Group Fitness Instructor**
Equinox
May 2013 - Nov 2014 · 1 yr 7 mos
Orange County, California Area

Taught indoor cycling, IndoRow®, TRX®, and Shockwave classes


**Education and Marketing Coordinator**
Team Arney, Inc.
Nov 2012 - Nov 2014 · 2 yrs 1 mo
Orange County, California Area

• Assisted in developing educational content for the 2014 Schwinn Cycling
workshops to be presented at international fitness conventions.. ...see more


**Continuing Education and Educational Products Coordinator**
IDEA Health & Fitness
May 2011 - Oct 2012 · 1 yr 6 mos
San Diego

• Edited video of filmed fitness sessions to be made into online continuing
education courses...                                   ...see more

Show all 6 experiences →

## Education


**Texas A&M University**
Master of Science (MS), Health Education
2011 - 2013


**Texas A&M University**
BS, Community Health
2008 - 2011

Activities and societies: Director of United Way on Campus, Class Councils
Committee Chair, Freshman Orientation Counselor

## Licenses & certifications


**Personal Fitness Trainer**
Athletics and Fitness Association of America - AFAA
Issued Mar 2011 · Expired Mar 2015

Show credential ☑


**Group Fitness Certification**
Athletics and Fitness Association of America - AFAA
Issued Nov 2009 · Expired Mar 2015

Show credential ☑

Show all 5 licenses & certifications →

 Preparing PDF, your download will begin shortly.



**Volunteer and Patient Advisory Committee**
Planned Parenthood of the Pacific Southwest
Nov 2016 – Present · 8 yrs
Health

· Serve on a committee whose purpose is to improve patient experience
· Promote health services at community events
· Underwent media training to be a spokesperson and educator for the
organization
· Health center greeter

## Skills

Creative Problem Solving

Presentation Skills

Show all 29 skills →

## Recommendations

**Received**    Given



**Eric Pointer** · 3rd
KVUE Daybreak Reporter
November 17, 2012, Eric and Grace studied together

Grace was an exemplary student. She served as a model for what an ideal
student was. Always working hard to make good grades while actively
participating in extracurricular activities. Her strong work ethic and
dedication to detail are frequently showcased in all that she does.

## Honors & awards

Summa Cum Laude
Dec 2013

 Associated with Texas A&M University

## Interests

**Top Voices**    Companies    Groups



**Brené Brown** in · 3rd
University of Houston + University of Texas at Austin | Researcher.
Storyteller. Courage-builder.
4,539,792 followers

+ Follow

## Causes

Civil Rights and Social Action · Economic Empowerment · Education · Health ·
Human Rights · Science and Technology

i  Preparing PDF, your download will begin shortly.

**3**

**EXHIBIT Q**



**Attacks on Churches, Pro-Life Organizations, Property, and People Since the Dobbs Leak on May 2, 2022 (as of 5/19/23)**

**Churches:**

1. May 3 – Sacred Heart of Mary Catholic Church in Boulder, CO vandalized with "My Body My Choice" graffiti
   https://www.nationalreview.com/news/colorado-church-vandalized-with-pro-abortion-graffiti-in-wake-of-scotus-leak/

2. May 5 – Saint Joseph's Church & Academy in Armada, MI was vandalized with satanic symbols & messages calling for the death of Republicans
   https://twitter.com/MrAndyNgo/status/1524480428459151360?s=20&t=GxPaM9bSyoBPoGMy-bQrAQ

3. May 7 – Saint John XXIII Catholic Church in Fort Collins, CO was smashed up in an attack claimed by the Colorado Anarchists group
   https://twitter.com/MrAndyNgo/status/1524486356755484672?s=20&t=GxPaM9bSyoBPoGMy-bQrAQ

4. May 8 – St. Bartholomew the Apostle Catholic Church in Katy, TX announces the church's tabernacle was stolen
   https://twitter.com/FrPlant/status/1523669071975563265

5. May 9 – Holy Rosary Catholic Church in Houston, TX vandalized
   https://twitter.com/Magister_Pownd/status/1523703253925769216

6. May 9 – Notre Dame de Lourdes Swarthmore, PA vandalized with "You do not have the right to decide how others live"
   https://twitter.com/roman_orthodoxy/status/1523841772455174144

7. May 9 – Saint Louis Catholic Church in Louisville, CO vandalized
   https://twitter.com/roman_orthodoxy/status/1523843010328416258

8. May 11 – Saint Elizabeth Ann Seton in Houston, TX – Desecration of the Eucharist
   https://www.lifenews.com/2022/05/10/abortion-activists-vandalize-three-more-catholic-churches/

9. May 17 – Statues of Lúcia dos Santos and Jacinta Marto smashed and decapitated (Our Lady of Sorrows Catholic Church, New York, NY)
   https://abc7ny.com/cardinal-timothy-dolan-our-lady-of-sorrows-vandalism-lower-east-side/11913896/

10. May 22 – Pro-abortion messages spray-painted on church building (St. Michael's Catholic Church, Olympia, WA)
    https://freebeacon.com/latest-news/anarchists-take-credit-for-vandalizing-four-pro-life-churches-in-washington-state/

11. May 25 – Harbor Church vandalized in Olympia, WA
    https://www.lifenews.com/2022/05/25/radical-pro-abortion-group-that-firebombed-pro-life-office-vandalizes-four-more-churches/

12. May 25 – Calvary Chapel vandalized in Olympia, WA
    https://www.lifenews.com/2022/05/25/radical-pro-abortion-group-that-firebombed-pro-life-office-vandalizes-four-more-churches/

13. May 25 – The Church of Jesus Christ of Latter-Day Saints vandalized in Olympia, WA
    https://www.lifenews.com/2022/05/25/radical-pro-abortion-group-that-firebombed-pro-life-office-vandalizes-four-more-churches/

1

14. May 26 – Jackson, MS church vandalized with pro-abortion graffiti
https://www.lifenews.com/2022/05/26/abortion-activists-vandalize-mississippi-church-as-pro-abortion-violence-continues-nationwide/

15. May 29 – Tabernacle stolen, Holy Eucharist thrown on floor, statues of angels on the altar decapitated and destroyed (St. Augustine Catholic Church, Brooklyn, NY)
https://www.catholicnewsagency.com/news/251406/tabernacle-stolen-from-brooklyn-parish-church

16. June 23 – St. Margaret's Catholic Church has religious statues and garden pots smashed in Buffalo, NY
https://www.wkbw.com/news/local-news/buffalo-police-investigating-vandalism-at-st-margarets-roman-catholic-church-on-hertel-avenue

17. June 25 – Holy Name of Mary Catholic Church has statue memorializing children who died of abortion defaced in New Orleans, LA
https://www.fox8live.com/2022/06/25/catholic-statue-vandalized-nola-after-roe-v-wade-decision/

18. June 25 – St. John Neumann Catholic Church spray painted with graffiti and attempted arson in Reston, VA
https://twitter.com/LindsayAWatts/status/1541187028779503616

19. June 25 – All Saints Parish has sign vandalized with pro-abortion messages in Portland, OR
https://catholicsentinel.org/Content/Default/Homepage-Rotator/Article/Sign-vandalized-at-All-Saints/-3/382/45966

20. June 25 – St. Anthony's Catholic Church has two statues of angels stolen, statue of the Blessed Virgin Mary toppled in Harlingen, TX
https://www.valleycentral.com/news/local-news/harlingen-church-vandalized-church-member-steps-up/

21. June 25 – St. Patrick Catholic Church vandalized in Philadelphia, PA
https://www.catholicnewsagency.com/news/251687/attacks-on-churches-pro-life-pregnancy-centers-continue

22. June 25 – St. Anthony's Catholic Parish vandalized with graffiti in Renton, WA
https://www.kiro7.com/news/local/church-renton-vandalized-with-smashed-windows-spray-painted-anti-catholic-messages/RMAFIFTZZFH2XBG6IE3BUFYVSY/

23. June 25 – St. Therese Little Flower Catholic Church's memorial to the unborn vandalized in South Bend, IN
https://www.catholicnewsagency.com/news/251667/more-catholic-churches-pregnancy-centers-and-a-pro-life-memorial-vandalized

24. June 25 – Saint Phillips American Methodist Church defaced with graffiti in Tallahassee, FL
https://www.tallahassee.com/story/news/2022/06/27/tallahassee-leon-county-vandalism-graffiti-roe-v-wade-abortion-spray-paint-church-sign-reads-my-body/7747287001/

25. June 26 – St. Colman Catholic Church destroyed by suspected arson in Raleigh County, WV
https://www.catholicnewsagency.com/news/251648/catholic-church-attack-west-virginia-destroyed-arson

26. June 27 – Ascension Roman Catholic Church defaced with graffiti in New York City
https://www.newsweek.com/churches-vandalized-states-roe-wade-ruling-abortion-1720208
27. June 27 – St. Brendan the Voyager Orthodox Church has window smashed in Bullhead City, AZ
mohavedailynews.com/news/141242/pastor-vandalism-was-in-response-to-roe-v-wade-decision/
28. June 28 – St. Louise Catholic Church spray-painted with anti-Catholic messages, windows broken, and church employee assaulted in Bellevue, WA
https://www.kiro7.com/news/man-arrested-allegedly-vandalizing-bellevue-church/47F3AM26IRDTFNXL2YD5CDJPRQ/
29. July 3 – Holy Family Catholic Church defaced with graffiti in Hillsborough, NC
https://www.carolinajournal.com/hillsborough-catholic-parish-vandalized-w-fck-the-church-and-i-love-abortion/#:~:text=Early%20the%20morning%20of%20Sunday,in%20bright%20yellow%20spray%20paint
30. July 9 – Wildwood Baptist Church has cemetery headstones damaged
https://wtop.com/montgomery-county/2022/07/montgomery-co-fire-investigating-possible-arson-at-catholic-church/
31. July 9 – North Bethesda United Methodist Church damaged by arson in Bethesda, MD
https://wjla.com/news/local/bethesda-catholic-church-fire-saint-jane-frances-de-chantal-catholic-church-mass-arson-montgomery-county-maryland-old-georgetown-road-pews-first-responders-tips-information-parish
32. July 10 – St. Jane Frances de Chantal Catholic Church damaged by arson in Bethesda, MD
https://mocoshow.com/blog/early-morning-fire-at-bethesda-church-arson-suspected/?fbclid=IwAR1Mh5ULI9AyRtBGH5K87NfNtYi5E8gUkVdts3T0hJkFs8al1IpyYShrRRQ
33. July 31 – Victory Baptist Church defaced with graffiti and has property destroyed in Lawrence, KS
https://fox4kc.com/news/lawrence-church-vandalized-over-anti-abortion-stance/
34. July 31 – Calvary Temple Assembly of God defaced with graffiti in Lawrence, KS
https://lawrencekstimes.com/2022/08/01/churches-vandalized/
35. September 24-26 – Humboldt Unitarian Universalist Fellowship defaced with graffiti in Bayside, CA
https://www.times-standard.com/2022/09/28/4-humboldt-county-churches-report-vandalization/
36. September 24-26 – Eureka Seventh Day Adventist Church defaced with graffiti in Eureka, CA
https://www.times-standard.com/2022/09/28/4-humboldt-county-churches-report-vandalization/
37. September 24-26 – St. Mary's Catholic Church defaced with graffiti in Arcata, CA
https://www.times-standard.com/2022/09/28/4-humboldt-county-churches-report-vandalization/

**3**

38. September 24-26 – First Covenant Church defaced with graffiti in Eureka, CA
    https://www.times-standard.com/2022/09/28/4-humboldt-county-churches-report-vandalization/
39. October 8 – Church of the Resurrection defaced with graffiti in Lansing, MI
    https://nypost.com/2022/10/15/michigan-pro-choice-vandals-caught-spray-painting-church/

**Pro-Life Organizations/PRCs:**
1. May 3 – Trotter House in Austin, TX vandalized
   https://www.foxnews.com/politics/5-pro-life-pregnancy-centers-vandalized-scotus-leak
2. May 4 – CareNet Frederick defaced with graffiti
   https://www.dailywire.com/news/pro-life-pregnancy-centers-are-under-attack
3. May 5 – Portland, OR Pregnancy Resource Center on SE Powell Blvd. was smashed up
   https://twitter.com/MrAndyNgo/status/1524466721704325122?s=20&t=GxPaM9bSyoBPoGMy-bQrAQ
4. May 6 – First Step Pregnancy Resource Center has sign ripped off in Bangor, ME
   https://www.christianitytoday.com/news/2022/may/supreme-court-leak-alito-pregnancy-centers-abortion.html
5. May 7 – CWA headquarters had security system ripped out and vandalized in Washington, D.C.
   https://www.dailywire.com/news/pro-life-womens-group-says-leftist-vandalized-urinated-on-their-office
6. May 8 – Wisconsin Family Action (FPC) was burned and vandalized
   https://twitter.com/AlexanderShur/status/1523320097993076737
7. May 8 – Oregon Right to Life office firebombed. No staff were injured
   https://www.kgw.com/article/news/crime/molotov-cocktails-oregon-right-to-life-keizer/283-84ffd04a-41ba-47fd-99d9-7af4a61ddfde
8. May 8 – Pregnant women housing in Denton, TX vandalized
   https://twitter.com/CaroleNovielli/status/1523033535195631616
9. May 8 – Loreto House Pregnancy & Parenting Resource Center in Denton, TX vandalized
   https://twitter.com/NTCatholic/status/1523331364061331457?s=20&t=Eu6EssIiXP1WthfKHAHAfQ
10. May 8 – First Care Women's Health in Manassas, VA vandalized
    https://twitter.com/obianuju/status/1523759330511581185
11. May 13 – Reisterstown, MD (Baltimore County) Alpha Pregnancy Center was vandalized with a threat & other graffiti by "Jane's Revenge"
    https://twitter.com/MrAndyNgo/status/1525940538511335429?s=20&t=GxPaM9bSyoBPoGMy-bQrAQ
12. May 14 – BirthRight pregnancy resource nonprofit in Frederick, MD was vandalized with pro-abortion graffiti
    https://twitter.com/MrAndyNgo/status/1525941738396913666?s=20&t=GxPaM9bSyoBPoGMy-bQrAQ
13. May 17 – Cherish Life America billboard attacked in Pittsburgh, PA

https://www.facebook.com/ProlifeAcrossAmerica/photos/a.427357340671492/74177063 08303192/

14. May 20 – Pro-life billboard vandalized in Portland, OR with "Abort the Supreme Court" https://twitter.com/MrAndyNgo/status/1528804212833779712?s=20&t=mRkOAzYTfFB ME3qU6H32Mg

15. May 25 – Women's Hope in Auburn, AL vandalized https://oanow.com/news/local/the-thing-you-cant-compromise-on-as-a-catholic-vicar-parishioners-respond-to-vandalism-at/article_358b33a8-d86a-11ec-92fa-6bbb3b68c30a.html

16. May 27 – Northeast Portland Mother and Child Education Center vandalized https://www.catholicsentinel.org/Content/News/Local/Article/Mother-and-Child-center-vandalized/2/35/45777

17. May 27 – Lynnwood, WA pro-life pregnancy center attacked https://mynorthwest.com/3489169/next-step-pregnancy-center-vandalized-lynnwood-pro-abortions-rights/

18. May 28 – Threats and pro-abortion messages spray-painted on building housing the South Broward Pregnancy Help Center/Respect Life Office in Miami, FL https://www.miamiarch.org/CatholicDiocese.php?op=Article_archdiocese-of-miami-respect-life-office-vandalized

19. May 30 – Dove Medical Pregnancy Center in Eugene, OR vandalized https://twitter.com/MrAndyNgo/status/1531427308669702145?s=20&t=xAKeZnGDcee0 3E11009koQ

20. June 2 – Agape Pregnancy Center vandalized in Des Moines, IA https://www.desmoinesregister.com/story/news/politics/2022/06/13/janes-revenge-abortion-group-claims-vandalism-des-moines-pregnancy-center/7611008001/

21. June 2 – Community PRC vandalized with nails in the parking lot, spray painted graffiti, broken glass in Anchorage, Alaska https://alaskawatchman.com/2022/06/09/anchorage-pro-life-center-vandalized-with-graffiti-broken-glass-and-nails/

22. June 3 – Washington, D.C. Capitol Hill Pregnancy Center vandalized https://www.foxnews.com/us/washington-dc-abortion-pregnancy-vandalized

23. June 4 – Care Net Puget Sound pregnancy center offices' doors plastered with pro-abortion posters in Federal Way, WA https://www.liveaction.org/news/pro-abortion-violence-escalates-overturn-roe/

24. June 7 – CompassCare pregnancy center firebombed by Jane's Revenge in Buffalo, NY https://www.nationalreview.com/news/pro-abortion-terrorists-firebomb-buffalo-pro-life-pregnancy-center/

25. June 7 – Pro-life pregnancy center vandalized in Asheville, NC https://www.catholicnewsagency.com/news/251480/vandalism-pro-life-pregnancy-center-north-carolina

26. June 8 – Options360 in Vancouver, WA, was hit with red paint last night and had "Jane's Revenge" written on the front of the building https://twitter.com/AlissaAzar/status/1534969525459767296?s=20&t=Nh9tZfidRGN38 MHsnhV0ag

27. June 11 – Gresham Pregnancy Resource Center firebombed in Gresham, OR
https://www.oregonlive.com/crime/2022/06/federal-investigators-looking-into-suspicious-fire-at-gresham-pregnancy-center.html

28. June 11 – Hope Pregnancy Center vandalized with smashed windows and graffiti in Philadelphia, PA
https://catholicnewsagency.com/news/251546/philadelphia-pro-life-clinic-vandalized

29. June 13 – Property destruction and attempted arson at the office of Washington State Rep. Andy Barkis, a pro-life Republican in Boston Harbor, WA
https://twitter.com/jtwilcox111/status/1536460651324878853

30. June 15 – Minnesota Citizens Concerned for Life offices vandalized in Minneapolis, MN
https://twitter.com/MCCL_org/status/1537157844897767424?s=20&t=2bonx5eGZPwtQNOC8GGn3Q

31. June 19 – Lennon Pregnancy Center in Dearborn Heights, MI has glass doors and windows smashed and is vandalized with spray paint
https://theparadise.ng/pro-abortion-terrorist-group-claims-to-have-attacked-two-detroit-area-pregnancy-centers/

32. June 19 – The Pregnancy Care Center in Redford, MI has glass doors and windows smashed and is vandalized with spray paint
https://www.lifenews.com/2022/06/22/pro-abortion-domestic-terrorists-destroy-pro-life-pregnancy-center-smashing-doors-and-windows/

33. June 21 – The offices of Jackson Right to Life and the campaign headquarters of Rep. Tim Walberg (R-Mich.) are graffitied and a glass door is smashed in Jackson, MI
https://twitter.com/sbaprolife/status/1539691573054738432

34. June 24 – Tree of Life Pregnancy Support Center vandalized with graffiti in Paso Robles, CA
https://pasoroblesdailynews.com/paso-robles-pregnancy-center-vandalized-reports-say/145894/

35. June 25 – Life Choices pregnancy center vandalized and set on fire in Longmont, CO
https://nypost.com/2022/06/25/christian-pregnancy-center-in-colorado-vandalized-burned-after-roe-v-wade-reversal/

36. June 25 – Blue Ridge Pregnancy Center spray painted with graffiti and multiple windows broken in Lynchburg, VA
https://wset.com/news/local/lynchburg-police-investigating-blue-ridge-pregnancy-vandalism

37. June 25 – Sacco Company Catholic Bookstore set on fire in Houston, TX
https://www.catholicnewsagency.com/news/251653/investigation-underway-of-major-fire-at-catholic-bookstore-in-houston

38. June 25 – The mobile clinic of Options Health is vandalized in Concord, CA
https://www.catholicnewsagency.com/news/251687/attacks-on-churches-pro-life-pregnancy-centers-continue

39. June 25 – LifeChoice Pregnancy Center defaced with graffiti in Winter Haven, FL
https://www.catholicnewsagency.com/news/251667/more-catholic-churches-pregnancy-centers-and-a-pro-life-memorial-vandalized

40. June 25 – Informed Choices Medical Clinic defaced with graffiti in Iowa City, IA
https://twitter.com/Ollie_XVX/status/1541107511151001600

41. June 25 – Pro-life sign vandalized at St. Teresa of Avila Catholic Church in Hutchinson, KS
   https://www.catholicnewsagency.com/news/251687/attacks-on-churches-pro-life-pregnancy-centers-continue

42. June 26 – Heart to Heart Pregnancy Center defaced with graffiti in Cortez, CO
   https://www.catholicnewsagency.com/news/251667/more-catholic-churches-pregnancy-centers-and-a-pro-life-memorial-vandalized

43. June 26 – North Carolina Republican Party headquarters defaced with graffiti in Raleigh, NC
   https://www.newsobserver.com/news/politics-government/article262918998.html

44. June 27 – Offices of Hinson Baptist Church and First Image pregnancy center has windows smashed and is defaced with graffiti in Portland, OR
   https://thepostmillennial.com/exclusive-female-photojournalist-assaulted-by-antifa-during-vandalism-of-portland-pregnancy-center

45. June 27 – A Woman's Friend Pregnancy Resource Clinic has windows smashed in Yuba City, CA
   https://sacramento.cbslocal.com/2022/06/30/yuba-city-pregnancy-resource-clinic-vandalized/

46. June 29 – Pathways Pregnancy Care Center defaced with graffiti in Littleton, NH
   https://www.wmur.com/article/vandalism-christian-pregnancy-center-littleton/40477153#

47. June 30 – Attempted arson and property defacement committed against Hope Clinic for Women in Nashville, TN
   https://www.tennessean.com/story/news/crime/2022/06/30/nashville-pregnancy-center-molotov-cocktail-breaks-window-janes-revenge-abortion/7780855001/

48. June 30 – Cowley County GOP offices has glass door broken, property destroyed in Winfield, KS
   https://www.foxnews.com/politics/kansas-county-gop-office-targeted-act-vandalism-supreme-court-abortion-ruling

49. July 3 – Heartbeat of Miami's Pregnancy Help Medical Clinic has security cameras damaged and is defaced with graffiti in Hialeah, FL
   https://www.miamiherald.com/news/local/community/miami-dade/hialeah/article263217043.html

50. July 4 – Birthright pregnancy resource center is defaced with graffiti in St. Paul, MN
   https://www.mprnews.org/story/2022/07/05/crisis-pregnancy-center-vandalized-in-st-paul

51. July 6 – Clearway Clinic has glass doors and windows smashed in Worcester, MA
   https://www.boston25news.com/news/local/vandals-splatter-paint-smash-doors-windows-attack-pregnancy-crisis-centers-worcester/UDFHPTVCGZCKDMZ5ALCRI5JYAM/

52. July 6 – Problem Pregnancy center is defaced with paint in Worcester, MA
   https://www.boston25news.com/news/local/vandals-splatter-paint-smash-doors-windows-attack-pregnancy-crisis-centers-worcester/UDFHPTVCGZCKDMZ5ALCRI5JYAM/

53. July 8 – Right to Life of Northeast Ohio has windows broken and is defaced with graffiti
   https://www.foxnews.com/us/ohio-right-life-offices-targeted-twice-pro-abortion-vandals-rocks-spray-paint

54. July 11 – Women's New Life Clinic defaced with graffiti in Baton Rouge, LA
https://www.wrkf.org/news/2022-07-12/crisis-pregnancy-center-in-baton-rouge-temporarily-closes-after-vandalism

55. August 18 – Bethlehem House Inc. Pregnancy Care Center defaced with graffiti in Easthampton, MA
https://www.masslive.com/news/2022/08/graffiti-reportedly-defaces-bethlehem-house-in-easthampton-labeled-by-some-as-crisis-pregnancy-center.html

56. August 22 – Alpha Pregnancy Care Center defaced with graffiti in Schenectady, NY
https://twitter.com/JoeBukuras/status/1562520572285767680

57. September 16 – Mother and Unborn Baby Care pregnancy center defaced with graffiti and windows shattered in Southfield, MI
https://www.detroitcatholic.com/news/pregnancy-resource-center-in-southfield-vandalized-with-pro-abortion-threats

58. September 24 – Elderly pro-life volunteer shot while canvassing door-to-door to discuss abortion ballot proposal in Lake Odessa, MI
https://www.foxnews.com/us/elderly-pro-life-volunteer-michigan-shot-heated-conversation-pro-life-group-says

59. September 25 – Bella Health + Wellness medical group defaced with graffiti in Englewood, CO
https://www.catholicnewsagency.com/news/252386/denver-area-pro-life-medical-practice-vandalized

60. December 17 – Pregnancy Aid Detroit defaced with graffiti in Eastpointe, MI
https://www.fox2detroit.com/news/eastpointe-pro-life-pregnancy-center-vandalized-with-spray-paint

61. December 17 – Home of Pregnancy Aid Detroit board member is defaced with graffiti and has windows broken in Grosse Pointe Woods, MI
https://www.cbsnews.com/detroit/news/eastpointe-pregnancy-center-board-members-home-vandalized/

62. January 29, 2023 – Houston Pregnancy Help Center defaced with graffiti in Houston, TX
https://pregnancyhelpnews.com/when-you-re-on-assignment-from-the-lord-you-do-what-it-takes-center-undeterred-by-pro-abortion-attack

63. March 3 – Our First Care pregnancy center is defaced with graffiti and has windows broken in Minneapolis, MN
https://www.cbsnews.com/minnesota/news/vandals-target-minneapolis-pregnancy-center/

64. March 15 – CompassCare's clinic is attacked for second time, has sign defaced with graffiti in Buffalo, NY
https://www.compasscarecommunity.com/2023/03/antifa-attacks-christian-pro-life-compasscare-in-buffalo-again/

65. April 15 – The Bowling Green Pregnancy Center is defaced with graffiti in Bowling Green, OH
https://www.ohiolife.org/breaking_bowling_green_pregnancy_center_vandalized_by_abortion_group

66. April 19 – Informed Choices clinic is damaged in Iowa City, IA
https://cbs2iowa.com/news/local/icpd-asking-for-help-in-vandalism-case

67. May 10 – JMJ Pregnancy Center has mutilated animal bodies left on property in Orlando, FL

https://www.foxnews.com/politics/florida-pro-life-pregnancy-center-targeted-with-decapitated-chicken-mutilated-lamb-ritualistic-attack

**Other Incidents:**

1. May 2 – Pro-life student organization memorial vandalized in St. Louis, MO
   https://campusreform.org/article?id=19517
2. May 3 – Pro-abortion activists injure two police officers in assault, smash police cars in Los Angeles, CA
   https://www.nbclosangeles.com/news/local/abortion-protest-downtown-la-lapd-officer-injured/2885093/
3. May 4 – Students for Life activists assaulted in Indianapolis protest
   https://studentsforlife.org/2022/05/10/video-abortion-supporters-blm-spokesperson-assault-pro-life-activists-in-indianapolis-protest/
4. May 8 – "Handmaids Tale" disruption and protest at Cathedral of our Lady of the Angels in Los Angeles, CA
   https://twitter.com/Romangod7/status/1523368533119234048
5. May 8 – Pro-abortion feminist calls for killing pro-life Americans, celebrates fire bombing on Twitter
   https://twitter.com/JerryDunleavy/status/1523452628575072256
6. May 9 – Pro-choice demonstrators attack, spit on "Students for Kari" volunteers in Phoenix, AZ
   https://www.thecollegefix.com/watch-pro-choice-demonstrators-attack-spit-on-students-for-kari-volunteers/
7. May 10 – Senator Collins of Maine reports abortion rights message written in chalk outside her home, receives threatening letters and phone calls
   https://www.bostonglobe.com/2022/05/11/metro/sen-collins-reported-abortion-rights-chalk-message-front-maine-house-has-received-threatening-letters-phone-calls/
8. May 11 – St. Patrick's Old Cathedral in New York City receives several bomb threats and arson threats
   https://www.lifenews.com/2022/05/11/abortion-activists-threaten-to-bomb-burn-down-catholic-church/
9. May 14 – Two arrested after woman kicks police officer at pro-choice rally in Boise, ID
   https://www.ktvb.com/article/news/crime/two-arrested-abortion-rallies-boise/277-234aa267-e3c3-40eb-bd94-2ac5070e8fd1
10. May 15 – Chairwoman for Planned Parenthood's Arizona branch bragged about her husband assaulting someone in a "Blacks for Trump" shirt at a "Bans Off Our Bodies" rally
    https://www.lifenews.com/2022/05/18/planned-parenthood-chair-brags-how-her-husband-assaulted-man-in-blacks-for-trump-shirt/
11. May 15 – Woman disrupts Sunday services held by pregnancy center, shouting and hurling objects in Long Beach, CA
    https://www.facebook.com/watch/?v=478468130632657
12. May 26 – Seven students suspended from Hunterdon Central Regional High School in New Jersey after verbally and physically assaulting a student holding a pro-life sign

https://www.ncregister.com/cna/catholic-pro-life-student-attacked-at-public-school-school-criticized-for-lack-of-protection

13. June 4 – Pro-abortion group accosts a Catholic pro-life procession in NYC
https://www.nationalreview.com/news/pro-abortion-protesters-mob-catholic-pro-life-procession/

14. June 6 – Pro-abortion activists strip down to underwear and storm Joel Osteen's church
https://www.lifenews.com/2022/06/06/watch-radical-half-naked-abortion-activists-invade-church-service-to-promote-killing-babies/

15. June 8 – Pro-abortion activist arrested after protestors disrupt Michigan State House meeting in Lansing, MI
https://www.bridgemi.com/michigan-government/activist-arrested-after-abortion-ban-protesters-disrupt-michigan-house

16. June 12 – Three protesters (one partially nude) shout down a priest's sermon and chant slogans at St. Veronica's Catholic Church in Eastpointe, MI
https://www.catholicnewsagency.com/news/251531/nearly-naked-protester-disrupts-mass-in-michigan

17. June 25 – Vermont Statehouse has windows smashed and is defaced with graffiti in Montpelier, VT
https://vtdigger.org/2022/06/25/efbfbcvermont-statehouse-struck-by-abortion-related-vandalism/

18. June 25 – 10 arrests made after 100 people surrounded Dove Medical with destructive intent in Eugene, OR
https://www.foxnews.com/us/oregon-police-arrest-10-outside-pregnancy-center-supreme-court-overturns-roe-v-wade

19. June 26 – Pro-abortion extremist charged with attempted murder of police officer in Los Angeles, CA
https://www.breitbart.com/politics/2022/06/26/lapd-charges-man-with-attempted-murder-during-roe-v-wade-protests/

20. June 27 – Monroe County war memorial, courthouse vandalized with graffiti in Monroe County, IN
https://fox59.com/indiana-news/monroe-county-war-memorial-courthouse-vandalized-with-pro-abortion-rights-messages/

21. July 7 – Alternatives Pregnancy Center is threatened by a man armed with a machete in Sacramento, CA
https://dailycaller.com/2022/07/12/crisis-pregnancy-center-abortion-activists-machete/

22. July 28 – Pro-abortion activists arrested for felony vandalism of artwork in Los Angeles, CA
https://www.artnews.com/art-news/news/abortion-rights-protest-lacma-urban-light-chris-burden-1234635580/

23. July 31 – Riverside County Historic Courthouse is vandalized in Riverside, CA
https://ktla.com/news/protest-for-abortion-rights-results-in-vandalism-to-riverside-county-historic-courthouse-sheriffs-department-says/

24. January 1-2, 2023 – Pro-life billboard defaced with the words "Kill them kids" in Portland, OR
https://www.koin.com/news/portland/anti-abortion-billboard-vandalized-in-portland/

**EXHIBIT R**



**Civil Rights Division**
U.S. Department of Justice



# Special Litigation Section Cases and Matters

[Corrections](#)
[Juvenile Justice](#)
[Disability Rights Docket](#)
[Law Enforcement Agencies](#)
FACE
[Religious Exercise of Institutionalized Persons](#)
[Indigent Defense](#)
[Archives](#) *--closed matters*

# Corrections

## Alabama

- Alabama's State Prisons for Men - Litigation
  [Case Summary](#)  |  [CRIPA Notice Letter (2019)](#)  |  [Cover Letter to CRIPA Notice (2019)](#)  |  [Use of Force CRIPA Notice Letter (2020)](#)  |  [Cover Letter to Use of Force CRIPA Notice (2020)](#)  |  [Complaint (2020)](#)  |  [Amended Complaint (2021)](#)  |  [Attachment A to Amended Complaint (2021)](#)  |  [Second Amended Complaint (2021)](#)

- Julia Tutwiler Prison for Women - Enforcement
  [Case Summary](#)  |  [Findings Letter (2014)](#)  |  [Complaint (2015)](#)  |  [Consent Decree (2015)](#)

- Mobile County Metro Jail - Investigation
  [Case Summary](#)  |  [Findings Letter (2009)](#)

- *Varden, et al. v. City of Clanton* - Statement of Interest
  [Statement of Interest (2015)](#)

- Puerto Rico Police Department - Enforcement
[Case Summary](#) | [Findings Letter (2011, English)](#) | [Findings Letter (2011, Spanish)](#) | [Complaint (2012)](#) | [Settlement Agreement (2013, English)](#) | [Settlement Agreement (2013, Spanish)](#)

## Tennessee

- Memphis Police Department - Investigation
[Case Summary](#)

## Virgin Islands

- Virgin Islands Police Department - Enforcement
[Technical Assistance Letter (2005)](#) | [Complaint (2008)](#) | [Settlement (2009)](#)

## Washington

- Seattle Police Department - Enforcement
[Case Summary](#) | [Findings Letter (2011)](#) | [Complaint (2012)](#) | [Settlement Agreement (2012)](#) | [Order Modifying and Preliminarily Approving Agreement (2012)](#)

# FACE

## Colorado

- *United States v. Scott* - Closed
[Case Summary](#) | [Complaint (2011)](#) | [Memorandum in Support of Motion for Preliminary Injunctive Relief (2011)](#) | [Opposition to Defendant's Motion to Dismiss (2011)](#) | [Consent Decree (2011)](#) | [Opposition to Motion for Permission to Intervene (2011)](#) | [Opposition to Defendant's Renewed Motion to Dismiss (2011)](#) | [Reply to Defendant's Opposition to Motion for Preliminary Injunction (2011)](#) | [Order (2011)](#) | [Motion to Compel Defendant to Produce Documents (2011)](#) | [Motion for Adverse Inferences Against Defendant (2012)](#) | [Motion to Exclude Expert Opinion Testimony (2012)](#) | [Opposition to Defendant's Motion in Limine (2012)](#)

## Connecticut

- *United States v. Scott*

  - District Court Motion to Dismiss Decision Reported at 919 F.Supp. 76 (D. Conn. 1996)

  - District Court Decision Reported at 958 F.Supp. 761 (D. Conn. 1997)

  - District Court Ruling on Motion to Reconsider Reported at 975 F.Supp. 428 (D. Conn. 1997)

- District Court Contempt Decision Reported at 1997 WL 889513 (D.Conn.)

- District Court Modification of Injunction Reported at 1998 WL 241755 (D.Conn.)

- District Court Contempt Decision Reported at 1998 WL 386483 (D.Conn.)

- Court of Appeals Decision Reported at --F.3d --, 1999 WL 570473 (2nd Cir. 1999)

## District of Columbia

- *United States v. Alaw*
  Case Summary  |  Complaint (1998)  |  Injunction Order (2002)  |  Consent Decree (2002)  |
  Injunction Order (Post Appeal 2004)

- *United States v. Retta*
  Case Summary  |  Complaint (2011)  |  Motion to Dismiss (2011)  |  Consent Judgment
  (2013)  |  Order Approving Consent Judgment (2013)

## Florida

- *Holder v. Pine*
  Case Summary  |  Complaint (2010)  |  Order (2012)  |  Settlement (2012)

- *United States v. Zastrow et al.*
  Case Summary  |  Amended Complaint (2024)

## Kansas

- *United States v. Dillard* - Closed
  Case Summary  |  Complaint (2011)  |  Motion for Preliminary Injunctive Relief (2011)  |
  Opposition to Defendant's Motion to Dismiss (2011)  |  Motion to Dismiss Defendant's
  Counterclaims (2012)  |  Opposition to Dismiss Motion for Summary Judgement (2012)  |
  Opposition to Defendant's Motion to Amend Counterclaim (2012)  |  Opposition to
  Defendant's Motion for Reconsideration (2012)  |  Memorandum in Support of Motion to
  Compel (2012)  |  Motion for Privacy Act Protective Order (2012)  |  Response to Defendant's
  Second Motion to Dismiss (2016)  |  Motion to Exclude Evidence of Victim's Personal Medical
  History (2016)  |  Motion to Limit the Scope of Testimony (2016)  |  Verdict (2016)

- *United States v. Burke*
  District Court Decision Reported at 15 F.Supp.2d 1090 (D.Kan. 1998)

## Kentucky

- *Holder v. Hamilton* - Closed
  Case Summary  |  Complaint (2011)  |  Opposition to Defendant's Motion to Strike and
  Motion to Dismiss (2011)  |  Motion to Strike Defendant's Third Party Complaint (2011)  |
  Motion for Summary Judgement (2012)  |  Reply in Support of its Motion for Summary
  Judgement (2012)  |  Motion to Preclude Witness Testimony (2012)  |  Dismissal (2013)

- *United States v. Thomas et al.*
  [Case Summary](#) | [Complaint (2017)](#) | [Motion for Temporary Restraining Order and Preliminary Injunction (2017)](#) | [Order (2017)](#) | [Motion for Leave to Withhold Patient's Identity and Prevent Disclosure of Identifying Information and Records (2017)](#) | [Response in Opposition to Motion to Alter Amend or Vacate Denial of Intervention (2017)](#) | [Opposition to Defendant's Motion for Summary Judgement (2018)](#)

## Mississippi

- *United States v. Charles Roy McMillan*
  [Settlement (2008)](#)

## Missouri

- *United States v. Dinwiddie*
  [Case Summary](#) | [Complaint (1994)](#) | [Order (1996)](#)

## New Jersey

- *United States v. Courney*
  [Case Summary](#) | [Complaint (2022)](#) | [Consent Decree (2022)](#)

- *United States v. Gregg, et al.*
  [Case Summary](#) | [Complaint (2nd Amended 1996)](#)

## Ohio

- *United States v. Citizens for a Pro-Life Society, et al.*
  [Case Summary](#) | [Complaint (2024)](#)

- *United States v. Operation Rescue National*
  [Case Summary](#) | [Alaw Consent Decree and Order (1998)](#) | [Anderson Consent Decree (1998)](#) | [Benhem Consent Decree (1998)](#) | [Mechanic Consent Decree and Order (1998)](#) | [Mechanic Consent Decree (1998)](#) | [Mehaffie Consent Decree and Order (1998)](#) | [Order MSJ and Permanent Injunction (1998)](#) | [Thomas Consent Decree (1998)](#)

- *United States v. Smith*
  [Case Summary](#) | [Order (2009)](#)

## Pennsylvania

- *Gonzales v. Dunkle*
  [Case Summary](#) | [Motion Preliminary Junction (2007)](#)

- *Holder v. Branca*
  Case Summary | Complaint (2009) | Order (2009)

- *Keisler v. Dunkle*
  Complaint (2007) | Order (2007) | Opposition Motion to Dismiss (2007)

- *United States v. Connolly*
  Case Summary | Complaint (2024)

- *United States v. Parente*
  Case Summary | Complaint (2011) | Order (2012)

## Tennessee

- *Femhealth USA, Inc. d/b/a carafem vs. Williams, et al.*
  Statement of Interest (2022)

## Texas

- *Holder v. Gaona*
  Complaint (2010) | Motion to Strike (2010) | Motion to Dismiss First-Amended Counterclaim (2010) | Motion to Dismiss Second-Amended Counterclaim (2010) | Motion to Dismiss Defendant's Counterclaim (2010) | Consent Judgment and Order of Approval (2011)

- *United States v. Brown*
  Case Summary | Consent Decree (1997)

- *United States v. Tomanek*
  Order (1998)

## Washington

- *United States v. Kroack*
  Case Summary | Complaint (2011) | Consent Judgment and Order of Approval (2011)

- *United States v. Smith*
  Court of Appeals Decision Reported at 134 F.3d 373 (6th Cir. 1997)

# Religious Exercise of Institutionalized Persons

- Publications
  Statement on the Institutionalized Persons Provisions of the Religious Land Use and

**EXHIBIT S**





**CA Reproductive Rights Task Force: Quarter 3 Meeting**
**Thursday, July 27, 2023 | 11 AM-12 PM**

Virtual Participation: <u>Zoom</u>

## AGENDA

   I.   Introductions and Welcome

  II.   Review Purpose and Goals

 III.   Review Meeting Minutes (January 2023)

 IV.   Reproductive Rights Task Force Agenda Items

  V.   Closing Remarks

 VI.   Adjourn

**1**

**Repro Rights Task Force Meeting Minutes**

**January 26, 2023**

Attendees:

| | |
|---|---|
| James Toma – DOJ | Julie Wilensky – San Francisco |
| Maggy Krell – DOJ | Kavita Narayan – Santa Clara |
| Renuka George – DOJ | Aaron Israel – Sacramento City |
| Michael Redding – DOJ | Jonathan Raven – Yolo County |
| Clara Levers – DOJ | Sara Eisenberg – San Francisco |
| Caryn Rice – DOJ | Tiffany Tejada-Rodriguez – LA City |
| Lorie Adame – DOJ | Pat Espinoza – San Diego |
| Julie Rau – San Diego | Cynthia Chandler – Alameda County |
| Shanaira Banerjee – LA County | Alana Mathews – Sacramento County |
| Cara Reichard – Oakland | Julius De Guia – San Francisco |
| Mara Elliott – San Diego | Susana Alcala Wood – Sacramento City |
| Selia Warren - Oakland | Diana Becton – Contra Costa County |
| Steven DeSalvo – LA County | |

- Welcome message and introductions.
- Recap of last meeting, covering legislation and what the members can do on a local and statewide level to increase access to care.
- Review some of the bills at state level this past year and any overlap into localities. Any potential gaps in the law, etc.
- AB1242 – sponsored by AG office and creates abortion safeguards and prohibits LE from assisting in an investigation.
  - Mara – What can city officials do to assist?
  - Clara – Peace officer legal force book, we would like local agencies to be review requests critically when receiving requests from other states to investigate as they don't always look like they pertain to abortions.
  - Selia – Is there a resource available for our law enforcement to be able to "communicate with our partners"? How can we make those connections when needed?
  - James – Included bulletin: https://oag.ca.gov/news/press-releases/attorney-general-bonta-issues-guidance-protect-out-state-patients-seeking
  - https://oag.ca.gov/system/files/media/2022-dle-13.pdf
- AB2223 – Protects against criminalization for pregnancy loss
- Bill?
- SB1245 – LA specific
- SB1375 – related to NPs and their ability to provide reproductive healthcare
- AB2626 – protects medical licenses for abortion care
- AB2134 – healthy equity grant program
- AB1918 – CA repro health services corps
- AB245 – Abortion accessibility act
- https://abortion.ca.gov/your-rights/state-action/
- Clinic security:

**2**

- o Maggy – What are potential issues with the Face Act and are there any potential solutions?
- o Diana Becton – do we need to think about legislation that would amend our penal code around getting search and arrest warrants?
- o Susana Alcala Wood – running into restrictions around ability to restrict noise. There is an ability to keep them a certain number of feet away, but we cannot stop the noise that is interfering with patient care.
  - ▪ Clara – are officers citing them for disturbing the peace? There are several other laws that can be applied that will flush out this issue.
  - ▪ Aaron Israel– utilize private right of action
- o Renuka – Once the arrest happens, what does that mean in terms of deterrence?
  - ▪ Diana – just being able to charge someone may not be enough to truly deter someone.
- o Cynthia – Have folks discussed ordinances allowing people to sue for false advertising against pregnancy resource centers?
- o Selia – What about modifying our civil harassment and work place violence prevention restraining order laws to address this behavior (if needed) or query whether these laws could be used for this purpose. It wouldn't help for the first timers but could catch repeat offenders.
- o Aaron – Sac County jail often does not hold misdemeanor arrestees.
- o Alana – willing to have a more in depth conversation after this meeting.
- Cynthia Chandler – working on repro law and policy for 30 years and currently working under DA Price. Wanting to discuss ordinances that are using civil remedies instead of criminal. Would like to discuss suing for false advertising against pregnancy resource centers. Because they aren't medical centers they don't need to comply with HIPAA.
  - o Legal Voice is an agency that has assisted in these ordinances
    - ▪ It would need to be a county ordinance as opposed to a city ordinance
  - o Julie – SF challenged this law and the supreme court held that it was constitutional
  - o Zoe – Oakland also uses this ordinance.
  - o Tiffany – Prop 64 standing requirement removes the obstacle of whether or not someone used any money. This works when you have a PRA.
- Tiffany – what about the abortion pill reversal?
  - o Julie – SF has been interested in this as well and would like to collaborate after meeting
  - o Renuka – we are  not seeing sites making claims on the safeness of the pills, so there is not a lot of information out there and cpcs should not be making statements about the safety of them, but there is no way of knowing what is said in appointments.
  - o Cynthia - https://www.abortionpillreversal.com/abortion-pill-reversal/faq
- Renuka – there is some interest on creating model language around the face act and cpcs, bubble zone ordinances (the more specific and local the better).
  - o Should we create smaller working groups to tackle these issues before next meeting?
  - o Next meeting April and Caryn to send out a survey on best dates
- Final thoughts
  - o Alana – Send an email with smaller working groups that are wanted and 2-3 objectives between now and next meeting.
  - o Susana – Can we create a drop box to put all these docs?

**BACKGROUND: The DOJ California Reproductive Rights Task Force**

**Mission**

The DOJ California Reproductive Rights Task Force mission is to protect access to abortion and other reproductive healthcare in California. To accomplish this mission, the Task Force will coordinate efforts between the California Department of Justice (DOJ) and local law enforcement agencies such as District Attorneys, County Counsel and City Attorneys. The Task Force will also collaborate with entities integral to protecting access to reproductive rights, such as federal and state government agencies and reproductive rights stakeholders.

**Membership**

The DOJ will lead the Task Force, and the Senior Assistant Attorney General of the DOJ Healthcare Rights and Access section (or her designee) will chair the Task Force. Membership will include legal staff from DOJ, district attorneys, county counsel and city attorneys. We anticipate starting with a group of 10-15 members that meets every 2-3 months, comprised of a variety of geographic locations, population and access to reproductive care. If the group grows larger than 15 members, smaller working groups will be formed to tackle the goals listed below. We will keep an open line of communication with other stakeholders such as the Governor's Office, state and federal agencies, local law enforcement, legislators, providers, nonprofits, and academic centers; and will set up quarterly to bi-annual meeting with these groups.

**Goals and Deliverables**

The Task Force goals are to protect access to abortion on local-statewide issues, which may include:

- Protecting access to abortion clinics, and prosecuting crimes of intimidation and harassment at clinics (FACE Act) and civil enforcement actions;

- Protecting consumers from deceptive or unlawful business practices;

- Providing assistance regarding model ordinances on bubble zones to protect access to clinics;

- Providing information regarding new reproductive rights laws, consulting on implementation, and considering additional legislation to fill any gaps;

- Reviewing and staunching flow of abortion related healthcare information out of the state of California, that could be used against women seeking abortions in California (e.g., electronic health records);

- Providing technical assistance regarding state legislation and local ordinances to protect providers and patients

- Reviewing land use issues regarding reproductive healthcare facilities and consider state or local legislation to ensure facilities are not discriminated against; and

- Educating local governments and public stakeholders.